## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **ALONZO LYDELL BURGESS,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **CASE NO. 3:07-CV-0474-SLB-JEO** |
| | ) | |
| **RICHARD ALLEN, Commissioner of** | ) | |
| **the Alabama Department of Corrections,** | ) | |
| | ) | |
| Respondent. | ) | |

### MEMORANDUM OPINION

This action seeks habeas corpus relief with respect to Alonzo Lydell Burgess's state court conviction and death sentence on a charge of capital murder. (*See* doc. 15.) Upon consideration of the pleadings and the record of the state-court proceedings, the court finds that Burgess's Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody under Death Sentence, (doc. 15), is due to be denied and his claims dismissed.

### I. THE OFFENSE CONDUCT

The following summary of the evidence relevant to the offense is taken from the opinion of the Alabama Court of Criminal Appeals on direct appeal. *Burgess v. State*, 723 So. 2d 742 (Ala. Crim. App. 1997).

> Alonzo Lydell Burgess was convicted by a Jefferson County jury of the attempted murder of LaRico Devon Long, [in violation of] § 13A-4-2, Ala.Code 1975, and of the capital murder of Shelia Nnodimele, Alexis Nnodimele, and Latoria Long by one act or pursuant to one scheme or course of conduct, [in violation of] § 13A-5-40(a)(10), Ala.Code 1975. The jury recommended, by an 8-4 vote, that Burgess receive a sentence of life

imprisonment without parole.  The trial court sentenced Burgess to death.
Burgess appeals from the capital murder conviction and death sentence.  We
affirm.

The trial court's sentencing order summarized the evidence presented
at the guilt phase as follows:

> "The Court finds from the evidence introduced at trial
> that the defendant, Alonzo Lydell Burgess, was living with the
> deceased, [Shelia] Nnodimele, and her three children, deceased,
> Latoria Long, age 14 years, deceased, Alexis Nnodimele, age 8
> years, and LaRico Long, age 2 ½ years on or about January 28,
> 1993, and January 29, 1993, at her home on Brotherton Street in
> Cherokee, Alabama.  The Court finds that defendant had been
> living with Shelia Nnodimele for some time and that they had
> had a stormy relationship with the defendant physically abusing
> the deceased, Shelia Nnodimele, and with the defendant having
> a bad relationship with the oldest daughter, Latoria Long,
> deceased.  The Court finds from the evidence that the deceased,
> Shelia Nnodimele, and her three children had had to move out
> of their own home on several occasions during Shelia
> Nnodimele's relationship with the defendant due to his abuse.
> The Court further finds from the evidence that the defendant,
> Alonzo Lydell Burgess, was dependent on deceased, Shelia
> Nnodimele, for furnishing him money (at the time, she worked,
> and he did not), for a roof over his head, his food and for
> transportation.  The Court further finds that the defendant,
> Alonzo Lydell Burgess, had a crack cocaine habit at the time in
> question and that he would frequent the place of employment of
> deceased, Shelia Nnodimele, especially on paydays (Thursdays)
> in order to get her check so he could support his habit.

> "The Court further finds that the two older children,
> Latoria Long and Alexis Nnodimele, were good students and
> had not missed any full days of school in the 1992-1993 school
> year prior to January 29, 1993.  The Court finds that the last time
> these two girls were seen alive was in the afternoon at the end
> of school on January 28, 1993.  The Court further finds that on
> the evening of January 28, 1993, the defendant was seen by
> various witnesses at Shelia Nnodimele's place of employment

2

with another woman at the beginning of Ms. Nnodimele's shift, and that he did not get her paycheck even though it was payday. The Court finds that he called her at least twice and the first time he called, Alvin Powers, her co-worker, who answered the telephone, did not tell Shelia Nnodimele who was calling, but he knew it was the defendant.  She answered the telephone.  The second time defendant called, Jessie Freeman, her co-worker answered the telephone and he told Shelia Nnodimele who was calling and she refused to answer to telephone.

"The Court finds from the evidence that the defendant killed the two girls between the time they were last seen at school and the time they were found on the morning of January 30, 1993.  More specifically, the Court finds from the evidence that he beat the two girls to death with a bumper jack assembly post and strangled Latoria Long with a ligature on the night of January 28, 1993, or the early morning hours of January 29, 1993, prior to 7:15 a.m. when Shelia Nnodimele, deceased, returned to her home from work.

"The Court further finds that Shelia Nnodimele was last seen alive the morning of January 29, 1993.  The Court further finds that the defendant killed Shelia Nnodimele on the morning of January 29, 1993, by beating her on or about the head with a bumper jack assembly post and by strangling her with a ligature and by suffocating her when she returned home from work. When she was found dead, she was wearing the clothes she had been wearing when she was last seen at work by one of the co-workers.  Dr. Kenneth Warner testified that the cause of death of Shelia Nnodimele was trauma to her head, strangulation or suffocation or a combination of the three and that the manner of death was homicide; . . . he testified that the cause of death of Latoria Long was cranial cerebral trauma (trauma to her head) and strangulation by ligature, and that the manner of her death was homicide, and . . . he testified that the cause of Alexis Nnodimele's death was cranial cerebral trauma (trauma to her head) and that the manner of her death was homicide.  He further testified that the presence of cerebral edema in Alexis Nnodimele indicated that she died slowly, because a person has to be alive in order for edema to appear.  He testified that all

3

three deceased suffered extensive fractures to their skulls and neck[s].  With respect to the neck injuries found by Dr. Warner on Shelia Nnodimele and Latoria Long, he testified they were identical.  He further testified that the victims received the blow to the top of their heads which was of such magnitude that it caused a fracture to the base of their skulls.  Likewise did Dr. Warner find an extensive fracture to the base of the skull on Alexis Nnodimele, and he testified that her injuries were consistent with those of her mother and sister.  The Court further finds from the evidence that defendant on January 29, 1993, was seen by various witnesses, either wanting to borrow money or pawning items belonging to the deceased victims, and that he appeared nervous, fidgety, and big-eyed.

"The Court further finds that after defendant killed the three victims, he attempted to commit suicide on January 30, 1993,[1] and left two notes indicating the reasons for the killings.[2] However, the Court also finds from the evidence that defendant's misuse of the deceased, Shelia Nnodimele's money, house and vehicle was in the process of being terminated by her immediately prior to her death."

---

[1]The Court of Criminal Appeals found:

The State's evidence at Burgess's trial tended to show that on January 30, 1993, Burgess called out of the door of Shelia Nnodimele's mobile home to the neighbors across the road and asked them to come over to the mobile home. . . . As the neighbors approached Shelia's trailer they saw that Burgess was holding a shotgun.  Before they could reach the trailer Burgess pointed the shotgun at his chest and fired.

*Burgess v. State*, 962 So. 2d 272, 276-77 (Ala. Crim. App. 2005).

[2]Burgess wrote two suicide notes that were found in Shelia Nnodimele's house.  In the first, he stated: "The reason for this is because the relationship was incomplete.  I didn't really have the mother or father on my side and at first I really tried to get to know them. Also look in the bedrooms."  (R. Vol. 3, Tab. 4 at M-60).  In the second, he stated:  "The reason for this is because of people not accepting me and I tried to get to know them."  (*Id*. at M-62.)

*Burgess*, 723 So. 2d at 747-49 (footnotes added).

## II.  THE SENTENCING

Since Petitioner raises numerous claims upon which make specific reference to the factual and legal findings of the trial judge's sentencing order will be imperative, the pertinent portions of the order resulting in Burgess's death sentence, as well as the Alabama Court of Criminal Appeals' independent review of that sentence, are set out below.

## A.  THE SENTENCING ORDER

In the Order of the Court in Imposition of Sentence, the trial court found:

> The Court considers the aggravating circumstances as set out and enumerated in Section 13A-5-49 of the Code of Alabama of 1975 as amended.[3]

---

[3]The current version of Section 13A-5-49 provides:

Aggravating circumstances shall be the following:

(1)  The capital offense was committed by a person under sentence of imprisonment;

(2)  The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person;

(3)  The defendant knowingly created a great risk of death to many persons;

(4)  The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping;

(5)  The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

5

A.  The Court finds from the evidence introduced at the punishment phase before the jury that the defendant, Alonzo Lydell Burgess, was a person under a sentence of imprisonment.  In fact the Court finds that defendant [pled] guilty to the offense of harassing communications in violation of City Ordinance #1006 for the City of Cherokee, Alabama and that he was under a sentence of six months incarceration in the County Jail suspended for two years.  Said conviction was dated  May 8, 1992.  The complainant was the deceased [Shelia] Nnodimele's father and the victim [was] her mother.  Although the actual jail sentence exceeded the maximum sentence which may be imposed on a conviction of harassing communications, the City Court was authorized to impose a period of suspension of two years.  The Court finds that this is an aggravating circumstance pursuant to Section 13A-5-49(1) of the Code of Alabama, as amended and the Court has considered said aggravating circumstance.

The Court finds from the evidence introduced at the punishment phase of the trial before the jury that the defendant, Alonzo Lydell Burgess, was previously convicted of a felony involving the use or threat of violence to the person, namely two counts of felony kidnapping, which convictions were in 1988 in the Circuit Court of Tishomingo County, Mississippi.  The defendant received two 10 year sentences which ran concurrent, with the defendant to

---

(6)  The capital offense was committed for pecuniary gain;

(7)  The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws;

(8)  The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses;

(9)  The defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct; or

(10)  The capital offense was one of a series of intentional killings committed by the defendant.

Ala. Code § 13A-5-49.  Subsections (9) and (10) were added in 1999, and, therefore, are not applicable to this matter.

serve six years of said sentence and the remaining four years suspended.  The Court finds that this is an aggravating circumstance pursuant to section 13A-5-49(2) of the Code of Alabama, as amended, and the Court has considered said aggravating circumstance.

> . . .

B.  The Court now proceeds to consider the mitigating circumstances as set out and enumerated in Section 13A-5-51, Code of Alabama, as amended.[4]

No additional evidence was presented by the State or by the defense at the sentence hearing before this court.  Both the State and the defense counsel presented arguments. A presentence investigation report was furnished [to] the

---

[4]Section 13A-5-51 provides:

Mitigating circumstances shall include, but not be limited to, the following:

(1)  The defendant has no significant history of prior criminal activity;

(2)  The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;

(3)  The victim was a participant in the defendant's conduct or consented to it;

(4)  The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor;

(5)  The defendant acted under extreme duress or under the substantial domination of another person;

(6)  The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and

(7)  The age of the defendant at the time of the crime.

Ala. Code § 13A-5-51.

Court and the parties prior to this hearing in accordance with Section 13A-5-47, Code of Alabama.

1.   The Court finds from the evidence that the defendant has a significant history of prior criminal activity.  The defendant has been convicted of 2 counts of kidnapping prior to these three murders.  The defense counsel stated that the original charges in Mississippi were for capital offenses.  Defendant [pled] guilty to 2 counts of kidnapping.  The Court finds that at least one of the victims in those cases was a girl under 14 years [old].  The defendant has been convicted of the offense of harassing communications, where the deceased victims' family were the victims, and was on a suspended sentence when these three killings occurred.  The Court further finds from the pre-sentence report that even after that suspended sentence was imposed, defendant violated the conditions of his probation by assaulting [Shelia] Nnodimele, deceased.  That assault took place less than one month after the defendant was sentenced in the City Court of Cherokee, Alabama.  Accordingly, the Court does not consider the mitigating circumstance listed in section 13A-5-5l(1), Code of Alabama, the Court finding that it does not exist.

2.   The Court finds from the evidence that the capital offense was not committed by the defendant while he was under the influence of extreme mental or emotional disturbance.  The Court finds from the evidence that although the defendant was a crack cocaine user during the month of January, 1993, and depended on [Shelia] Nnodimele's paycheck to support his habit, he was not so mentally, or emotionally disturbed at the time period from the evening of January 28, 1993 until the late morning of January 29, 1993 that he did not have the presence of mind to go to his neighbor, Donna Cosby's house and call [Shelia] Nnodimele and tell her to catch a ride home.  When she came home shortly thereafter, on or about 7:15 a.m. on January 29, 1993, according to William (Big) Smith, defendant seemed nervous, but all he did was ask him for some cigarettes.  William Smith observed the defendant for some 3-4-5 minutes and he did not testify that defendant appeared mentally or emotionally disturbed at that time.  The Court further finds from the testimony of Ronald Chapman that when he observed the defendant on the evening of January 28, 1993 at [Shelia] Nnodimele's place of employment he had a conversation with the defendant about whether or not defendant could borrow some gas money from Mr. Chapman to get the woman home, who was sitting with defendant in [Shelia] Nnodimele's car, and when he refused to let defendant have any money, defendant [had] the presence of mind to plan with the woman to transfer the liability for this passenger to Mr. Chapman by placing her in his

8

car.  There was no testimony from Mr. Chapman that defendant was mentally or emotionally disturbed at that time interval.  Mr. Chapman testified that on other occasions [he had] seen defendant under the influence of drugs as well as "shaking like a leaf" but no such observation was made by this witness on the late evening of January 28, 1993.  Although there was evidence that defendant's mother suffer[s] from a mental illness, and testimony from Dr. John R. Goff that defendant suffer[s from] a cyclothermic disorder, which he characterized as a mood disturbance, there was no evidence that the defendant was especially manic, nor especially depressed during the time period in question.  Accordingly, the Court does not consider the mitigating circumstance listed in Section l3A-5-51(2), Code of Alabama, the Court finding that said mitigating circumstance does not exist in this case.

3.  The Court finds from the evidence that the victims were not participants in defendant's conduct [nor] consented to it.  Although an argument was made by defense counsel that there was no evidence of fighting, that evidence of lack of fighting or lack of a struggle shows that the victims were either asleep when they were attacked or trusted the defendant, and therefore did not expect the attack, not that they consented to it.  Therefore, the Court finds that the mitigating circumstance listed in Section 13A-5-51(3), Code of Alabama, does not exist, and the Court does not consider it.

4.  The Court does not find from the evidence that the defendant was an accomplice in a capital offense committed by another person and that his participation was relatively minor.  Therefore, the Court finds that the mitigating circumstance listed in Section 13A-5-51(4), Code of Alabama, does not exist, and the Court does not consider it.

5.  The Court does not find that the defendant acted under the substantial domination of another person.  Further, the Court does not find that the defendant acted under extreme duress.  Although the Court finds from both the psychological evaluations of the defendant and the testimony of Dr. Goff, as well as from the defendant's personal statement as it appears in the presentence investigation report, that the defendant had a crack cocaine dependency at the time period in question, and that his drug seeking behavior might have been a motivational factor for the three killings, eye witnesses who saw defendant in or about the time period in question, January 28, 1993 until the morning of January 29, 1993, and who knew defendant, did not testify that defendant looked or acted like he was under the influence of drugs. It was not until after the three killings that defendant was seen by various witnesses as

9

being wide-eyed, fidgety and very nervous. Dr. Maier's report also indicates that any drug seeking behavior on the part of defendant was quite likely during the hours after the killings, but before the suicidal act. Therefore, the Court finds that the mitigating circumstance listed in Section 13A-5-51 (5) Code of Alabama, does not exist, and, the Court does not consider it.

6.  The Court does not find from the evidence that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Although there was scientific evidence that defendant suffers from a mood disorder, that he is of low intelligence, that he grew up in a dysfunctional home, was crack dependent and there had always been violence in his life, Dr. Maier stated in his report: "I do not see any clear relevance to symptoms of mental illness, nor is his below average intelligence low enough to suspect an inability to distinguish right from wrong. Defendant's effort to kill himself also suggests fright and an awareness of wrong doing . . . . Further, defendant's manner and method of attacking the child victims, his attacking the children first while their mother was away and no one [was] likely to be around, also suggests that defendant appreciated the criminality of his conduct. Accordingly, the Court finds that the mitigating circumstance listed in Section 13A-5-51(6) Code of Alabama, does not exist, and the Court does not consider it.

7.  The Court does find that the defendant was 26 years old at the time of the commission of the crime, and although that is not very young, that, combined with defendant's low intelligence, indicate[s] immaturity on the part of defendant. Therefore, the Court finds that the mitigating circumstance listed in Section 13A-5-51(7), Code of Alabama, does exist, and the Court does consider it.

8.  The Court does find that the jury's recommendation is a mitigating factor and the Court has considered said mitigating factor at this sentence hearing. However, the jury was allowed to hear testimony regarding the defendant being raised in a dysfunctional family, that he was physically abused by his uncles, that they were unkind to him and that he was borderline mentally retarded as well as suffering from a mood disorder. Further the jury heard evidence that defendant tried to commit suicide shortly after the killings. As stated above, the Court finds that defendant's dysfunctional family life, his mood disorder, his uncles' abuse and his attempted suicide are not mitigating factors.

9.  The Court finds that the defendant's remorse, as found by Dr. Maier[,] is a mitigating factor and does consider it.

10.  The Court does not find any other mitigating factors.

The Court having considered the aggravating circumstances as they were proven, that the capital offense was committed by a person under sentence of imprisonment, and that the defendant was previously convicted of a felony involving the use or threat of violence to the person, and the following mitigating circumstances [–] namely[,] the defendant's age, the jury recommended sentence of life imprisonment without parole and defendant's remorse as found by Dr. Maier [–] and . . . weighing these, the Court finds that the aggravating circumstances outweigh the mitigating circumstances outlined above.  Killing three human beings, two of whom were children, intentionally, and deliberately, when taken together with defendant's previous conviction of a felony involving threats of violence to at least one child under 14 years of age, evidences a total and complete disregard for the value of human life.

Therefore, on this the 21st day of March, 1994, with the defendant, Alonzo Lydell Burgess, being present, and having been convicted by a jury of capital murder and the Court having weighed the aggravating circumstances against the mitigating circumstances and factors and the Court having found that the aggravating circumstances outweigh the mitigating circumstances and factors;

It is therefore ORDERED, ADJUDGED, and DECREED by the Court, and it is the judgment of this Court and its sentence by law that the defendant, Alonzo Lydell Burgess, suffer death by electrocution.

(R. Vol. 2 at 276-283 [footnotes added].)

## B.   INDEPENDENT REVIEW OF SENTENCE ON DIRECT APPEAL BY THE ALABAMA COURT OF CRIMINAL APPEALS

Pursuant to Alabama law, the Alabama Court of Criminal Appeals independently examined and affirmed the trial court's sentencing determination.  *Burgess v. State*, 723 So. 2d at 769-70.  It held:

In accordance with the requirements of § 13A-5-53, Ala. Code 1975, we have reviewed the record of proceedings for any error that adversely affects Burgess's rights, and we have found none. We have also determined that the trial court properly found two aggravating circumstances: (1) that the capital offense was committed while Burgess was under a sentence of imprisonment; and (2) that Burgess had previously been convicted of a felony involving the use or threat of violence. The trial court found that the appellant's age was a statutory mitigating circumstance. The trial court found the jury's recommended sentence of life imprisonment without parole and Burgess's remorse to be nonstatutory mitigating circumstances. The court found no other mitigating circumstances to exist. The evidence supports the trial court's findings with regard to the aggravating and mitigating circumstances.

In accordance with § 13A-5-53(b), we have reviewed the propriety of the death sentence. The trial court found that the aggravating factors outweighed the mitigating factors and wrote, "Killing three human beings, two of whom were children, intentionally and deliberately, when taken together with defendant's previous conviction of a felony involving threats of violence to at least one child under 14 years of age, evidences a total and complete disregard for the value of human life." There is no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances leads us to conclude that the trial court's sentence of death was the appropriate sentence in this case. We also find that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *Williams v. State*, 710 So.2d 1276 (Ala.Cr.App.1996).

For all of the foregoing reasons, we affirm the trial court's judgment.

*Burgess*, 723 So. 2d at 769-70.

### III.  **PROCEDURAL HISTORY**

On March 1, 1994, Alonzo Burgess was found guilty of capital murder. A penalty hearing followed and the jury, by a vote of 8-4, recommended that he be sentenced to life without parole. A formal sentencing hearing as required by Alabama Code § 13A-5-47 was

12

conducted on March 21, 1994.  Thereafter, the trial court judge sentenced Burgess to death.

Burgess appealed his conviction and sentence to the Alabama Court of Criminal Appeals.  On August 22, 1997, that court entered a published opinion affirming Burgess's conviction and death sentence.  *See Burgess*, 723 So. 2d at 747.  The Supreme Court of Alabama affirmed the conviction and sentence on August 22, 1998, finding no reversible error, plain or otherwise.  *See Ex Parte Burgess*, 723 So. 2d 770, 773 (Ala.1998).  The United States Supreme Court denied Burgess's petition for writ of certiorari on April 5, 1999.  *See Burgess v. Alabama*, 526 U.S. 1052 (1999).

Following the Supreme Court's denial of his petition for writ of certiorari, Burgess filed a petition for relief from judgment pursuant to Rule 32 of the Alabama Rules of Criminal Procedure on March 15, 2000.  (R. Vol. 27, Tab. 53.)  An order dismissing part of Burgess's original petition was entered on September 25, 2000.  (R. Vol. 37, Tab. 84.)  He filed an amended petition on February 20, 2002.  (R. Vol. 28, Tab. 63.)  The Circuit Court of Colbert County held an evidentiary hearing on February 25, 2002, (R. Vol. 33, Tab. 71 at 1-66), and, on January 17, 2003, the court entered an order denying the amended petition.  (R. Vol. 37, Tab. 85.)

Burgess appealed from the decision denying his Rule 32 petition, and on September 30, 2005, the Alabama Court of Criminal Appeals affirmed the Rule 32 court's decision.  *Burgess*, 962 So. 2d at 300.  An application for rehearing was granted, after which the

decision of the circuit court was affirmed.  *See id*. at 300-01.  The Supreme Court of Alabama denied certiorari review on February 23, 2007.  (R. Vol. 37, Tab. 87.)

Shortly thereafter, on March 14, 2007, Burgess filed a Petition for Writ of Habeas Corpus by Prisoner in State Custody under Death Sentence in this court. (Doc. 1.)  On June 27, 2008, he filed his Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody under Death Sentence.  (Doc. 15.)

### IV.  <u>THE SCOPE OF FEDERAL HABEAS REVIEW</u>

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 780 (2011). "Judges must be vigilant and independent in reviewing petitions for the writ, a commitment that entails substantial judicial resources.  Those resources are diminished and misspent, however, and confidence in the writ and the law it vindicates undermined, if there is judicial disregard for the sound and established principles that inform its proper issuance." *Id*.  "The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Id*. at 783.

Pursuant to 28 U.S.C. § 2254(a), a federal district court is prohibited from entertaining "[a]n application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court" unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States."  In other words, this court's review

of habeas claims is limited to federal constitutional questions.  Claims pertaining solely to

questions of state law fall outside the parameters of this court's authority to provide relief

under § 2254.  Thus, unless otherwise expressly stated, use of the word 'claim' in this

opinion presupposes a claim of federal constitutional proportion.

## A.     EXHAUSTION AND PROCEDURAL DEFAULT

Prior to seeking relief in federal court from a state court conviction and sentence, the

habeas petitioner is required to present his federal claims to the state court and to exhaust all

of the state's available procedures.   28 U.S.C. § 2254(b)(1)(A).   The purpose of this

requirement is to ensure that state courts are afforded the first opportunity to correct federal

questions affecting the validity of state court convictions.  As explained by the Supreme

Court:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on
> federal court relitigation of claims already rejected in state proceedings.  Cf.
> *Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996)
> (discussing AEDPA's "modified res judicata rule" under § 2244).  It preserves
> authority to issue the writ in cases where there is no possibility fairminded
> jurists could disagree that the state court's decision conflicts with this Court's
> precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas
> corpus is a "guard against extreme malfunctions in the state criminal justice
> systems," not a substitute for ordinary error correction through appeal.
> *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560
> (1979)(Stevens, J., concurring in judgment).  As a condition for obtaining
> habeas corpus from a federal court, a state prisoner must show that the state
> court's ruling on the claim being presented in federal court was so lacking in
> justification that there was an error well understood and comprehended in
> existing law beyond any possibility for fairminded disagreement.
>
> The reasons for this approach are familiar.  "Federal habeas review of
> state convictions frustrates both the States' sovereign power to punish

offenders and their good-faith attempts to honor constitutional rights."
*Calderon v. Thompson*, 523 U.S. 538, 555-556, 118 S. Ct. 1489, 140 L. Ed. 2d
728 (1998)(internal quotation marks omitted).  It "disturbs the State's
significant interest in repose for concluded litigation, denies society the right
to punish some admitted offenders, and intrudes on state sovereignty to a
degree matched by few exercises of federal judicial authority." [*Harris v.*]
*Reed*, 489 U.S. [255,] 282, 109 S. Ct. 1038 [(1989)](KENNEDY, J.,
dissenting).

Section 2254(d) is part of the basic structure of federal habeas
jurisdiction, designed to confirm that state courts are the principal forum for
asserting constitutional challenges to state convictions.  Under the exhaustion
requirement, a habeas petitioner challenging a state conviction must first
attempt to present his claim in state court.  28 U.S.C. § 2254(b).  If the state
court rejects the claim on procedural grounds, the claim is barred in federal
court unless one of the exceptions to the doctrine of *Wainwright v. Sykes*, 433
U.S. 72, 82-84, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977), applies.  And if the
state court denies the claim on the merits, the claim is barred in federal court
unless one of the exceptions to § 2254(d) set out in §§ 2254(d)(1) and (2)
applies.  Section 2254(d) thus complements the exhaustion requirement and
the doctrine of procedural bar to ensure that state proceedings are the central
process, not just a preliminary step for a later federal habeas proceeding, *see
id.*, at 90, 97 S. Ct. 2497.

*Harrington*, 131 S. Ct at 786-87.

If a petitioner fails to raise his federal claim to the state court at the time and in the

manner dictated by the state's procedural rules, the state court can decide not to review the

claim on the merits because the claim is procedurally defaulted.  Usually, if the last state

court to examine a claim explicitly finds that the claim is defaulted because the petitioner has

failed to follow some state procedural rule, then federal review of the claim is also precluded

pursuant to federal procedural default principles.  "If the state court rejects the claim on

procedural grounds, the claim is barred in federal court unless one of the exceptions to the

doctrine of *Wainwright v. Sykes*, 433 U.S. 72, 82-84, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977),

applies." *Harrington*, 131 S. Ct. at 787.  Exceptions to the procedural default doctrine

include:  (1) when the state procedural rule is not "firmly established and regularly

followed;" (2) when the petitioner has "good cause" for not following the state procedural

rule **and** he was "prejudiced" by not having done so; and (3) when the federal court's failure

to consider the petitioner's claims will result in a "fundamental miscarriage of justice."  *See*

*Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see also Coleman*

*v. Thompson*, 501 U.S. 722, 749-50 (1991); *Murray v. Carrier*, 477 U.S. 478, 496 (1986);

*Smith v. Murray*, 477 U.S. 527, 537 (1986); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th

Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional

violation has probably resulted in the conviction of one who is actually innocent.'")(quoting

*Schlup v. Delo*, 513 U.S. 298, 327 (1995)(quoting *Carrier*, 477 U.S. at 496)).

### 1.  Adequate and Independent State Ground Doctrine

As explained by the Supreme Court:

> "A federal habeas court will not review a claim rejected by a state court
> 'if the decision of [the state] court rests on a state law ground that is
> independent of the federal question and adequate to support the judgment.'"
> [*Beard v.*] *Kindler*, 558 U.S., at  ___, 130 S. Ct. [612,] 615 [(2009)](quoting
> *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L. Ed. 2d 640
> (1991)).  The state-law ground may be a substantive rule dispositive of the
> case, or a procedural barrier to adjudication of the claim on the merits. See
> [*Wainwright v.*] *Sykes*, 433 U.S. [72,] at 81-82, 90, 97 S. Ct. 2497 [(1977)].

> Ordinarily, a state prisoner seeking federal habeas relief must first
> "exhaus[t] the remedies available in the courts of the State," 28 U.S.C. §
> 2254(b)(1)(A), thereby affording those courts "the first opportunity to address

and correct alleged violations of [the] prisoner's federal rights," *Coleman*, 501 U.S., at 731, 111 S. Ct. 2546.  The adequate and independent state ground doctrine furthers that objective, for without it, "habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court." *Id*., at 732, 111 S. Ct. 2546.  Accordingly, absent showings of "cause" and "prejudice," see *Sykes*, 433 U.S., at 84-85, 97 S. Ct. 2497, federal habeas relief will be unavailable when (1) "a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement," and (2) "the state judgment rests on independent and adequate state procedural grounds." *Coleman*, 501 U.S., at 729-730, 111 S. Ct. 2546.

. . .

To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed". *Kindler*, 558 U.S., at ___, 130 S. Ct., at 618 (internal quotation marks omitted).  "[A] discretionary state procedural rule," we held in *Kindler*, "can serve as an adequate ground to bar federal habeas review."  *Ibid*.  A "rule can be 'firmly established' and 'regularly followed,'" *Kindler* observed, "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Ibid*.

*Walker v. Martin*, ___ U.S. ___, ___,  131 S. Ct. 1120, 1127-28 (2011)(footnote omitted).

Whether or not a state procedural rule is "adequate and independent" so as to have a preclusive effect on federal review of a claim "'is itself a federal question.'" *Lee v. Kenna*, 534 U.S. 362, 375 (2002)(quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).   A state procedural rule is "independent of the federal question" when it "rest[s] solidly on state law grounds [that are] not intertwined with an interpretation of federal law." *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001)(quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).  To be considered "adequate" to support the state-court decision, the state procedural rule must be both "firmly established and regularly followed." *Lee,* 534 U.S. at 376 (quoting

*James v. Kentucky*, 466 U.S. 341, 348 (1984).  In other words, the rule must be "clear [and]

closely hewn to" by the state for a federal court to find it to be adequate.  *James*, 466 U.S.

at 345.  This does not mean that the procedural rule must be applied rigidly in every instance,

or that the occasional failure to apply the rule eliminates its "adequacy."  Rather, the

"adequacy" requirement means that the procedural rule "must not be applied in an arbitrary

or unprecedented fashion."  *Judd,* 250 F.3d at 1313.

     If the procedural rule is adequate to support the state-court decision, then the federal

court will not review the merits of the claim.  If, however, the rule is not firmly established,

or if it is applied in an arbitrary, unprecedented, and manifestly unfair fashion, the federal

court will review the claim, de novo, on its merits.  *Card*, 911 F.2d at 1517.

     In some circumstances, the doctrines of procedural default and exhaustion intertwine.

For instance, if the petitioner did not exhaust his federal claims, the district court may dismiss

the claim without prejudice or stay the case to allow the petitioner the chance to exhaust his

state remedies.  However, "if it is clear from state law that any future attempts at exhaustion

[in the state court] would be futile" under the state's own procedural rules, the federal court

may find that the claim is "procedurally defaulted, even absent a state court determination

to that effect[.]"  *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999)(citing, 404 U.S. 270,

276 (1971) and *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir.), *cert. denied*, 525 U.S.

963 (1998)).

### 2.  The "Cause and Prejudice" Standard

As the "cause *and* prejudice" standard clearly is framed in the conjunctive, a petitioner must prove both parts.  The Supreme Court has held:

> In procedural default cases, the cause standard requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts" to raise the claim in state court.  *Murray v. Carrier*, 477 U.S. [478], 487, 106 S. Ct. [2639], at 2645 [(1986)].  Objective factors that constitute cause include "'interference by officials'" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." *Ibid*.  In addition, constitutionally "[i]neffective assistance of counsel . . . is cause." *Ibid*.  Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default. *Id*., at 486-488, 106 S. Ct., at 2644-45.  Once the petitioner has established cause, he must show "'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168, 102 S. Ct. 1584, 1594, 71 L. Ed. 2d 816 (1982).

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991); s*ee also Carrier*, 477 U.S. at 488-89 ("Ineffective assistance of counsel . . . is cause for a procedural default."); *Reed v. Ross*, 468 U.S. 1, 16 (1984)("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures.").

Once good cause is proven, a habeas petitioner also must prove prejudice.  Such a showing must go beyond proof "that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

20

### 3. The "Fundamental Miscarriage of Justice" Standard

In a "narrow class of cases," a federal court may consider a procedurally-defaulted claim without proof of good cause. *McCleskey*, 499 U.S. at 494; *Dretke v. Haley*, 541 U.S. 386, 393 (2004)(quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986); citing *Schlup v. Delo*, 513 U.S. 298 (1995)). These cases allow a federal court to examine the merits of a procedurally defaulted claim if the petitioner shows "a constitutional violation has probably resulted in the conviction of one who is actually innocent of the substantive offense," or the petitioner "could show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Dretke*, 541 U.S. at 393 (internal citations and quotations omitted).

### B. RULES GOVERNING REVIEW IN HABEAS CORPUS CASES UNDER § 2254

#### 1. 28 U.S.C. § 2254(d)

When Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), it limited the circumstances under which a habeas petitioner could obtain relief. Indeed, under the AEDPA, a petitioner is entitled to relief on a federal claim only if he shows that the state court's adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or that the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."[5]  28 U.S.C. § 2254(d); s*ee also Williams v. Taylor*,  529 U.S. 362, 404 (2000); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).  "Moreover, a state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence."  *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)).

Burgess contends, "[U]nder *LeCroy* and *Davis*, if the state court is presented with a federal constitutional issue but decides the issue on the merits using state grounds, there is no decision to which this court may 'defer.'  In those situations, this court should decide the claim de novo."  (Doc. 29 at 4 [citing *LeCroy v. Secretary, Florida Department of*

---

[5]Section 2254(d) provides:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

22

*Corrections*, 421 F.3d 1237 (11th Cir. 2005); *Davis v. Secretary, Department of Corrections*, 341 F.3d 1310, 1313 (11th Cir. 2003)].)  This court disagrees.

The Supreme Court has held, "A state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite [Supreme Court] opinions.  We have held that a state court need not even be aware of our precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003)(internal quotations and citations omitted).  "Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."  *Bell v. Cone*, 543 U.S. 447, 455 (2005).

"A decision that does not rest on procedural grounds alone is an adjudication on the merits, regardless of the form in which it is expressed."  (Internal quotations and citation omitted).  *Williams v. Allen*, 598 F.3d 778, 797 (11th Cir. 2010).  Section 2254(d) requires that "any claim that was adjudicated on the merits in State court proceedings" be accorded deference in the federal courts.  *See* 28 U.S.C. § 2254(d).  Burgess's argument that this court's review is determined by the grounds relied upon by the state court is without merit.

Burgess argues that "§ 2254(d)(1) is unconstitutional because it improperly infringes on the judicial power granted by Articles III and VI of the United States Constitution and because it operates, to some extent, as a suspension of the writ of habeas corpus in violation of Article I, § 9 of the United States Constitution."  (Doc. 29 at 2.)  Contrary to Burgess's contention, § 2254(d)(1) does not "strip[] jurisdiction from federal courts" to be the "final

arbiter of what the Constitution means" in favor of state court decisions that hold a petitioner

"in custody in violation of the United States Constitution."  (*Id*. at 2-3.)

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

> The reasons for this approach are familiar.  Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.  It disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority.

> Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions.

*Harrington*, 131 S. Ct. at 786-87 (internal citations and quotations omitted).

A state court's adjudication of a claim will be sustained under § 2254(d)(1), unless

it is "contrary to" clearly established, controlling Supreme Court precedent, or it is an

"unreasonable application" of that law.  These are two different inquiries, not to be confused,

nor conflated, as the Supreme Court explained in *Williams*, saying:

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of ...* clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams*, 529 U.S. at 404 (emphasis in *Williams*).

The statute limits the source of "clearly established Federal law" to "holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state-court decision." *Id*. at 412. A state-court determination can be "contrary to" clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Id*. at 405. Likewise, a state-court determination can be an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

25

*Id*. at 407.  Whether a particular application of Supreme Court precedent is "reasonable" turns on whether the application of Supreme Court precedent at issue was "objectively unreasonable."  Therefore, the question is not whether the state court "correctly" decided the issue, but whether its determination was "reasonable," even if incorrect.  *See Bell*, 535 U.S. at 694.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (internal citations and quotations omitted).

## 2.  Procedural Rule Governing Habeas Corpus Cases Under § 2254

Since "federal habeas review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements" of 28 U.S.C. § 2254 Rule 2(c) of the Rules Governing Section 2254 Cases.  *McFarland v. Scott*, 512 U.S. 849, 856 (1994).  A petitioner must specify all grounds for relief available to him, state the facts supporting each ground, and state the relief requested.   28 U.S.C. § 2254, Rule 2(c)(1)(2)(3) of the *Rules Governing Section 2254 Cases*.  A "general reference to the transcripts, case records, and briefs on appeal patently fails to comply with Rule 2(c)." *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990).  The habeas petitioner has the burden of proof to establish the factual basis for the relief he seeks.  *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983); *Corn v. Zant*, 708 F.2d 549, *reh'g denied*, 714 F.2d 159 (11th Cir. 1983).  He must provide substantial evidence showing that federal post-conviction relief should be awarded.  *Douglas v. Wainwright*, 714 F.2d 1532, *reh'g denied*, 719 F.2d

406 (11th Cir. 1983), *vacated on other grounds*, 468 U.S. 1206 (1984) and 468 U.S. 1212 (1984).   The mere assertion of a ground for relief, without specific factual detail and reference to record evidence does not satisfy petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2)[6] and Rule 2(c), *Rules Governing § 2254 Cases*.

## V.  <u>THE CLAIMS</u>

---

[6]Section 2254(e) provides:

(e)(1)  In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2)  If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

    (A)  the claim relies on –

        (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and

    (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e).

A.   **BURGESS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING BOTH THE GUILT AND PENALTY PHASES OF HIS TRIAL. Petitioner's Claim IV.A. (Doc. 15 at 15-73; doc. 29 at 6-26.)[7]**

1.   **The Constitutional Standard for Ineffective Assistance of Counsel**

Burgess claims that his trial counsel – and in one instance his appellate counsel – were constitutionally ineffective.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court has established a national standard for judging the effectiveness of criminal defense counsel under the Sixth Amendment.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  *Strickland*, 466 U.S. at 686.

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.  The Supreme Court has noted the difficulty in succeeding on an ineffective assistance claim in a § 2254 case:

> "Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S. ___, ___, 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010).

---

[7]Citations to page numbers in Burgess's Amended Petition, (doc. 15), refer to the page numbers displayed on the document in the court's CM/ECF electronic filing system.

An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve.  *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689, 104 S. Ct. 2052; see also *Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993).  The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.  *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., ___, 129 S. Ct. [1411,] 1420[, 173 L. Ed. 2d 251 (2009)].  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  556 U.S., at ___, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is ***any*** reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 131 S. Ct. at 788 (emphasis added).

### a.     The performance prong

"To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Id*. at 787 (quoting *Strickland*, 466 U.S. at 688).  "A court considering a claim of ineffective assistance

must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id*. (quoting *Strickland*, 466 U.S. at 689).  "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id*. (quoting *Strickland*, 466 U.S. at 687).  The effectiveness or ineffectiveness of counsel is evaluated by consideration of the totality of the circumstances.  *Stanley v. Zant*, 697 F.2d 955, 962 (11th Cir. 1983).

### b.    The prejudice prong

"With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  *Harrington*, 131 S. Ct. at 787(quoting *Strickland*, 466 U.S. at 694.  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Id*. (quoting *Strickland*, 466 U.S. at 693).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  *Id*. at 787-88 (quoting *Strickland*, 466 U.S. at 687).

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. See *Wong v. Belmontes*, 558 U.S.___, ___, 130 S. Ct. 383, 390, 175 L. Ed. 2d 328 (2009) (per curiam) (slip op., at 13); *Strickland*, 466 U.S., at 693, 104 S. Ct. 2052. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different.  *Id*., at 696, 104 S. Ct. 2052.  This does not require a showing that counsel's actions "more

likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." *Id.*, at 693, 697, 104 S. Ct. 2052. The likelihood of a different result must be substantial, not just conceivable. *Id.*, at 693, 104 S. Ct. 2052.

*Id.* at 791-92.

### c.    State court findings of historical fact

The state court's findings of historical facts made in the course of evaluating a claim of ineffective assistance of counsel are subject to a presumption of correctness under 28 U.S.C. § 2254(d)(2) and (e)(1). *See, e.g.*, *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

### 2.    Disposition of Two Issues Common to Many of the Ineffectiveness Claims

### a.    Procedural default and exhaustion – factual allegations and evidence proffered for the first time in this petition.

Respondent Richard Allen argues "that Burgess alleges numerous facts in his current petition that were not presented to the State courts in his second amended Rule 32 petition," and, therefore, "these new factual allegations are unexhausted and not properly before this court for review because they are procedurally defaulted." (Doc. 21 at 4.) Burgess does not deny that he is offering some new factual allegations in support of his ineffectiveness claims. (*See* doc. 29 at 5-6.) Three out of the six exhibits attached to his Amended Petition are offered for the first time in this court. These exhibits contain facts that were not presented during the state-court collateral proceedings. (*See* doc. 15, Exs. 2, 3 and 6.)

31

Exhibit 2 is the March 1, 2007, Declaration of Fred Ingram, in which Ingram asserts that he knew Burgess used crack cocaine during the three or four years before the murders. (*Id.*, Ex. 2 ¶ 12.)  Ingram testified at Burgess's trial, (*see* R. Vol. 16 at 2526-49), and he was not asked about Burgess's drug use, (doc. 15, Ex. 2 ¶ 15).   He was not called as a witness during the Rule 32 evidentiary hearing.

Exhibit 3 is the June 12, 2008, Declaration of Gwyn Thompson, in which Thompson contends Burgess was "laid back" before he began using crack, but that after he became addicted to crack he was "paranoid," "nervous," "obsessed," and "intent on getting more" when he was "coming down from a high." (*Id.*, Ex. 3 ¶¶ 3, 8.)  Thompson did not testify at trial or during the post-conviction proceedings.

Exhibit 6 is the June 12, 2008, Declaration of Bryan A. Hudson, a neuropsychologist, who contends that Burgess is mentally retarded.  (*Id.*, Ex. 6 at 12.)  Hudson did not testify at trial or during the post-conviction proceedings.

These Declarations were executed in 2007 and 2008.  Burgess had filed his Rule 32 petition in March 2000, and an evidentiary hearing was held in February 2002.  His post-conviction petition was denied by the Rule 32 court in 2003.  The present habeas petition had been pending for about one year before Exhibits 2, 3 and 6 were filed as attachments to Burgess's Amended Habeas Petition.

Burgess contends that this court may consider these new exhibits and the facts contained therein; he argues "that none of the additional facts he has alleged in this petition

fundamentally alter the legal claims that are before the court.  They do not create new claims; they merely buttress existing ones.  Therefore, the State's contention that this court cannot consider those facts is incorrect."  (Doc. 29 at 6; *see id.* at 5-6.)  Burgess does not explain why he failed to present this evidence to the state court; the court's examination of the evidence shows that the additional facts could have been presented during the Rule 32 proceedings.  Burgess's failure to produce this evidence as part of his Rule 32 ineffective assistance claims in state court "means that [he] deprived the state courts of 'the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding.'"  *Bailey*, 172 F.3d at 1305 (quoting *Picard*, 404 U.S. at 276).  Therefore, both Burgess's new allegations in the Amended Petition and Exhibits 2, 3 and 6 attached thereto are procedurally defaulted and will not be considered.  Moreover, this ruling applies to the extent Burgess attempts to support any of his other claims with the new facts contained in Exhibits 2, 3, and 6.

### b.    The state court's legal conclusions based on the lack of testimony from trial counsel during post-conviction proceedings

Allen argues that Burgess is not entitled to any relief from the state court's rejection of his ineffectiveness-assistance claims because he failed to call his trial counsel to testify at the Rule 32 hearing, which resulted in a lack of evidence to support these claims.[8]  (Doc.

---

[8]Respondent also asserts that Burgess "prevented the State from investigating his ineffectiveness claims" during Rule 32 proceedings.  (Doc. 22 at 10.)  Burgess argues that he in no way interfered with the State's investigation of his allegations just because he first "invoke[d] attorney-client privilege," but then waived it.  (Doc. 29 at 7.)  The allegations

22 at 12 [citing *Wood v. Allen*, 542 F.3d 1281, 1301-05 (11th Cir. 2008].)  Burgess disagrees

that a petitioner who "fails to call trial counsel to testify in state court can never meet his

burden under *Strickland v. Washington*, 466 U.S. 668 (1984)."  (Doc. 29 at 7.)

The state court held:

> No . . . affidavits or statements by either of Burgess's trial attorneys are contained in the record, even though the record shows that counsel was available.  As this Court stated in *Brooks v. State*, 929 So.2d 491, 497 (Ala. Crim. App. 2005), quoting *Grayson v. Thompson*, 257 F.3d 1194, 1218 (11th Cir. 2001):
>
> > "'[W]e note that the record is silent as to why trial counsel did not pursue a motion to suppress the evidence obtained from Grayson incident to his arrest on Fourth Amendment grounds; Grayson's habeas counsel did not inquire as to trial counsel's reasons for not raising such a claim either during counsel's deposition or his testimony at the state habeas hearing.  *An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation].  Therefore, 'where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment*.'" *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000)(en banc)(quoting *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999))."

---

underlying this conflict were addressed by the Alabama Court of Criminal Appeals, and since neither petitioner nor respondent disputes the historical factual findings, it is presumed true that trial counsel declared, but later withdrew, his declaration that Burgess would not waive attorney-client privileges for post-conviction purposes.  *See Burgess*, 962 So. 2d at 278-80.  Thereafter, the State and Burgess's Rule 32 counsel were free to discuss the case with and call trial counsel as witnesses during post-conviction proceedings.  There is no evidence that the State was hindered in any fashion.  Allen's contention that Burgess's ineffectiveness claims are defaulted because he prevented or interfered with the State's post-conviction investigation is without merit.

See also *Grossman v. Crosby*, 359 F. Supp. 2d 1233, 1252 (M.D. Fla. 2005); *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999).

*Burgess*, 962 So. 2d at 280 (emphasis added).

The state court did not hold that a petitioner could never prove a *Strickland* claim without testimony from his trial counsel. The court merely stated the well-established standard of review for such claims, which includes a presumption of effective representation. There is no rule that failure to call trial counsel at the post-conviction evidentiary hearing will automatically, and without exception, result in a finding that trial counsel was effective. However, if, under the circumstances of a particular claim, the presumption of effectiveness cannot be overcome without the testimony of trial counsel (*e.g.,* to clarify an incomplete, silent or ambiguous record as to the reasons for counsels' actions), then the petitioner's ineffectiveness claim will fail based on a lack of proof. The Eleventh Circuit applies this principle:

> The performance inquiry will generally boil down to whether trial counsel's actions (or inactions) were the result of deficient performance or sound trial strategy. *See Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 164, 100 L. Ed. 83 (1955))). To protect counsel's independence, we start with the **strong presumption that trial counsel's performance was constitutionally adequate**. *Id*.

> Two principles underlie this presumption. First, the Supreme Court has time and again counseled against judging trial counsel's performance with the benefit of hindsight. *Id*.; *see also Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S. Ct. 1, 6, 157 L. Ed. 2d 1 (2003)(per curiam)("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the

35

benefit of hindsight."); *Bell v. Cone*, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852, 152 L. Ed. 2d 914 (2002)(same).  Second, trial advocacy is not a science, but an art; there are few "right" answers in the proper way to handle a trial. *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067 ("Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.").

This presumption is an evidentiary presumption that carries through the trial.  *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir.2000)(en banc).  Thus, a petitioner must not present evidence merely to refute the presumption.  Rather, ***the petitioner must present evidence that outweighs the presumed evidence of competence***.  *Kimmelman v. Morrison*, 477 U.S. 365, 384 106 S. Ct. 2574, 2588, 91 L. Ed. 2d 305 (1986)("[T]he defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.").  Therefore, "'***where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment***.'" *Chandler*, 218 F.3d at 1314 n.15 (quoting *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir.1999)).

*Harvey v. Warden, Union Correctional Institution*, 629 F.3d 1228, 1238-39 (11th Cir. 2011)(emphasis added); *Grayson v. Thompson*, 257 F.3d 1194, 1218 (11th Cir. 2001)(the court "must indulge the strong presumption that counsel's conduct was reasonable in the absence of evidence regarding his reasons for failing to raise such a challenge").  When trial counsel does not testify at the Rule 32 hearing, the court lacks evidence of what counsel did and why he did it and, therefore, it lacks evidence to rebut the presumption "that [counsel] did what he should have done, and that he exercised reasonable professional judgment." *Chandler*, 218 F.3d at 1314 n.15 (internal citation and quotations omitted).

The Alabama Court of Criminal Appeals analyzed each ineffective-assistance claim separately under the standard set forth above; it did not simply reject Burgess's claims based on the failure of his trial counsel to testify.

### 3.    The Ineffective-Assistance Sub-claims

####    a.    Trial counsel was inadequately compensated.  (Doc. 15 at 16-17.)

Burgess contends that Alabama provides inadequate funding and compensation for capital defense attorneys.  (*Id.*)  He alleges that "the severe compensation limitations pose an unconstitutional taking of private property by denying just compensation, violate the separation of powers doctrine, discriminatorily deny indigent capital defendants their constitutional right to effective assistance of counsel, and violate the Equal Protection Clause.  (*Id*. at 17.)   He contends:

> The State of Alabama denied Mr. Burgess the effective assistance of counsel, in part, because of the insufficient funds provided for the court-appointed attorneys in capital cases.  At the time of Mr. Burgess'[s] trial, ALA CODE §15-12-21 was interpreted to limit court-appointed attorneys, trying capital cases, to a maximum of $1,000 for out-of-court trial preparation for each phase of the capital trial, based on a $20 per hour rate.  *See Ex parte Grayson*, 479 So. 2d 76, 79-80 (Ala.), *cert. denied sub nom*, *Grayson v. Alabama*, 474 U.S. 865 (1985).

> "It is well established that the Sixth Amendment guarantees to criminal defendants not only the right to assistance of counsel, but requires that assistance to be legally effective."  *Waldrop v. State*, 506 So. 2d 273, 275 (Miss. 1987); *see also Strickland v. Washington*, 466 U.S. 668 (1984). The failure to provide adequate funding to court-appointed counsel curtails this most fundamental right.  The failure to compensate counsel adequately in Mr. Burgess'[s] case was particularly debilitating given the unique circumstances and issues involved.  Indeed, the unreasonable limit on counsel compensation was a primary cause of Mr. Burgess'[s] counsel's deficient performance.

In addition, the severe compensation limitations pose an unconstitutional taking of private property by denying just compensation, violate the separation of powers doctrine, discriminatorily deny indigent capital defendants their constitutional right to effective assistance of counsel, and violate the Equal Protection Clause. As a growing number of courts from inside and outside the Eleventh Circuit have recognized, these compensation caps violate the Fifth, Sixth, Eighth, and Fourteenth amendments to the United States Constitution and Alabama Law. *See May v. State*, 672 So. 2d 1310 (Ala. 1995)(Maddox, J., concurring specially)(endorsing position that inadequate compensation constitutes improper taking); *Arnold v. Kemp*, 813 S.W.2d 770, 780-81 (Ark. 1991)(Newbern, J., concurring), *modified by, State v. Post*, 845 S.W.2d 487 (Ark. 1993)(same); *Makemson v. Martin County*, 491 So. 2d 1109, 1115 (Fla. 1986)(holding $3,500 compensation limit in capital trial violates separation of powers and effective assistance of counsel mandates); *DeLisio v. Alaska Superior Court*, 740 P.2d 437, 443 ([Alaska] 1987)(finding takings clause prevents attorney compensation at rate less than that "received by the average competent attorney operating on the open market.").

Due to inadequate compensation, Mr. Burgess was deprived his right to a fundamentally fair trial and sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

(*Id*. at 6-17.)

When he raised this claim on direct appeal, the Alabama Court of Criminal Appeals

held:

Burgess argues that the trial court erred when it denied defense counsel's motions for adequate compensation and that the limitations placed by § 15-12-21(d), Ala. Code 1975, on compensation of counsel representing indigent defendants are unconstitutional. He also contends that those limitations deprive indigent defendants of the effective assistance of counsel. These same arguments have been rejected previously by the appellate courts of this state. *See Ex parte Brown*, 686 So.2d 409, 422 n. 6 (Ala. 1996), *cert. denied*, 520 U.S. 1199, 117 S. CT. 1558, 137 L. Ed.2d 705 (1997); *Price v. State*, 725 So. 2d 1003 (Ala. Cr. App. 1997); *Smith v. State*, 698 So.2d 189

(Ala. Cr. App. 1996), *aff'd*, 698 So.2d 219 (Ala.1997); *May v. State*, 672 So.2d 1307 (Ala. Cr. App. 1993), *writ quashed*, 672 So.2d 1310 (Ala. 1995).

*Burgess*, 723 So. 2d at 763-64.

As to the takings claim, Burgess has no standing to assert a claim for the loss of his attorneys' property. *May v. State*, 672 So. 2d 1310, 1311-12 (Ala. 1995)(Maddox, J., concurring specially)("Requiring **attorneys** to represent indigent defendants without compensating them adequately for their professional services has been a perennial problem for the state[.] . . . In conclusion, I remind the reader of a statement often attributed to Abraham Lincoln: 'A lawyer's time and advice are his stock in trade.' It seems axiomatic that if the state appropriates that "stock in trade" without an adequate payment therefore, it has taken property without just compensation.")(emphasis added). Burgess has not been denied just compensation. Assuming a cap on their compensation is a violation of the Takings Clause, such a claim belongs to the attorneys, who have been deprived of fair compensation for their work. *Id*.

Also, assuming the compensation caps could amount to a violation of the separation-of-powers doctrine, Burgess has not pointed to any evidence that his attorneys' reasonable compensation exceeded the cap and/or that the compensation cap denied him of adequate representation. *See Makemson v. Martin County*, 491 So. 2d 1109, 1112 (Fla. 1986). Similarly, his equal protection claim seems to assert that the compensation caps deprived him and other indigent defendants of equal protection because application of the caps resulted in a denial of effective assistance of counsel. This pleads nothing more, however, than that he

39

was deprived of effective assistance of counsel because he received ineffective assistance of counsel.  Therefore, the court finds that Burgess has failed to plead this claim with the specificity required by Rule 2(c).

None of these claims provides a basis for relief.  Although a petitioner may be able to trace the deficient performance of his counsel to counsel's lack of compensation, it does not follow that appointed counsel's performance will always be deficient because of inadequate compensation.

But, aside from his assertion that inadequate compensation in his "case was particularly debilitating given the unique [yet unspecified] circumstances and issues involved," Burgess makes no specific allegation of a link between inadequate compensation and the claims of ineffective assistance.  (*See* doc. 15 at 16-17.)  Moreover, he has not shown that the state court's rejection of this claim was unreasonable.  Inadequate funding of counsel appointed to represent capital defendants, as unfair as it might be to the attorneys, does not itself amount to ineffective assistance of counsel; a petitioner must show actual errors or shortcomings in the performance of counsel.  *Strickland*, 466 U.S. at 690.  Thus, the allegation that the compensation caps hindered the ability of trial counsel to represent Burgess has meaning only by reference to specific errors or shortcomings purportedly caused by inadequate defense funding.  Only by examining specific errors or shortcomings can it be determined, first, that it was an error outside the broad scope of competence expected of counsel, and second, whether the error caused real prejudice to the defendant.  Consequently,

40

the assertion that Alabama provides inadequate compensation for appointed capital defense counsel fails to state a basis for habeas relief.  Burgess has not shown that the state court's rejection of the ineffectiveness claim based on inadequate funding was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.

This claim will be denied.

> **b.** **"Trial counsel failed to present evidence of mental health issues and the viable defense of voluntary intoxication [*at the guilt phase of trial*]."**[9] **Petitioner's Claim IV.A.1.  (Doc. 15 at 18-32; doc. 29 at 9-13.)**

> **c.** **Trial counsel failed to retain the appropriate experts at the guilt phase of trial.**[10] **Petitioner's Claim IV.A.4.  (Doc. 15 at 52-61; doc. 29 at 16-19.)**

To avoid repetition of certain underlying factual allegations and issues, sub-claims (b) and (c) will be addressed together.  As a preliminary matter, this court expressly finds that the only "mental health issues" appropriate for habeas discussion in the context of sub-claims

---

[9]In the body of this claim in his Amended Petition, Burgess also included the penalty phase of trial.  However, because he repeats the penalty phase allegations as part of his claims that counsel failed to investigate and present an adequate penalty phase strategy and an adequate theory of mitigation, (*see* sub-claims 3(d) and 3(e), *infra*), the court sees no reason to address the penalty phase claims at this time.

[10]In his Amended Petition, Burgess included challenges to the penalty phase of trial.  In it, he accuses his counsel of "present[ing] meager and inadequate expert testimony at the sentencing phase which neither involved meaningful discussion of Mr. Burgess'[s] crack cocaine addiction, nor its effect on his mental health."  (Doc. 15 at 23.)  However, for the reasons set out in the immediately preceding footnote, this aspect of his claim will be discussed in sub-claims 3(d) and 3(e), *infra*, dealing with the penalty phase.

(b) and (c) are those Burgess alleged in his Rule 32 petition.  In that petition, Burgess alleged

his counsel failed to investigate and present evidence (1) that his mental and emotional

impairments due to childhood abuse and (2) that his substance abuse caused him to suffer

organic brain disorder/neurological damage that would have supported a voluntary

intoxication defense at the guilt phase of trial.  (R. Vol. 28, Tab. 63 at 5-6.)

> Burgess alleges:
>
> > Substantial evidence was available at the time of trial that would have
> > negated the element of specific intent to kill, and established a defense to
> > capital murder.  This evidence related to the effect of Mr. Burgess' severe
> > mental and emotional impairments as a result of having been physically and
> > emotionally abused, his crack cocaine addiction and use of a significant
> > amount of crack cocaine on the day of the alleged offense and its effects on
> > Mr. Burgess'[s] behavior all of which impacted and diminished his ability to
> > form the required intent to commit capital murder.  Trial counsel's failure to
> > properly investigate, prepare, and present mental health and intoxication
> > evidence negating the requisite specific intent to commit capital murder
> > constitutes prejudicially deficient performance in violation of the Sixth,
> > Eighth, and Fourteenth Amendments and the Alabama Constitution.

(Doc. 15 at 18.)   The Alabama Court of Criminal Appeals denied these claims because

Burgess "failed to present any evidence in support of this claim at the evidentiary hearing."

*Burgess*, 962 So. 2d at 295.

Throughout sub-claims (b) and (c), Burgess uses the phrases "mental impairments,"

and "mental illness," in an overbroad and conclusory manner.  He alleges that he suffers from

"several [unidentified] mental and emotional impairments as a result of having been mentally

and emotionally abused," mental retardation, borderline intellectual functioning, organic

brain disorder, and psychiatric disorders.  (*Id*. at 18-33.)  He contends:

Trial counsel failed to investigate adequately the evidence of Mr. Burgess'[s] mental illness and failed to present adequately such evidence at the guilt phase of his trial. Mr. Burgess has suffered from mental and emotional problems as a result of having been physically and emotionally abused. This evidence was not presented by counsel adequately. Counsel did not conduct sensitive and detailed interviews with family members such as his mother Sally Burgess, his grandmother Evie Johnson, his uncles, or with other witnesses such as Gloria Cummings, or childhood friends including Sabrina Mitchell, Melissa Bennett, Johnny Southward, or teachers, who could have provided information about Mr. Burgess'[s] abusive childhood, mental retardation, and substance abuse problems.

Mr. Burgess is mentally retarded, which places him in the class of people who may not be executed under the Eighth and Fourteenth Amendments to the United States Constitution. *See Atkins v. Virginia*, 536 U.S. 304 (2002). This subject is more fully discussed in section IV.B, which is incorporated herein by reference. Trial counsel was privy to the fact that Mr. Burgess had been previously diagnosed as being borderline mentally retarded or possibly mildly mentally retarded. They were in possession of records scoring his IQ as low as 66 on a partial IQ test, a 73, and between 70 and 80. Yet, they failed to put on adequate testimony regarding this information. In fact the only expert they put on did not even give Mr. Burgess an IQ test, nor did he talk to any of Mr. Burgess'[s] family, school teachers, or any collateral sources. This subject is more fully discussed in section IV.A. (4), which is incorporated herein by reference. Trial counsel failed to present testimony from teachers who would have testified that Mr. Burgess was in special education classes, and that he struggled through school generally obtaining low to failing grades. Counsel further failed to present testimony from family members, acquaintances, and teachers which would have evidenced the predominance of low intellectual functioning in Mr. Burgess'[s] family, and that one of his uncle's was mentally retarded as well as two of his nephews, and Mr. Burgess'[s] own son. The fact that he was raised by people with such significant intellectual deficits is demonstrative of the environment in which he was raised, but also of his own limited abilities and also of the likelihood that Alonzo inherited these mental illnesses and deficits. This information could have and should have been presented to the jury during the guilt phase of the trial, as his significant intellectual deficits have a direct bearing on culpability, particularly when combined with his substance abuse problems and history of emotional and physical abuse.

43

Contrary to prevailing professional norms, counsel also failed to adequately utilize independent mental health experts to evaluate, diagnose, and testify about Mr. Burgess'[s] mental and emotional problems, including his substance abuse problems at the time of the crime. *See American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Commentary to Guideline 4.1 (2003)(stating that "unless counsel agrees otherwise, the defendant is entitled to experts independent of the government; the jurisdiction may not meet its obligations by relegating him to the state mental hospital or the state crime laboratory")(hereafter "*ABA Guidelines*"); *see also Rompilla* [*v. Beard*], 545 U.S. [374,] 387-89 [(2005)](indicating that American Bar Association Standards for Criminal Justice are "guides to determining what is reasonable"), citing *Wiggins*, 539 U.S. at 524).

Knowing that Mr. Burgess had been addicted to crack cocaine and alcohol for a significant period of time leading up to the commission of the charged crimes, defense counsel failed to present testimony regarding Mr. Burgess'[s] crack addiction or expert testimony about the impact of crack cocaine on Mr. Burgess'[s] behavior, particularly considering the other mental health issues suffered by him.   This failure deprived Mr. Burgess of a successful intoxication defense at the guilt phase, as well as a compelling mitigation case in light of a full understanding of Mr. Burgess'[s] substance abuse problem.

A viable defense under Alabama law was that Mr. Burgess'[s] voluntary intoxication prevented him from forming the requisite intent for capital murder.  *See* ALA.CODE § 13A-3-2(a), (d)("intoxication, whether voluntary or involuntary, is admissible in evidence whenever it is relevant to negate an element of the offense charged"); *see also Fletcher v. State*, 621 So. 2d 1010 (Ala. Crim. App. 1993); *Enmund v. Florida*, 458 U.S. 782 (1982). Despite the availability of such a defense and despite the obvious impact crack cocaine had on Mr. Burgess'[s] involvement in this crime, Mr. Burgess'[s] lawyers erroneously and unreasonably failed to present a defense case in support of a crack cocaine intoxication defense.

Given the circumstances surrounding the offense, a legitimate defense in this case would have been one based on intoxication.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court held that to satisfy the first prong of an ineffectiveness claim, a petitioner must show that his lawyer's performance fell below an "objective standard of

reasonableness." *Id.* at 688.  In this case, trial counsel's performance was unreasonable because although it was clear that a crack cocaine intoxication defense was available for defending Mr. Burgess, and although a relevant instruction was submitted to the jury, they presented no evidence in support of it.

(Doc. 15 at 18-21.)

The court notes that Burgess's counsel could not have been ineffective for failing to raise an *Atkins* claim in connection with Burgess's alleged mental retardation because such a claim did not even exist at the time his case went to trial in 1994.  *See In re Holladay*, 331 F.3d 1169, 1172 (11th Cir. 2003)("[T]here is no question that the rule recently announced by the Supreme Court in *Atkins* – that the execution of mentally retarded persons constitutes 'cruel and unusual punishment' in violation of the Eighth Amendment, *see* [*Atkins v. Virginia*,] 536 U.S. [304], 321 [(2002)] – is a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court that was previously unavailable.")(citation omitted).  In any event, Burgess is not mentally retarded.  See, *infra*.

In his Rule 32 Petition, Burgess alleged that he "suffered from mental and emotional problems as a result of having been physically and emotionally abused."  (R. Vol. 28, Tab. 63 at 5.) He has never identified, either in post-conviction proceedings or the case *sub judice*, the type of mental and emotional impairments he contends resulted from childhood abuse. He does not explain the causal connection between any acts of child abuse and an organic brain disorder/neurological damage.  He does not describe how such unidentified impairments are applicable to a voluntary intoxication defense.  Therefore, his allegations

45

of ineffective assistance of counsel with regard to their presentation and investigation of his impairments caused by childhood abuse fail to satisfy the heightened pleading requirements for habeas cases. *See*, *e.g.*, *McFarland*, 512 U.S. at 856.

As explained above, Burgess is required to state the facts supporting each ground in his petition pursuant to 28 U.S.C. § 2254 app. Rule 2(c), *Rules Governing Section 2254 Cases in the United States District Courts*. "In order to show his trial counsel failed to investigate . . ., [a petitioner] would have to show that they did not in fact know the facts he claims they failed to discover." *Blakenship v. Hall*, 542 F.3d 1253, 1276-77 (11th Cir. 2008), *cert. denied* 131 S. Ct. 1041 (2011). Burgess has not described how counsel's performance was deficient or how counsel's purported deficiencies resulted in prejudice. The absence of a fully-developed argument necessarily leads this court to conclude that Burgess has failed to show that the state court's denial of this claim was contrary to, or an unreasonable application of, clearly established federal law. *See Burgess*, 962 So. 2d at 295. Further, Burgess has not demonstrated that the state appellate court's adjudication of this claim was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Because Burgess did not call his trial counsel to testify at his Rule 32 hearing, the court "presume[s] that [trial counsel] did what [they] should have done and that [they] exercised reasonable professional judgment." *Chandler*, 218 F.3d at 1314 n.15. In light of

46

this presumption and the silent state court record, the court finds the state court's decision that Burgess's trial court performed competently is not unreasonable.

Therefore, this part of Burgess's claim will be denied.

Burgess alleges his trial counsel were ineffective because they failed "to properly investigate, prepare, and present mental health and intoxication evidence," by way of lay and expert testimony to negate "the requisite specific intent to commit capital murder." (Doc. 15 at 18.) Allen argues that the sub-claim pertaining to voluntary intoxication are procedurally defaulted because the claim "was not alleged in Burgess's Rule 32 petitions and was not addressed by the State courts." (Doc. 21 at 5 [citing R. Vol. 28, Tab. 63 at 1-33].) Burgess counters that this aspect of the claim is not only exhausted, but should be reviewed de novo because it was not denied on the merits by the Rule 32 court or the Alabama Court of Criminal Appeals. (Doc. 29 at 10.) In support of his position, Burgess contends that during post-conviction proceedings he fairly raised what is now before this court

> through [a separate Rule 32] claim [in which] he alleged failure to obtain adequate expert assistance in the guilt phase of the trial. In that claim, he specifically stated that trial counsel failed to obtain experts who could have explained the impact of Mr. Burgess'[s] substance abuse problems 'on these crimes.' (R. 32 petition at 8[.]) The petition went on to state that the court was unaware of other aspects of Mr. Burgess'[s] addiction, which could cause 'completely irrational and ungovernable behavior.' *Id*.

(*Id*.) After careful review of the entire post-conviction record, the court finds neither party's representations are entirely accurate.

47

i.      The question of procedural default – failure to raise
voluntary intoxication defense

This court has reviewed the Rule 32 claims upon which Burgess relies.  In his Rule

32 petition, Burgess alleged that his trial counsel did not adequately investigate and present

evidence of his substance abuse history and how it could cause organic brain dysfunction that

would render him not guilty of capital murder.  (*See* R. Vol. 28, Tab. 63 at 5-6.)  He also

contended that counsel "failed to adequately prepare independent mental health experts to

evaluate, diagnose and testify about . . . his substance abuse problems," and, in a separate

claim, he contends that his trial counsel was ineffective for failing to obtain expert testimony

at the guilt phase of trial to explain Burgess's long-term drug use in the context of

"biochemical and psychological changes in brain chemistry that adversely effect normal brain

functioning" and "neurological and psychological impairment known as craving, which can

drive addicts to irrational and ungovernable behavior."  (*Id*. at 5, 8.)

This court finds no real distinction between these claims to the extent they fault

Burgess's trial counsel for failing to present the described expert testimony during the guilt

phase of the trial.  The Rule 32 court made findings of fact and conclusions of law applicable

to his counsel's failure to "adequately prepar[e] mental health experts to testify during the

guilt-phase of trial regarding his substance abuse problems;" it did not specifically address

expert testimony on changes in brain functioning and/or cravings associated with long-term

drug abuse.  (R. Vol. 37, Tab 85 at 8.)  However, under the circumstances, this court finds

that the state court's decision sufficiently addressed both Rule 32 claims – as presented to

it.  The pertinent portion of the Rule 32 court's order reads:

> Burgess also contends that trial counsel was ineffective for not adequately preparing mental health experts to testify during the guilt-phase of trial regarding his substance abuse problems.

> The Honorable John Benn and the Honorable Cliff Wright represented Burgess at trial.  Although Benn and Wright had been subpoenaed and were available to testify, Burgess failed to call either to testify at the Rule 32 hearing.  Because the record is silent as to the extent of trial counsel's guilt-phase investigation regarding Burgess's mental health, the Court presumes that Mr. Benn's and Mr. Wright's investigation was reasonable and "that they exercised reasonable professional judgment."  *Chandler*, 218 F 3d at 1314 n.15, quoting, *Williams v. Head,* 185 F.3d 1223, 1228 (11th Cir. 1999).

> Moreover, because Burgess presented no evidence concerning the extent of trial counsel's investigation of his mental health at the evidentiary hearing, the Court finds that he has abandoned this claim.  *See*, *Payne v. State*, 791 So. 2d 383, 399 (Ala. Crim App. 2000)(holding that claims of ineffective assistance of counsel were abandoned where the petitioner failed to have presented any evidence to support them at the evidentiary hearing); *see also*, *Grayson v. State*, 675 So. 2d 516, 526 (Ala. Crim. App. 1999)(holding where no evidence as to extent of trial counsel's investigation was presented at the evidentiary hearing, there was no evidence by which the court could measure the reasonableness of the investigation).

(*Id.*)

On appeal, Burgess made a clear, reasoned argument that an expert witness at the guilt

phase of trial could have testified to evidence that would have supported a voluntary

intoxication defense.  (R. Vol. 35, Tab. 74 at 34-46.)  The State responded that Burgess had

failed to present an ineffective-assistance claim pertaining to counsel's alleged failure to

raise an adequate intoxication defense at trial before the Rule 32 court. (*Id*., Tab. 75 at 31-34.)

The Alabama Court of Criminal Appeals did not specifically mention voluntary intoxication as a guilt-phase defense in its opinion rejecting these claims on appeal. However, it held that, while Burgess claimed that his trial counsel had failed "to obtain adequate expert assistance during . . . the guilt . . . phase of his trial[,] . . . he failed to present any evidence in support of the claim at the [Rule 32] evidentiary hearing." *Burgess*, 962 So. 2d at 295 (citing Rule 32.3 Ala. R. Crim. P.). The appellate court then concluded that the trial court properly denied Burgess relief. *Id*. Thus, regardless of the manner in which Burgess developed these sub-claims on collateral review, the Alabama Court of Criminal Appeals considered and rejected these claims based on a lack of evidence, which is a decision on the merits. As such, this court's review of Burgess's ineffective assistance claims (b) and (c) will be conducted pursuant to 28 U.S.C. § 2254(d).

### ii.     Habeas examination of the remainder of claims (b) and (c)

Burgess's habeas claims (b) and (c) are based on his assertion that his counsel should have presented evidence that he was voluntarily intoxicated at the time of the murders so as to negate the intent required for capital murder. (*See* doc. 15 at 22, 54.) However, Burgess does not dispute the state court's findings that the witnesses who testified at trial did not observe Burgess in an intoxicated state either a short time before or after the time periods in which the murders were committed. (*See* R. Vol. 2 at 279-81.) The Rule 32 court found that only one of the three witnesses Burgess called during post-conviction proceedings, Melissa

Bennett, testified about Burgess's drug use, and she had testified only about his drug use as a child because she had not had much contact with Burgess in the last 23-24 years. (R. Vol. 37, Tab. 85 at 10.) Burgess presented no additional evidence or expert testimony at the Rule 32 evidentiary hearing as to his recent substance abuse history. Moreover, he did not produce evidence that his trial counsel knew or did not know about his drug use.

Burgess contends that "counsel admitted that knowledge of the drug use would have affected their trial strategy," and that "[a]ny ignorance of this information is simply a failure to investigate." (*Id*. at 28.) At trial, the following colloquy occurred:

> MR. BENN:  Your Honor, at this time, the Defendant would like to renew the motion and assign a separate basis for it as it relates to testimony that was proffered outside the presence yesterday by the District Attorney involving the testimony of Mr. Ronald Chapman. With respect to the offer of that testimony, and with disclosure that the District Attorney intends to get into that evidence, I would like the record to reflect that I had my first opportunity under court order to talk with Mr. Chapman yesterday afternoon at the time we recessed, which was approximately five or little bit before six o'clock. That based upon his disclosures that he was making, coupled with the testimony that was offered or proffered during the voir dire examination yesterday, we would like to renew the motion at this time as it relates specifically to the presence of an affirmative defense in the case that we otherwise do not have any particular supporting information on as the Court is aware, a voluntary intoxication [or] an affirmative defense in the case as it relates to alcohol or drugs.
>
> . . .
>
> THE COURT: Anything from the State?
>
> [PROSECUTOR]: Judge, I will just say that the evidence has been there all this time. They have had an investigator. They have not presented their case as yet, and they can still use their investigator to locate people, to bring additional testimony that would be consistent with what Mr. Chapman is going to testify to in that regard. Their defense to this point, I would say, has not

been consistent with the fact of him being under the affect of drugs, except that they basically pled that he wasn't there at the time the offense occurred.

       THE COURT: Okay.  I'm going to overrule the motion.

(R. Vol. 13 at 1776-81.)

The record does not demonstrate that failure to determine the nature of Chapman's testimony was based on a failure to investigate.  Chapman's testimony was a surprise in the most classic sense.  *See also Burgess*, 723 So. 2d at 758-59.  Chapman had refused to speak with defense counsel's investigator prior to trial, and, until a break in his testimony as the State's trial witness, he had not revealed what he knew about Burgess's drug activities around the time of the murders.

As is apparent from the trial record, defense counsel's strategy during the trial was to convince the jury there was reasonable doubt as to whether Burgess had killed the victims. (*See* R. Vol. 17, Tab. 21 at 2716-69; *id*. Vol. 18 at 2770-77.)  Counsel argued that the evidence showed someone else committed the offenses in retaliation for drugs debts owed by Burgess.  They repeatedly argued that the State's case was based only on circumstantial evidence, contending that there were no eyewitnesses to the murders and no forensic evidence linking Burgess to the murder weapon.  Also, counsel emphasized what Burgess was doing between the time the victims were last seen alive and the time Burgess shot himself.  Moreover, the record contains evidence that Burgess did not appear high at or near the time of the murders.  Indeed, Chapman testified that he saw Burgess trying to get crack between 10:00 a.m and noon on Friday morning, the day before the bodies were discovered.

52

(*See* R. Vol. 13 at 1799, 1806-07.)  This evidence does not support Burgess's argument that Chapman's testimony supported the theory that he was intoxicated at the time of the murders.

The record does not support a finding that trial counsel failed to investigate and discover Burgess's drug use at the time of the murders.  Certainly, Burgess was aware of his own drug use at the time of the offense, and counsel was aware of the reports of three mental health experts with whom Burgess had discussed his drug use.[11]  None of these experts reported that Burgess was intoxicated to the point of legal insanity at the time of the offense.

It is well known that

> Alabama law regarding the affirmative defense of insanity and of voluntary intoxication as a defense to the intent element of Alabama law provides that insanity is an affirmative defense that the defendant must prove by clear and convincing evidence. Ala. Code § 13A-3-1(a), (c).  The affirmative defense of insanity requires proof that "at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts." Ala. Code § 13A-3-1(a).  Thus, in order to establish the affirmative defense of insanity, the defendant must establish that he suffered from a mental disease.

> On the other hand, voluntary intoxication is not an affirmative defense to capital murder in Alabama.  Evidence that a defendant was voluntarily intoxicated is, however, admissible "whenever it is relevant to negate an element of the offense charged," such as intent to murder. Ala. Code § 13A-3-2(a).  Importantly, it must be emphasized that "[i]ntoxication in itself does not constitute mental disease or defect within the meaning of Section 13-3A-1." Ala. Code § 13A-3-2(d) (emphasis added).  Pursuant to Alabama law, "[t]he degree of intoxication required to establish that a defendant was

---

[11]These experts were Dr. Shealy, a clinical psychologist, and Dr. Goff, a neuropsychologist, both of whom were retained by the defense.  The third expert was  Dr. Maier, a clinical psychologist who examined Burgess on behalf of the State.

incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill." *Flowers v. State*, 922 So. 2d 938, 955 (Ala. Crim. App. 2005) (emphasis added) (citation and quotation marks omitted). In short, the level of intoxication needed to negate intent must rise "to the level of statutory insanity." *Ware v. State*, 584 So. 2d 939, 946 (Ala. Crim. App. 1991) (citation and quotation marks omitted).

*Allen*, 598 F.3d at 789-790.

The strategy chosen by trial counsel was logical and reasonable. Chapman's mid-trial testimony did not demonstrate a failure to investigate Burgess's drug use or his level of intoxication at the time of the offense. Indeed, these facts were the subject of consideration by the mental health experts before trial.

The Alabama Court of Criminal Appeals found that Burgess had failed to present any evidence of these claims at the Rule 32 evidentiary hearing. *Burgess*, 962 So. 2d at 295. The court also found:

> The record shows that Burgess originally entered a plea of not guilty by reason of mental disease or defect. That plea was subsequently withdrawn. After the original plea was entered counsel moved that Burgess be evaluated by a mental-health professional. Counsel also moved to be provided funds for an expert psychiatrist – that motion was granted. (Record on appeal, C.R. 117.) Counsel also moved to be provided funds for an investigator – that motion was granted. (Record on appeal, C.R. 119.) The record also shows that Burgess was examined by at least three mental-health experts before his trial. However, Burgess's attorneys were not called to testify. The only evidence to support this claim was the testimony of the three witnesses who were called at the evidentiary hearing.

> > "[A]ppellant contends that his counsel failed to fully investigate possible mitigating factors. He argues that counsel should have called an expert witness on 'cultural diversity,' but he does not explain what such a witness could have said on his behalf. He also argues that counsel should have called an expert witness on fetal alcohol syndrome

54

and should have obtained a neuropsychological assessment to investigate possible organic brain impairment. However, the record does not show that defense counsel failed to investigate these possibilities. Contrary to appellant's suggestion, we cannot infer failure to investigate from a silent record; the burden of demonstrating ineffective assistance is on him."

*State v. Murphy,* 91 Ohio St.3d 516, 542, 747 N.E.2d 765, 797 (2001). "Although trial counsel clearly has a duty to adequately investigate possible defenses to enable formulation of an informed trial strategy . . ., we will not presume from a silent record that counsel failed in this duty." *People v. Jennings*, 53 Cal. 3d 334, 375, 807 P.2d 1009, 1035, 279 Cal. Rptr. 780, 806 (1991).

Also, a review of the post-conviction record shows that the State made the following argument in its response to Burgess's amended petition:

"Trial counsel will testify that Dr. Alan Shealy, a certified forensic psychologist evaluated Burgess for the defense and informed counsel that Burgess did not suffer from a mental disease or defect to the degree that it would support an insanity defense. Shealy's opinion was consistent with the opinion of Dr. Lawrence Maier, a forensic psychologist that evaluated Burgess for the State.

"Because trial counsel's decision to withdraw Burgess's plea of not guilty by reason of mental disease or defect was based upon the opinion of two mental health experts including his own, it was reasonable . . . .

. . .

"If necessary to rebut this claim the State will present the testimony of Burgess's trial counsel, who would testify that Shealy's oral report indicated that Burgess was malingering, manipulative, and did not suffer from a severe mental disease or defect. Trial counsel did not call Shealy to testify during the penalty-phase because they feared

such unfavorable evidence might be admitted during the cross-examination . . . .[12]

"The record indicates that none of the three mental health experts that evaluated Burgess opined that he suffered from serious mental disease or defect."

(R. 288-89.)  These assertions by the State are not refuted in the record.

*Burgess,* 962 So. 2d at 289-90 (footnote added).

Although Burgess alleges that "there were witnesses that would have testified regarding Mr. Burgess'[s] drug use and expert testimony could have supported a voluntary intoxication defense," (doc. 15 at 29), this assertion is rebutted by the trial record.  Based on this evidence and the lack of any testimony from trial counsel, the court cannot find that Burgess has rebutted the presumption that his counsel's performance was reasonable and that they made all significant decisions in the exercise of reasonable professional judgment.

The court finds there is a reasonable argument that Burgess's trial counsel satisfied the *Strickand* deferential standard.  Burgess has not shown that the state court's rejection of these ineffective assistance claims based on trial counsel's failure to retain experts and to present evidence of mental health issues and the viable defense of voluntary intoxication at

---

[12]Burgess did not call Dr. Shealy as a witness at the post-conviction hearing either. Burgess has submitted an letter, dated August 13, 1993, and written by Dr. Shealy to trial counsel. (*See* doc. 15, Ex. 1.)  In the letter, Dr. Shealy stated that he had completed a partial psychological examination of Burgess, but that further assessment was needed and submitted a billing statement.  The interim letter was offered and admitted into evidence at the penalty phase of trial.  (*See* R. Vol. 18, Tab. 28 at 2954-55).  Tellingly, a final written evaluation by Dr. Shealy has never been mentioned.

the guilt phase of trial is contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.

Therefore, Burgess's claims based on the alleged ineffective assistance of his counsel during the trial claims will be denied.

> **d.      Trial counsel failed to develop adequate penalty and sentencing phase strategy.  Petitioner's Claim IV.A.2.  (Doc. 15 at 32-45; doc. 29 at 13-16.)**

> **e.      Trial counsel failed to develop or present an adequate theory of mitigation.  Petitioner's Claim IV.A.3.  (Doc. 15 at 45-51; doc. 29 at 13-16.)**

Sub-claim (d) is virtually identical to (e) so the court finds no reason to address these claims separately.  Burgess argues his trial counsel were ineffective because they failed to adequately develop a penalty phase strategy and mitigation theory.  Under these claims, he identifies three categories of evidence that he alleges competent counsel would have investigated more thoroughly and presented at the penalty stage of his trial:  (1) Burgess's life history, including his dysfunctional family and abuse as a child, as well as childhood friends that cared about him, (doc. 35-38); (2) irregularities with regard to his prior convictions, which the State had argued were statutory aggravating factors, (*id*. at 39); and (3) his mental health issues, including his low I.Q. and the effects of substance abuse, (*id*. at 39-42).

### i.  State court proceedings

A.        The penalty phase case

The Alabama Court of Criminal Appeals described defense counsel's apparent theory

of mitigation[13] as follows:

> The record shows that at the penalty phase of the capital trial counsel
> in his opening statement attacked the evidence of aggravating circumstances
> presented by the State and argued that Burgess was relying on the existence of
> four statutory mitigating circumstances to support a sentence of life
> imprisonment without the possibility of parole.  Counsel argued that Burgess
> did not have a significant history of prior criminal activity, that Burgess was
> under the influence of extreme mental disturbance at the time of the murders,
> that Burgess was under extreme duress at the time of the murders, and that
> Burgess was only 26 years old when he committed the murders.  Counsel made
> the following arguments in his opening statement in the penalty phase:

>> "Mr. Burgess came into this world, I think the testimony
>> will tell you, without a father.  There was no father ever in his
>> life.  He was raised by his mother who is mentally ill, who is
>> paranoid schizophrenic.  He started off his life like that, and he
>> never knew his father.  He was abused as a child through his
>> relatives . . . .  He had no brothers or sisters,[14] and it forced him
>> to be a lonely person, and to be somewhat of an outcast.  He
>> only had very few relatives who he could rely on.  One was his
>> grandmother, who was elderly and [was] not able to assist or
>> help him.  And, obviously as he grew older, he did very poorly
>> in school.  He did not graduate from school.  He went, I think,
>> through the tenth grade.  He, obviously, came from a
>> dysfunctional family, and he, inevitably became addicted to
>> drugs and alcohol."

---

[13] Because trial counsel did not testify at the Rule 32 hearing, the court has no direct evidence of counsel strategies and theories.

[14] Dr. Goff testified that Burgess had a mentally-retarded sibling.  (R. Vol. 18 at 2930.)

(Record on appeal [at] 2864-65.)

*Burgess*, 962 So. 2d at 293.

Defense counsel called only Dr. Goff during the penalty phase. (R. Vol. 18, Tab. 28 at 2916-66.) Dr. Goff identified himself as a clinical neuropsychologist, whom trial counsel had retained only for mitigation purposes "to try to get an assessment of [Burgess's] mental status, and diagnosis, and determination of what might be wrong with him from a mental or emotional standpoint." (*Id*. at 2919, 2952.) A typical assessment, according to Dr. Goff, would include information from collateral sources, such as "family members, academic and school records, and generally the statement as to what kind of difficulty the individual has been having over a period of time." (*Id*. at 2920.) The assessment would also include a formal mental status examination "where [he would try] to sit down and go through a number of symptoms, and see if the patient is demonstrating any particular symptoms of a recognized emotional or mental disturbance." (*Id*.)

Dr. Goff testified that Burgess did not have anyone that he could "call on, with the exception of his one uncle, who was the one that used to beat him all the time," and that uncle did not want to talk to Dr. Goff. (*Id*. at 2930-31.) Thus, much of Dr. Goff's information about Burgess's life history came from Burgess himself. Throughout the assessment, Dr. Goff described Burgess's affect as "euphoric" and "agitated;" he testified Burgess was "unable to [or] having difficulty in concentrating on what was going on," and he was talking so rapidly it was difficult to question him. (*Id*. at 2922-23, 2927.) Burgess

was able to tell Dr. Goff that he had been born in Iuka, Mississippi, and that his grandmother was the "primary center of household." (*Id*. at 2923.)  Although his mother was also in the household, she "wasn't very active in dealing with" Burgess. (*Id*. at 2923-2924.)  Dr. Goff reviewed collateral medical records and stated that Burgess's mother was "mentally ill" -  a paranoid schizophrenic. (*Id*. at 2923, 2929.)  Burgess also "[h]ad a bunch of uncles - 2 or 3 who moved in and out and were physically abusive to him and unkind." (*Id*. at 2924.)  Also, Dr. Goff testified that Burgess had "allude[d] to the fact that he was beat up all the time when he was a youngster, and he said that there was a particular uncle . . . who was quite active in knocking him around a lot.  His comment was that he got the shit beat out of him all the time when he was a child." (*Id*. at 2927.)   Dr. Goff stated that Burgess "mentioned that he had a sibling who was mentally retarded, . . . but that was the only person he seemed to talk to.  The family group seemed kind of loose." (*Id*. at 2930.)  Dr. Goff agreed the family was extremely dysfunctional. (*Id*.)

Burgess left school in the eighth grade and went to a youth facility in Ohio.  Dr. Goff reviewed some school records which showed Burgess attended school through eighth grade and then lived in a boy's facility in Ohio. (*Id*. at 2921-24.)  Burgess described his attendance as sporadic and said he "failed a good bit which [Dr. Goff testified] would be expected as well." (*Id*. at 2931.)   At some point, Burgess returned to Mississippi, but he did not go back to school and "was in trouble off and on . . . until he reached adulthood." (*Id*. at 2924.)

Burgess reported drug and alcohol use to Dr. Goff, who testified:

[Burgess] began using alcoholic beverages to his report when he was
extremely young.  He said his mother drank a good bit, and he could recall .
. . using alcoholic beverages when he was four or five years of age, or least
being given alcoholic beverages, and that sometimes, people will give alcohol
to children who are overly active or whatever, but I don't think he started
seriously drinking until his middle adolescence.  And then, at some point along
the line, and I'm not sure he was really clear as to when that might have
happened, he began using crack cocaine.  He indicated he had used crack
cocaine for two or three years, and at least, and he had at one point sought
treatment at the mental health center there in Florence.  But, as far as I could
ascertain with the records, as with most such patients, he didn't really follow
through.  He went there maybe three times and stopped going . . . .

(*Id*. at 2927-29.)  Also, Dr. Goff, reading from Dr. Maier's report, stated:

Furthermore, there was some evidence to suggest that the Defendant has a
history of assaultive behavior, cocaine abuse (and perhaps dependency), and
drug seeking behavior.  The latter (drug seeking behavior) seems quite likely
during the hours after the alleged killings but before the suicidal act.

Drug seeking behavior, no money, and perceived possible rejection
from his girlfriend may have all had motivational relevance to the crimes under
consideration.  I do not see any clear relevance to symptoms of mental illness,
nor is his below average intelligence low enough to suspect an inability to
distinguish between right and wrong.  Defendant's effort to kill himself also
suggests fright and awareness of wrong doing, as seen on this date related to
apparent remorse and regret.  Also noted during the current assessment was a
paranoid like tendency to put blame on one of the children, victims, family of
his dead girlfriend, and the community at large 'for not liking me.'  Paranoid-
like beliefs are fairly common occurrences in some dependent people.

In short, Mr. Burgess may have been under the influence of drugs and
may have been angered by the prospect of losing his 'family' via removal from
the home due to fearfulness and past abuse experience by his girlfriend/victim.
He denied any knowledge of sexual issues on the night in question.  Mr.
Burgess does not appear to have been suffering from any major thought
disturbance or mood disturbance, except for what might have been drug related
at the time of the alleged crimes.

61

(*Id*. at 2938-2940.)

The sentencing court also had the Presentence Investigation Report, which contained a lengthy statement of Burgess's "personal/social history" as recounted by a probation and parol officer, who stated that Burgess had been "very cooperative" and had "spoke[n] at great length about his life."  The parole officer reported that Burgess's uncle beat him severely. and "that there has always been violence in his life."  (R. Vol. 21 at 24, 29.)

### B.     The Rule 32 evidentiary hearing

Three witnesses were called to testify at the Rule 32 evidentiary hearing,[15] and since Burgess does not dispute the accuracy of the state court's findings concerning the substance of their testimony, it is set out herein.  The circuit court made the following findings as to Burgess's Rule 32 Petition:

> "Burgess called three witnesses to testify at the [Rule 32] evidentiary hearing.
>
> "Debbie Southward testified on direct examination that she had known Burgess from the time he was a child until he was a teenager.  Southward described Burgess as a 'typical kid' that respected her and 'never gave [her] any problem.'  Southward described an incident when Burgess was seven or

---

[15]Burgess asks the court to consider the affidavit of Dr. Roswell Evans, a psychopharmologist, which was submitted in support of a post-conviction motion for funds to retain a mental health specialist in substance abuse (the denial of which is not at issue). (Doc. 15 at 56-57 [citing R. Vol. 29, Tab. 69 at 583-84].)  Dr. Evans's affidavit was neither proffered nor admitted as evidence at the Rule 32 evidentiary hearing.  Furthermore, the only identified lay witness testimony that Burgess contends supports any general assertions Evans made about the effects of crack cocaine already has been found to be procedurally defaulted because it is presented for the first time in this court.  (*See* doc. 15, Exs. 2 and 3.)  Thus, Evans's affidavit will not be considered on this issue.

eight years old where he helped her daughter out of a sewer she had fallen into. On cross-examination, Southward indicated that she was unaware that Burgess had been convicted of kidnapping in Mississippi prior to being convicted of capital murder in Alabama.

"Johnny Southward, Debbie's son, testified that Burgess and he had been childhood friends because their grandmothers lived close together. Johnny Southward stated that he and Burgess rode bicycles, played ball, and did '[j]ust boyish things[.]'  Johnny testified that Burgess would help him when he would have epileptic seizures.  Johnny said Burgess was a good person at the time he knew him, but indicated that he had not had any close contact with Burgess after he turned 13 years old and Burgess turned 11 years old.  On cross-examination, Johnny indicated that he was not aware that Burgess had been convicted of, and served penitentiary time for, kidnapping in Mississippi and that Burgess is not the same person today that he grew up with as a child.

"Melissa Bennett testified that she had grown up with Burgess and known him all his life. Bennett testified that she and Burgess played together as children and that he went on vacations with her family.  Bennett indicated that Burgess went to church with her family, and described him as 'funny' and 'compassionate.'  Bennett testified that Burgess helped older people rake and mow their lawns and once kept her from being hurt in a fight.  Bennett described Burgess's mother as 'a nice lady' that 'had a mental problem.'  Bennett testified that Burgess's mother would sometimes talk to people that were not there and wear clothespins and light bulbs on her ears.  Bennett testified that Burgess was physically and verbally abused by his uncles and that neither his mother or grandmother protected him from the abuse.  Bennett stated that she had seen Burgess take drugs, including alcohol and marijuana, and sniff paint thinner.  Bennett said she hated what Burgess had done but that she loved him unconditionally 'like a brother.'  Bennett admitted on cross-examination that she had not had much contact with Burgess in the last 23 to 24 years."

*Burgess*, 962 So. 2d at 287-88 (quoting R. Vol. 37, Tab. 85 at 9-10).

The court also found:

The Rule 32 court found:

"At the penalty phase of the Burgess trial, trial counsel called Dr. John H. Goff, a clinical neuropsychologist, to testify. Goff opined that Burgess came from an extremely dysfunctional family. Goff testified that his investigation revealed that Burgess was borderline mentally retarded, that he had been physically abused by his uncles as a child, that he began using alcohol at a young age and had used crack cocaine, and that his mother had been diagnosed paranoid schizophrenic. Goff stated that Burgess suffered from a cyclothymic disorder that caused him 'substantial problems with fluctuating moods.' Goff indicated trial counsel had specifically requested that he investigate for evidence to establish mitigating circumstances.

"As this claim relates to the jury's recommended sentence, the Court finds that it is without merit. The Court finds the testimony of Dr. Goff far more compelling and credible than the testimony of Debbie and John Southward and Melissa Bennett. Neither of the witnesses called to testify at the evidentiary hearing had seen Burgess for many years, were unfamiliar with his criminal record as an adult, and were obviously biased for Burgess based on their prior relationships with him. Dr. Goff, on the other hand, presented a detailed synopsis of the effects that Burgess's family life and drug use had on his life. Further, the Court finds that much of the testimony elicited at the Rule 32 hearing regarding the physical/mental abuse suffered by Burgess, his drug and alcohol abuse, and his family's history of mental illness was cumulative to the testimony provided at trial by Dr. Goff.

*Burgess*, 962 So. 2d at 288-89 (citing Second supplemental record at 12-14).

## C. State appellate court opinion

The Alabama Court of Criminal Appeals addressed and rejected Burgess's contention

that counsel failed to investigate and present a mitigation theory, the pertinent portions of

which read:

The defense's strategy was so effective in the penalty phase that the jury recommended, by a vote of 8 to 4, that Burgess be sentenced to life imprisonment without the possibility of parole. Clearly, the trial strategy of Burgess's counsel was successful with the jurors. Therefore, we cannot say that Burgess is due relief on this claim.

64

Moreover,

> when claims of ineffective assistance of counsel involve the penalty phase of a capital murder trial the focus is on whether the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. An attorney's performance is not per se ineffective for failing to present mitigating evidence at the penalty phase of a capital trial.

As we also stated . . .:

> Prejudicial ineffective assistance of counsel under *Strickland* cannot be established on the general claim that additional witnesses should have been called in mitigation. Rather, the deciding factor is whether additional witnesses would have made any difference in the mitigation phase of the trial. There has never been a case where additional witnesses could not have been called.

Last, the United States Supreme Court stated . . ., when reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital trial:

> In *Strickland*, we made clear that, to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.

In its sentencing order, the circuit court found as aggravating circumstances that Burgess was under a sentence of imprisonment at the time of the murders and that Burgess had previously been convicted of a felony involving the use or threat of violence. In regard to mitigation, the circuit court found that Burgess's age at the time of the murders – 26 – was a mitigating circumstance and that the jury's recommendation of life imprisonment was a mitigating circumstance. The circuit court considered the evidence offered from Dr. Goff and other evidence related to Burgess's childhood, but it found none of that evidence to be mitigating.

In reviewing Burgess's claim of prejudice under *Strickland* we have independently reweighed the aggravating circumstances against the nonstatutory mitigating circumstances that were not presented at the penalty phase. We are confident that death was the appropriate sentence and that the alleged excluded evidence would not have effected the result. *Wiggins v. Smith*. Therefore, relief was correctly denied on this claim.

*Burgess*, 962 So. 2d at 294-95 (internal quotations and citations omitted).

### ii.      Life history. (Doc. 15 at 35-38.)

Burgess contends that his trial counsel should have investigated and presented evidence of his "family and social history, medical history, education history, employment and training history, correctional history, and any religious or cultural influences" at the penalty and sentencing phases of his trial. (*Id*. at 35 [citing *ABA Guidelines*, Guideline 1.11(F)(2)][footnote omitted].) He argues trial counsel performed deficiently in this area because they "'acquired only rudimentary knowledge [of Mr. Burgess' life history] from a narrow set of sources'. . . and presented none of this information during the penalty phase." (Doc. 15 at 35 [quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)].) He contends counsel's performance prejudiced him because, although there was "a wealth of mitigating [evidence] available through witnesses and records," counsel called only one witness – Dr. John Goff – to testify at the penalty phase of trial and they should have called "friends of Mr. Burgess'[s] from childhood." (*Id*. at 37.) Further, he complains that Dr. Goff's testimony was "cursory" in that he "admitted the bulk of his information was obtained solely from speaking with Mr. Burgess" and from reviewing school records and family medical records. (*Id*. at 36-37 [citing R. Vol. 18 at 2916-34; 2949-66].) The court notes that Dr. Goff's

testimony was not "cursory;" it covered many issues, including Burgess's family history and his mental health impairments.

Burgess alleges that there were "several witnesses," "friends," "family members," "community members," "other witnesses" and "records" that counsel could have presented that would have provided mitigating evidence. (Doc. 15 at 37.) He contends that trial counsel could have called individuals that knew him when he was a child – Debbie and Johnny Southward and Melissa Bennett. (*Id*. at 47-48.) However, choosing not to call witnesses that knew Burgess years before the murders may have been a deliberate choice not to emphasize the difference between the little boy Burgess was and the man he became. Nevertheless, because Burgess has not offered any evidence regarding what his trial counsel knew of his life history and why they did not present more evidence, the presumption that counsel's performance was reasonable and that they made all significant decisions in the exercise of reasonable professional judgment remains unrebutted.

The court finds there is a reasonable argument that Burgess's counsel satisfied *Strickland*'s deferential standard. Therefore, Burgess has not shown that the state court's rejection of these claims was contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the faces in light of the evidence. These claims will be denied.

### iii.    Aggravating factors (Doc. 15 at 39-40.)

Burgess alleges that counsel were ineffective because, although they were aware the state prosecutor was going to use two prior convictions as evidence in support of the aggravating factors against Burgess, yet "did not learn what they could about the circumstances surrounding" the offenses.  (*Id*. at 39.)  Allen contends that Burgess never raised this issue in state court.  (Doc. 21 at 7-8.)  The court agrees.  This claim is presented for the first time to this court.  Burgess's failure to raise this claim in accordance with Alabama procedural rules necessarily precludes federal review.  This claim is procedurally defaulted and will be denied.

The court also notes that Burgess has failed to plead this claim with particularity.  He contends:

> Trial counsel was ineffective in failing to fully investigate the prior convictions the State put forward in proving aggravating circumstances. . . . Here, . . . Mr. Burgess'[s] counsel failed to investigate fully his underlying offense.  Nor did counsel learn what they could about the circumstances surrounding such offense.  As a result, at sentencing counsel were compelled to rely on Mr. Burgess'[s] uncorroborated statements about a statutory aggravator – a prior Mississippi kidnaping conviction involving a minor.

(Doc. 15 at 39.)  Burgess does not state what exactly trial counsel would have learned about the kidnapping conviction had they conducted an investigation or how he was prejudiced.  Moreover, because he did not call his trial counsel to testify at the Rule 32 hearing, the presumption that counsel's performance was reasonable and that they made all significant decisions in the exercise of reasonable professional judgment remains unrebutted.

68

The court finds there is a reasonable argument that Burgess's counsel satisfied *Strickland*'s deferential standard. Therefore, Burgess has not shown that the state court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the faces in light of the evidence. This claim will be denied.

### iv.      Mental health issues  (Doc. 15 at 22-32, 40-44, 57-59.)

Burgess alleges that his trial counsel's performance during the penalty and sentencing phase was objectively deficient because counsel failed to investigate and present lay and expert testimony regarding Burgess's mental retardation, his mental and emotional problems, and the effects of his long-term drug and alcohol abuse. Discussion of mental health issues in this section includes Burgess's assertion that counsel failed to investigate and adequately present lay and expert testimony showing that substance abuse addiction could "produce[ ] biochemical and psychological changes in brain chemistry that adversely effect normal brain functioning." (Doc. 15 at 23.) He also argues that neither the court nor the jury were aware that long-term substance abuse "can cause problems in logical thinking, judgment, [and the] ability to focus and control impulses," and it can lead to "the neurological and psychological impairment known as craving, which can drive addicts to completely irrational and ungovernable behavior." (*Id*.) In essence, he declares he was prejudiced by counsel's inadequate presentation of these issues because a substance abuse expert, a neurobiologist or a neurologist should have been used to explain these concepts to the jury.

69

When the Alabama Court of Criminal Appeals addressed Burgess's complaints about counsel's investigation and presentation of a mitigation case at the penalty phase of trial, it affirmed and adopted the Rule 32 court's rejection of this claim on the merits. *See Burgess*, 962 So. 2d at 286-90 (quoting Second supplemental record at 12-14). Thereafter, the Alabama Court of Criminal Appeals concluded:

> We have thoroughly reviewed the record of the direct appeal. Clearly, this is not a case where Burgess's trial attorneys failed to investigate. The record shows they conducted a diligent investigation. Also, evidence was introduced in the penalty phase in support of mitigation. Burgess has failed to meet his burden in regard to this claim, and relief was correctly denied.

*Id*. at 290.

The Eleventh Circuit has held, "A thorough post-conviction mental health investigation does not render trial counsel's less thorough investigation ineffective. The key factor is whether the known evidence would lead a reasonable attorney to investigate further." *Harvey v. Warden, Union Correctional Institution*, 629 F.3d 1228, 1262 (11th Cir. 2011)(quoting *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010)(quoting *Wiggins*, 539 U.S. at 527))(internal citations and quotations omitted). "The mere fact that a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial." *Id*. (quoting *Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1242 (11th Cir. 2010)(quoting *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997)))(internal quotations omitted). Because Burgess has not produced any evidence as to what his counsel knew or did not know

of his history of substance abuse and other mental health and impairment issues and what steps they took to investigate and present these issues during the penalty phase of Burgess's trial, the presumption that counsel's performance was reasonable and that they made all significant decisions in the exercise of reasonable professional judgment remains unrebutted.

The court finds there is a reasonable argument that Burgess's counsel satisfied *Strickland*'s deferential standard. Therefore, Burgess has not shown that the state court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the faces in light of the evidence.

As to the prejudice prong, the Alabama Court of Criminal Appeals held that Burgess could not prove prejudice based on any inadequate performance by his counsel during the penalty phase, in part, because the jury had recommended a sentence of life without parole. *Id*. at 294. The court noted, "The defense's strategy was so effective in the penalty phase that the jury recommended, by a vote of 8 to 4, that Burgess be sentenced to life imprisonment without the possibility of parole. Clearly, the trial strategy of Burgess's counsel was successful with the jurors. Therefore, we cannot say that Burgess is due relief on this claim." *Id*. The court also stated, "In reviewing Burgess's claim of prejudice under *Strickland* we have independently reweighed the aggravating circumstances against the nonstatutory mitigating circumstances that were not presented at the penalty phase. We are confident that death was the appropriate sentence and that the alleged excluded evidence would not have effected the result." *Id*. at 295 (internal citation omitted).

71

"A petitioner cannot show sentencing phase prejudice when the jury recommends a sentence of life instead of death." *Parker v. Allen*, 565 F.3d 1258, 1275 (11th Cir. 2009)(citing *Routly v. Singletary*, 33 F.3d 1279, 1297 (11th Cir. 1994)).  In *Routly*, the Eleventh Circuit held:

> In the first instance, [petitioner] cannot show that any failure to present mitigating evidence to the jury prejudiced him to any degree whatsoever in the jury's consideration of penalty because the jury recommended a sentence of life imprisonment anyway.  Neither can he show that his case was prejudiced in the consideration of the sentencing judge because the essence of the mitigating evidence he now points to was before the judge . . . .

*Routly*, 33 F.3d at 1297.

The court does not find a reasonable probability that the outcome of Burgess's sentencing proceedings would have been altered by evidence of the effect of drug abuse on his brain or of his other mental health impairments.  Burgess has not shown that this decision by the state court, that any error of counsel did not result in prejudice, was unreasonable.

Based on the foregoing, these claims will be denied.

> **f.    Failure to object to the introduction of improper, prejudicial evidence.  Petitioner's Claim IV.A.5.  (Doc. 15 at 60-63; doc. 29 at 19-21.)**

Burgess complains that his trial counsel were ineffective because they failed to object to improper victim impact reports at the sentencing phase of trial and failed to object adequately to the inflammatory photographs and prior bad acts evidence at the guilt phase of trial.  (Doc. 15 at 61-65.)  Each specific allegation in this sub-category will be addressed individually below.

i.      **Failure to object to victim impact reports. (Doc. 15 at 61-62; doc. 29 at 21-22.)**

Burgess complains that, during the sentencing phase of his trial, defense counsel failed to object to the admission of victim impact evidence in the Presentence Investigation Report that "blatantly violated the prohibitions set out in *South Carolina v. Gathers*, 490 U.S. 805 (1989), and *Payne v. Tennessee*, 501 U.S. 808 (1991)."   (*Id.*)   On collateral appeal, the Alabama Court of Criminal Appeals held:

> Burgess presented no evidence at the Rule 32 hearing in support of this claim.  As we stated in *Payne v. State*, 791 So. 2d 383, 399 (Ala. Crim. App. 1999) (opinion on return to remand): "Because it appears that [the appellant] did not present evidence at the evidentiary hearing with regard to [certain] claims . . ., we conclude that he has abandoned these claims and we will not review them."

*Burgess*, 962 So. 2d at 301.

Burgess takes issue with the appellate court's use of the term "abandonment," and he argues that the court erroneously equated "abandoned" with not proving the claim.  (Doc. 29 at 53 [internal quotations omitted].)   This court need not decide whether the state court denied this claim because it was procedurally defaulted or because Burgess had failed to prove the claim.  For the reasons set forth below, this court finds that the state court's determination – that the sentencing court did not consider the inadmissible statements from the victims' family – is reasonable and binding on this court.  See, *infra*.  Therefore, Burgess cannot show that the failure of counsel to object to the inadmissible statements in the Presentence Investigation Report denied him effective assistance of counsel.

73

Therefore, this claim will be denied.

### ii.    Failure to adequately object to inflammatory, prejudicial photographs.  (Doc. 15 at 63.)

Burgess argues:

> Trial counsel failed to object adequately to the introduction of improper evidence, particularly inflammatory photographs.  Photographs that serve little or no purpose except to arouse the passion, prejudice, or sympathy of the jury should be excluded from evidence.  At trial, the state introduced several victims photos at the scene, some of which were taken after the victims' body positions had been altered by police.  (State's Exhibit 23-34).  Showing the jury these slides and pictures seriously prejudiced Mr. Burgess, yet counsel failed to object adequately to them.

(*Id*.)  On direct appeal, the Alabama Court of Criminal Appeals found:

> "The photographs now complained of portray the crime scene and the victim's bodies when they were discovered, thus, all are relevant.  That the photographs are gruesome and may have aroused the passions of the jurors is a direct result of the fact that the victims were murdered in a brutal gruesome manner."

*Id*. at 296 (quoting *Burgess*, 723 So. 2d at 764); *see also Ex parte Loggins*, 771 So. 2d 1093, 1103-05 (Ala. 2000)(discussing admissibility of relevant, yet "gruesome" and "ghastly," photographs in criminal trials even if the photographs inflame the passions of the jurors).  It denied Burgess's claim that his trial counsel had been ineffective because they did not object to the photographs on the ground that  "Burgess failed to present evidence in support of [it] at the Rule 32 hearing."  *Burgess*, 962 So. 2d at 301.

"[F]ailure to object to admissible evidence does not constitute ineffective assistance of counsel."  *United States v. Costa*, 691 F.2d 1358, 1363 (11th Cir. 1982).  Given the fact

that the Alabama courts have held that the photographs were admissible, there is a reasonable

argument that Burgess's trial counsel's decision not to object to the photographs satisfied

*Strickland*'s deferential standard.  *Harrington*, 131 S. Ct. at 788.  Because trial counsel did

not testify as to why they did not object to the photographs, the presumption that their

decision was reasonable and that they made their decision in the exercise of reasonable

professional judgment is unrebutted.

Therefore, this claim will be denied.

### iii. Failure to object adequately to prior bad acts at the guilt phase, failure to request limiting instruction as to prior bad acts, failure to raise these issues on direct appeal.  (Doc. 15 at 63-65.)

Burgess complains that trial counsel were ineffective for failing to "adequately" object

to evidence that he had previously assaulted Shelia Nnodimele and for "fail[ing] to request

an appropriate limiting instruction."  (*Id*. at 63, 64.)  He also alleges his appellate counsel

was constitutionally ineffective for failing to raise these issues on appeal.  (*Id*. at 64.)  When

the Alabama Court of Criminal Appeals addressed the substantive nature of these claims on

collateral appeal, it made the following findings of fact and conclusions of law:

> Burgess first argues that evidence of [his] abusive relationship with [Shelia Nnodimele] was inadmissible because, he argues, it permitted jurors to infer [his] guilt based on his prior conduct toward Shelia.

> We have examined the record that was filed with this Court on direct appeal. [Footnote 4]  The record shows that several friends of the victims testified that Burgess and [Shelia] had an abusive relationship and that they had seen Burgess strike [Shelia] on occasion. [Footnote 5]

[Footnote 4:]  This Court may take judicial notice of its prior records on appeal.  *See Nettles v. State*, 731 So.2d 626, 629 (Ala. Crim. App. 1998).

[Footnote 5:]  Burgess does not identify specific acts in his brief; he merely lists page numbers from the original record.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b), Ala. R. Evid.  However, Alabama has recognized several exceptions to this general exclusionary rule.  Prior bad acts may be admissible to show motive or intent to commit the charged offense.  See Rule 404(b), Ala. R. Evid. . . .

. . . "Former acts of hostility or cruelty by the accused upon the victim are very commonly the basis for the prosecution's proof that the accused had a motive to commit the charged homicide." 1 Charles W. Gamble, *McElroy's Alabama Evidence* § 45.01(8) (5th ed. 1996)(footnote omitted), and cases cited therein.

*Burgess*, 962 So. 2d at 281-82.  After an in-depth discussion of Alabama case law and as well as case law from other states, the court found, "Based on well-established caselaw, Burgess's prior acts of violence toward the victim were admissible under the motive and intent exceptions to the exclusionary rule." *Id.* at 283.

Burgess contends that his trial counsel were ineffective for failing to object to the evidence of his violence toward Shelia Nnodimele on the ground that the evidence was "more prejudicial than probative."  (Doc. 15 at 63.)   However, "failure to object to admissible evidence does not constitute ineffective assistance of counsel." *Costa*, 691 F.2d at 1363.

The standard of review for state evidentiary rulings in federal habeas corpus proceedings is a narrow one.  Only when evidentiary errors "so infused the

trial with unfairness as to deny due process of law" is habeas relief warranted. *Lisenba v. California*, 314 U.S. 219, 228, 62 S. Ct. 280, 286, 86 L. Ed. 166 (1941), quoted and applied in, *Estelle v. McGuire*, 502 U.S. 62, 75, 112 S. Ct. 475, 484, 116 L. Ed. 2d 385 (1991); accord *Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir.) (evidentiary ruling claims reviewed only to determine whether the error "was of such magnitude as to deny fundamental fairness"), cert. denied, 516 U.S. 946, 116 S. Ct. 385, 133 L. Ed. 2d 307 (1995); *Kight v. Singletary*, 50 F.3d 1539, 1546 (11th Cir. 1995), cert. denied, 516 U.S. 1077, 116 S. Ct. 785, 133 L. Ed. 2d 735 (1996).  Such a determination is to be made in light of the evidence as a whole.

*Felker v. Turpin*, 83 F.3d 1303, 1311-1312 (11th Cir. 1996).

The Alabama Court of Criminal Appeals found that the evidence was admissible for purposes of showing intent and motive.  Therefore, under the circumstances, the court finds that Burgess has not shown that his trial counsel's failure to object to this evidence or appellate counsel's failure to raise this issue on appeal were decisions outside the "the 'wide range' of reasonable professional assistance" or that it is reasonably likely that the outcome would have been different.   *Harrington*,   131 S. Ct. at 787.

As for Burgess's claim that counsel was ineffective for failing to request a limiting instruction regarding the prior bad acts evidence at trial, the appellate court found no plain error because "the evidence against Burgess was overwhelming [and] the circuit court gave the jury [a limiting] instruction."  *Burgess*, 962 So. 2d at 285.  The trial court instructed the jury, "The accused is not on trial for any act, or conduct, not alleged in the indictment. Regardless of your personal views, as jurors, you are not to concern yourselves with the lawfulness, or the unlawfulness of any prior incidents of behavior between the Defendant and

any victim in this case." *Id*. (quoting Record on Appeal at 2803).  The Court of Criminal

Appeals also found:

> More importantly, in the context of a Rule 32 proceeding and defending a claim of ineffective assistance of counsel, counsel may make a strategic decision to not call attention to prior bad act evidence by not requesting a limiting instruction on the use of those acts.  Though we have never addressed this specific issue, many other jurisdictions have found that an attorney's decision not to request a limiting instruction was a strategic choice that was not subject to attack in a Rule 32 petition.  Burgess failed to meet either prong of the *Strickland* test; thus, he is not entitled to relief on this claim.

*Id*.

The instruction appropriately limited the jury's consideration of the prior-bad-acts

evidence.  Burgess has not shown that trial counsel's failure to request a different limiting

instruction or appellate counsel's failure to raise the issue on direct appeal were decisions

outside the wide range of reasonable professional assistance.  Moreover, because neither trial

counsel nor appellate counsel testified as the reasons, or lack thereof, for their decisions, the

presumption that their decisions were reasonable and that they made their decisions in the

exercise of reasonable professional judgment is unrebutted.

The state court's rejection of these ineffectiveness claims arising out of the prior bad

acts evidence is neither contrary to nor an unreasonable application of clearly established

federal law, nor is it based on an unreasonable determination of the facts in light of the

evidence before it.  Therefore, this claim will be denied.

g.   **Failing to ensure Burgess's presence at critical stages of trial and failure to ensure a complete record on appeal.  Petitioner's Claim IV.A.6.  (Doc. 15 at 65-67; doc. 29 at 21-23.)**

i.   **Absence at critical stages**

Burgess contends that he "was denied his constitutional right to be present during many parts of his capital trial," and that he "[t]rial counsel failed to object to proceedings which occurred without Mr. Burgess being present."  (Doc. 15 at 65.)  As set forth below, the court finds that Burgess was not absent from any critical stage of the proceedings.  See, *infra*.  The court finds that Burgess's counsel satisfied *Strickland*'s deferential standard.

Therefore, this claim will be denied.

ii.   **Failed to ensure a complete record on appeal.  (Doc. 15 at 66.)**

Burgess contends:

> Trial counsel also failed to object adequately to the trial court's failure to transcribe all of the proceedings.  At Mr. Burgess's trial, crucial bench conference were not transcribed.  (M.11, 43, 46, 122, R. 202, 217, 268, 330, 438, 475, 475, 570, 668, 944, 1071, 1192, 1282, 1417, 1423, 1658, 2101).  Trial counsel should have objected to the failure to transcribe all of the proceedings.

(Doc. 15 at 66.)

The Alabama Court of Criminal Appeals adopted the Rule 32 court's summary dismissal of this claim as insufficiently pled.  *Burgess*, 962 So. 2d at 297.  This default effectively precludes federal review of the claim.

Even if it did not, the claim is also insufficiently pled for federal habeas purposes and could be dismissed on the basis alone.[16]

This claim for relief will be denied.

> h.   **Failing to perform a factual investigation and conduct independent tests on evidence used at trial.  Petitioner's Claim IV.A.7.  (Doc. 15 at 67-69.)**

Burgess argues that trial counsel were ineffective in failing to "adequately utilize independent experts to examine evidence."  (Doc. 15 at 68.)  Allen contends that Burgess did not raise this claim in the state court; therefore, it is procedurally defaulted.  (Doc. 21 at 21-22.)  The court agrees.  Burgess's failure to raise this claim in accordance with Alabama procedural rules necessarily precludes federal review of it.  This claim is procedurally defaulted and will be dismissed.

Moreover, Burgess has not shown what investigation his trial counsel conducted as to the physical evidence and why they chose not to pursue additional tests and experts; therefore,

---

[16]Burgess alleges:

> Trial counsel also failed to object adequately to the trial court's failure to transcribe all of the proceedings.  At Mr. Burgess' trial, crucial bench conferences were not transcribed. (M. 11, 43, 46, 122, R. 202, 217, 268, 330, 438, 475, 476, 570, 668, 944, 1071, 1192, 1282, 1417, 1423, 1658, 2101).  Trial counsel should have objected to the failure to transcribe all of the proceedings.

(Doc. 15 at 66-67.)  Burgess does not detail the nature of these so-called "crucial bench conferences" or describe how the failure to transcribe these proceedings prejudiced his right to a fair trial.

the presumption that their decisions were reasonable and that they made their decisions in the exercise of reasonable professional judgment is unrebutted.

> ### i.   Individual and cumulative errors warrant relief.  Petitioner's Claim IV.A.8.  (Doc. 15 at 69-73.)

In his last sub-claim of ineffective assistance of counsel, Petitioner asserts that the court must consider the cumulative effect of all of the mistakes of counsel.  Specifically, he asserts that counsel "failed to investigate the case against their client, they failed to put on a viable defense, they failed to conduct any mitigation investigation, and they failed to retain appropriate experts." (Doc. 15 at 71 [footnote omitted].)

For all of the reasons set out in this section of the Memorandum Opinion, Burgess cannot show he is entitled to habeas relief in connection with any of his ineffective-assistance claims.  His invitation to this court to implement a prejudice standard based on "cumulative errors" is rejected in this instance.    This claim will be denied.

## B.   BURGESS IS MENTALLY RETARDED UNDER THE STANDARDS ENUNCIATED BY THE UNITED STATES SUPREME COURT IN *ATKINS v. VIRGINIA*.  Petitioner's Claim IV.B.  (Doc. 15 at 73-87; doc. 29 at 26-29.)

Burgess contends, "Evidence in the trial and post-conviction record establishes that [he has] demonstrated deficits in intellectual functioning and adaptive skills consistent with" the standards set out by the United States Supreme Court in *Atkins v. Virginia,* 536 U.S. 304 (2002).  (Doc. 15 at 73.)  He also argues that Alabama's definition of mental retardation, set

forth in *Ex Parte Perkins*, 851 So. 2d 453,[17] is more stringent than federal law permits; specifically, he contends that *Atkins* does not permit Alabama to require an I.Q. test score below 70 in its definition of mental retardation.  (*See* doc. 29 at 26-27.)

During post-conviction proceedings, Burgess argued that all of the evidence necessary to support his mental-retardation claim was located in the trial court record, and he offered the trial court record as the sole support for his claim.  (*See* R. Vol. 33, Tab. 71 at 14.) Although he contends the record below establishes he is mentally retarded, he makes new factual allegations and presents evidence that was not presented to the state court in his Amended Petition before this court.[18]  (Doc. 15 at 73 and Ex. 6.)  Specifically, he attaches the affidavit of Dr. Bryan Hudson, a neuropsychologist, dated June 12, 2008, to his Amended Petition.  (*Id*. Ex. 6.)  In this affidavit, Dr. Hudson states that he gave Burgess the WAIS-III I.Q. test in May 2008.  (*Id*. ¶ 5.)  Dr. Hudson testified that Burgess scored a full scale 76; however, he testified "it is more appropriate to consider his score to fall somewhere between 71-81."  (*Id*. ¶ 9.)  He went on to state –

---

[17]The *Perkins* tests requires a defendant to prove "(1) significantly subaverage intellectual functioning (an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the deficiencies must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."  *Burgess*, 962 So. 2d at 299 (citing *Perkins,* 851 So. 2d at 456).

[18]In his original Petition, Burgess stated, "The trial record in this case suggests that Alonzo Burgess has mental retardation, (R. 2925, 2956), and thus he may not be executed under the Eighth and Fourteenth Amendments to the United States Constitution."  (Doc. 1 at 54.)

> When consideration is given to his previous IQ estimates, his academic disturbances, and his chronic inability to adapt to the demands of society, it is most likely that his "true" IQ falls somewhere in the low 70's range, as measured by the WAIS-III. Moreover, when consideration is given to the Flynn Effect,[19] I believe that his IQ would certainly fall in the range of mild mental retardation.

(*Id*. [footnote added].)   The court has not considered Dr. Hudson's Declaration, which Burgess failed, without explanation, to develop and present in the first instance to the state court.

The Rule 32 court found this claim – that Burgess is mentally retarded and, therefore, his execution would constitute cruel and unusual punishment – was barred "because it could have been but was not raised at trial and could have been but was not raised on appeal," and also "because it [was] a new claim that was raised outside the two-year limitations period provided in Rule 32.2(c), [Ala. R. Crim. P.], and does not relate back to any claim in Burgess's original, timely filed petition."   (R. Vol. 29 at 557.)   The Alabama Court of Criminal Appeals found the claim was not procedurally barred; nevertheless, it rejected the claim:

> Burgess, citing *Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), argues that it is a violation of the Eighth Amendment of the United States Constitution to execute a mentally retarded individual and that he is borderline mentally retarded.

---

[19]"The Flynn effect acknowledges that as an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population as a whole on that assessment instrument increases, thereby artificially inflating the IQ scores of individual test subjects.  Therefore, the IQ test scores must be recalibrated to keep all test subjects on a level playing field."  *Thomas v. Allen*, 607 F.3d 749, 753 (11th Cir. 2010).

The circuit court erroneously held that Burgess's claim of mental retardation was procedurally barred because it was not presented in a timely filed Rule 32 petition.  As we stated in *Clemons v. State,* [Ms. CR-01-1355, August 29, 2003] ___ So.2d ___, ___ (Ala. Crim. App. 2003):[20]

> "[W]e conclude that the decision in *Atkins* falls within *Teague's* first exception to the general rule of nonretroactivity and applies retroactively to cases that are on collateral review.  [*See Teague v. Lane,* 489 U.S. 288 (1989)].  The other states that have addressed this issue since the decision in *Atkins* have also reached this same conclusion.  *See Russell v. State,* 849 So. 2d 95 (Miss. 2003); *Johnson v. State,* 102 S.W.3d 535 (Mo. 2003); *State v. Dunn,* 831 So. 2d 862 (La. 2002)."

(Footnote omitted.)  However, we may affirm a circuit court's ruling if it is correct for any reason.  See *Reed* [*v. State*, 748 So. 2d 231, 233 (Ala. Crim. App. 1999)].

After an exhaustive review of the records of both the direct appeal and the postconviction proceedings we see no indication that Burgess meets the definition of mental retardation adopted by the Alabama Supreme Court in *Ex parte Perkins,* 851 So. 2d 453 (Ala. 2002).  In *Perkins,* the court adopted the most liberal definition of mental retardation employed by those states that bar the execution of the mentally retarded.  The defendant must have (1) significantly subaverage intellectual functioning (an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the deficiencies must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).  *Perkins,* 851 So. 2d at 456.

At the penalty phase, testimony was presented indicating that Burgess's IQ was between 70 and 80.  Burgess completed the ninth grade and went one year to Oakleigh Mississippi Training School after he was convicted of a drug

---

[20]*Clemons v. State*,  No. CR-01-1355, 2003 WL 22047260 (Ala. Crim. App. Aug 29, 2003), opinion after remand (Ala. Crim. App. Jun 24, 2005), *opinion after remand reversed*, No. 1041915, 2007 WL 1300722 (Ala. May 4, 2007)(holding that the Court of Criminal Appeals may not raise a Rule 32 procedural bar *sua sponte*).

offense in the State of Mississippi.  Records from the Mississippi Department of Corrections introduced for the postconviction proceedings showed one request for an inmate reclassification that contained the following remarks from the classification officer:

> "Mr. Burgess has completed his training and instruction in the welding program at the vocational school and has had a good attendance and work record.  We feel that Mr. Burgess is ready and deserving of this custody change at this time.  He has been enrolled in the welding program for approximately 12 months . . . .  This man is industrious, orderly and obedient."

(R. 666.)

The probation officer who conducted a six-hour interview with Burgess reported that he was "very cooperative and spoke at great length about his life." (Record on direct appeal, p. 29.)  Burgess reported to the probation officer that he had had jobs operating heavy equipment, working as a welder, and working as a brick mason.

The witnesses who testified at the postconviction hearing also described Burgess as a normal child who was considerate, compassionate, and caring. One witness commented that Burgess had a brother who was mentally retarded. Also, at the time Burgess committed the murders he had been in a long-term relationship with Shelia Nnodimele.

Burgess is not mentally retarded under the most liberal definition of mental retardation adopted by the Alabama Supreme Court in *Perkins.*  See also *Ex parte Smith,* [Ms. 1010267, March 14, 2003] ___ So.[3d] ___[, 2003 WL 1145475] (Ala. 2003).  Therefore, *Atkins* does not bar Burgess's sentence of death.

*Burgess*, 962 So. 2d at 298-99 (footnote added).

Before this court, Burgess contends that the state appellate court's rejection of his

*Atkins* claim is contrary to or an unreasonable application of clearly established federal law,

or an unreasonable determination of the facts in light of the evidence.  Specifically, Burgess

85

takes issue with the standard for determining mental retardation established by the Alabama

courts:

> It is not the Alabama Supreme Court's definition of mental retardation that is relevant, it is the United States Supreme Court's definition of mental retardation. The *Atkins* Court set out the standard, leaving only to the states the task of developing the ways of enforcing those standards. The Alabama Supreme Court is not free to define mental retardation in a way that is more restrictive than the Supreme Court defined it. *Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002) adopted a definition of mental retardation that included a specific reference to an IQ score of below 70. *Perkins* at 456. This does not comport with the United States Supreme Court opinion in *Atkins* which did not make an IQ of 70 a magic number that has to be met before a defendant may be found mentally retarded. Therefore, it is only the United States Supreme Court's position on the subject that is relevant.

(Doc. 29 at 26-27.)

"Although the *Atkins* Court alluded to clinical definitions propounded by the American

Association on Mental Retardation[21] ('AAMR') and the American Psychiatric Association

('APA'), it left to the states the development of standards for courts to employ in making a

determination of whether an offender is mentally retarded." *Thomas v. Allen*, 607 F.3d 749,

752 (citing *Atkins*, 536 U.S. at 317)(footnote added).[22]  The Eleventh Circuit has repeatedly

_____

[21]The American Association on Mental Retardation is now known as the American Association on Intellectual and Developmental Disabilities.

[22]The *Atkins* court noted:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: " *Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use,

86

applied the Alabama standard without any indication that its requirement of an IQ score of 70

or below was inconsistent with *Atkins* or otherwise unconstitutional. *See id.* at 752, 756-57;

*Powell v. Allen*, 602 F.3d 1263, 1272 (Ala. 2010); *Holladay v. Allen*, 555 F.3d 1346, 1353,

1357 (Ala. 2009). Therefore, this court finds Alabama's standard for establishing mental

retardation, including the requirement that Burgess prove an IQ score of 70 or lower, applies

to Burgess's case.

Burgess has offered nothing to show that the factual determinations underlying the

state appellate court's application of Alabama's mental retardation standard were

unreasonable. He contends:

---

self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id*., at 42-43.

*Atkins*, 536 U.S. at 308 n.3.

Mr. Burgess is entitled to relief under *Atkins* as he clearly meets the definition of having subaverage intellectual functioning and subaverage adaptive functioning, which serves as the basis for exclusion from execution. Mr. Burgess'[s] test scores ranged from a 73 when after he was arrested in Mississippi (Exhibit 5, Amended Habeas Corpus Petition), and Dr. Goff stated that he relied on the testing done by a previous doctor who found Mr. Burgess "borderline mentally retarded." (R. 2925)  In addition, he exhibited the deficits in adaptive skills such as deficits in conceptual skills and interpersonal skills.

(Doc. 29 at 28.)  The court finds that this evidence is not sufficient to overturn the state court's factual determination that Burgess is not mentally retarded.

As set forth above, Alabama requires a defendant, seeking to establish that he is mentally retarded, to show "(1) significantly subaverage intellectual functioning (an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the deficiencies must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)." *Burgess*, 962 So. 2d at 299 (citing *Perkins,* 851 So. 2d at 456).  "Borderline mentally retarded" and "borderline intellectual functioning" are terms used to describe a level of intellectual functioning just ***above*** mental retardation or intellectual disability.  In other words, people with IQ levels in the borderline range are not considered to be mentally retarded or to have an intellectual disability that "qualif[ies] for an exemption from the death penalty."  *See Holladay*, 555 F.3d at 1353 (citing *Smith v. State*, No. 1060427, 2007 WL 1519869, *8 (Ala. May 25, 2007))(emphasis added).[23]

_____

[23]The *Smith* court held:

The definition set forth in *Ex parte Perkins* is in accordance with the definitions set forth in the statutes of other states and with recognized clinical

The evidence shows that Burgess's IQ scores placed him in the category of borderline intellectual functioning or borderline mentally retarded, which equates to IQ scores over 70. Dr. Goff testified at the sentencing phase that Dr. Shealy, Burgess's expert, had found that Burgess was "borderline mentally retarded," and he testified that the state's expert, Dr. Maier, had found Burgess's IQ was "below normal, *probably* in the borderline range" and *maybe* "mildly mentally retarded."   (R. Vol. 18 at 2925, 2956 [emphasis added].)   Dr. Maier estimated Burgess's IQ was between 70 to 80.  (*Id*. at 2956.)  At 22, Burgess had an IQ test score of 73.  (Doc. 15, Ex. 5 at 3.)  The Alabama court's finding that Burgess was not mentally retarded is not an unreasonable finding based on the evidence.

---

definitions, including those found in the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.1994).  The *Manual of Mental Disorders* lists four degrees of mental retardation: mild, moderate, severe, and profound.  *Id*. at 40-41.  All four degrees of mental retardation require that all three prongs of the *Ex parte Perkins* test be satisfied before an individual can be diagnosed as mentally retarded; thus, if the defendant proves that he or she suffers any degree of mental retardation, the defendant is ineligible for the death penalty. [footnote]  However, a classification of "borderline intellectual functioning" describes an intelligence level that is higher than mental retardation, *id*. at 45, 684, and, thus, does not render a person ineligible for the death penalty.

> [Footnote]  If a person is deemed to be mentally retarded because the three prongs of Ex parte Perkins have been satisfied, the degree of mental retardation is based on the level of intellectual impairment: Mild = IQ level 50-55 to approximately 70; Moderate = IQ level 35-40 to 50-55; Severe = IQ level 20-25 to 35-40; Profound = IQ level below 20 or 25.  *Manual of Mental Disorders* at 40.

*Smith*, 2007 WL 1519869 at *8 and n.3.

Therefore, this claim will be denied.

**C.    THE TRIAL COURT'S CONSIDERATION OF EXTENSIVE VICTIM IMPACT EVIDENCE IN DETERMINING TO OVERRIDE THE VERDICT OF LIFE WITHOUT PAROLE VIOLATED PETITIONER'S FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.  Petitioner's Claim IV.C.  (Doc. 15 at 87-95; doc. 29 at 29-32.)**

Burgess contends, "In this case, victim impact statements" – including "the victims' family members' detailed accounts of the appropriate punishment for Mr. Burgess, as well as their opinions as to his character and the crime" contained in the Presentence Investigation Report – "were considered by the trial court and played a large role in its decision to override the jury's life recommendation."  (Doc. 15 at 88.)   He argues that the trial court must have found these statements in the Presentence Investigation Report dispositive because the Report was the only evidence that was before the sentencing court that was not before the jury, and the jury returned a verdict (life) different from the sentencing court (death).  (Doc. 29 at 31.) He also argues that he was denied the opportunity to respond to these improper statements. (Doc. 15 at 92.)  Although the sentencing court had the Presentence Investigation Report and this Report contained statements from the victims' family about their opinions of defendant and of the appropriate sentence, Burgess has not presented evidence that the sentencing court actually considered the family-opinion evidence; also, the record shows that he had notice and a chance to respond to the Presentence Investigation Report.

The Alabama Court of Criminal Appeal rejected this claim; it held:

> Burgess contends that the trial court erred at sentencing when it considered numerous victim impact statements, because the statements

90

contained comments from the victims' family members about the punishment Burgess should receive and their opinions about his character and the crime. He also argues that the trial court erred when it considered the portions of a victim impact report that detailed Burgess's actions toward the victims before the murders. The State contends that the record does not indicate that the trial court considered the victim impact reports in determining the proper sentence. The State also argues that no error would have occurred even if the court considered details of Burgess's behavior toward the victims before the murders.

Burgess did not object at trial to the inclusion of the victim impact statements in the presentence report, nor did he object to the trial court's alleged consideration of them. *We note, however, that when the court asked the parties whether they had any comments on the presentence report, Burgess brought several other matters to the court's attention*. His failure to object on the grounds now raised requires us to review the allegations for plain error to determine whether they constitute particularly egregious errors that seriously affected the fairness and integrity of the judicial proceedings. Rule 45A, Ala. R. Crim. P.; *Kuenzel v. State*, 577 So.2d 474, 481-82 (Ala. Cr. App.1990), *aff'd*, 577 So. 2d 531 (Ala.), *cert. denied*, 502 U.S. 886, 112 S. Ct. 242, 116 L Ed.2d 197 (1991).

The presentence report consists of 13 pages of information about Burgess; slightly more than 4 pages are the single-spaced, typewritten report of Burgess's life story as he related it to the probation officer who interviewed him. Also included with the presentence report were the victims' impact reports completed by [Shelia] Nnodimele's parents and sister and an unidentified person regarding the injuries and monetary losses suffered. The victim impact form specifically requested the victim's opinion of the appropriate punishment and an "impact statement." Along with the completed forms, the victims submitted handwritten statements addressing punishment and the impact of the murders. *The trial court's sentencing order does not refer to the victim impact statements; the court's fact findings and its discussion of the aggravating and mitigating circumstances refer repeatedly to the evidence presented at trial. The court also made specific references to portions of the presentence report completed by the probation and parole officer. The record does not indicate that the court considered the victim impact statements in sentencing Burgess, nor does it indicate that it based Burgess's sentence, even in part, on the statements.*

Statements regarding the impact of the crime on the victim are properly before a trial court at sentencing. *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L ED.2d 720 (1991). However, the United States Supreme Court did not overrule the prohibition it imposed in *Booth v. Maryland*, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440 (1987), against considering at the sentencing phase at a capital murder trial, victim impact evidence regarding the characterization of the crime, the defendant, or the appropriate punishment. ***We find no plain error here because we find no evidence that the statements were considered by the court at sentencing.***

*Ex parte Rieber*, 663 So. 2d 999 (Ala.1995), *cert. denied*, 516 U.S. 995, 116 S. Ct. 531, 133 L. Ed. 2d 437 (1996) presented facts substantially similar to those now before us. In the victim impact statement, the deceased's husband expressed his opinions about the defendant, the crime, and the appropriate sentence. The Alabama Supreme Court stated that a new sentence hearing is not required in every death penalty case in which a victim impact statement appears in the presentence report. The court also noted, as we have noted here, that the record did not indicate that the trial court considered the victim impact statement in sentencing the victim, and it found no reversible error. 663 So. 2d at 1006-07. *Ex parte Land*, 678 So.2d 224 (Ala.), *cert. denied,* 519 U.S. 933, 117 S. Ct. 308, 136 L. Ed. 2d 224 (1996), presented similar facts. In that case, the trial judge received and read several letters from the victim's family and friends, expressing their opinions about the defendant, the crime, and the appropriate punishment. The Alabama Supreme Court found no plain error, however, because the record established that the court did not consider the letters in determining the defendant's sentence. *See also Arthur v. State*, 711 So. 2d 1031 (Ala. Cr. App. 1996)(references in presentence report to family's statements regarding impact of murder and to appropriate sentence were not plain error).

As was true in all of the foregoing cases, ***there is no indication in this case that the victim impact statements were considered by the court in determining the appellant's sentence***. To the contrary, the record in this case, like the record in *Ex parte Land*, demonstrates that the trial court determined the sentence in the manner established by §§ 13A-5-47 to -52, Ala. Code 1975, because the court repeatedly referenced the Code sections in its findings. Based on the holdings in the above-cited cases, and on the record presented, we find no plain error in the trial court's actions.

*Burgess*, 723 So. 2d at 765-66 (emphasis added).

1. *Payne v. Tennessee*, 501 U.S. 808 (1991)

Burgess contends, "The victim impact reports that were considered by the trial court were replete with the victims' family members' detailed accounts of the appropriate punishment for Mr. Burgess, as well as their opinions as to his character and the crime.  The statements violated the law in *Payne* condemning consideration of the victims' family's characterizations about the defendant, the crime and the appropriate punishment;" he also argues that the Presentence Investigation Report contains inadmissible statements from the victims' family that contained details of Burgess's prior assault of Shelia Nnodimele and his "allegedly [keeping] Ms. Nnodimele's children from visiting their grandparents." (Doc. 15 at 88-89, 93.)  Burgess asks the court to assume the sentencing court considered the inadmissible statements based on two facts: (1) the sentencing court had the Presentence Investigation Report and the jury did not, and (2) the jury, voting 8-4, recommended a life sentence and the sentencing court imposed a sentence of death.

In *Payne*, the Supreme Court held that there is no *per se* bar to the introduction of victim impact evidence and argument, and it overruled prior precedent, which had held that all evidence and argument relating to the victim and the impact of the victim's death were inadmissible at a capital sentencing hearing. *Payne*, 501 U.S. at 827, *overruling in part Booth v. Maryland*, 482 U.S. 496 (1987) and *overruling South Carolina v. Gathers*, 490 U.S. 805 (1989).  The Supreme Court held:

> We thus hold that if the State chooses to permit the admission of victim
> impact evidence and prosecutorial argument on that subject, the Eighth

> Amendment erects no *per se* bar.  A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.  There is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne*, 501 U.S. at 827.  However, the Supreme Court did not address and, thus, left in place, the prohibition of evidence and argument, established in *Booth*, "of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence," because this sort of evidence was not presented at Payne's trial.  *Id*. at 830 n.2.

The court finds that the Presentence Investigation Report contains inadmissible opinion and characterization statements from the victims' family.  (*See* Vol. 21 at 36-43, 46-48, 59 - 65.)  Nevertheless, Burgess has not shown that the finding of the Court of Criminal Appeal – that Burgess did not prove that the sentencing court had considered or "used" these inadmissible statements – is an unreasonable finding.

In Alabama, when "the sentencing order reflects proper weighing of the aggravating circumstance and the mitigating circumstances," the reviewing court presumes that "the trial judge . . . disregard[ed] any inadmissible evidence and improper factors in sentencing."  *See Sockwell v. State*, 675 So. 2d 4, 36 (Ala. Crim. App. 1993)(citing, *inter alia*, *Lightbourne v. Dugger*, 829 F.2d 1012 (11th Cir. 1987), *cert. denied*, 488 U.S. 934 (1988)); *see also United States v. Menk*, 406 F.2d 124, 127 (7th Cir. 1968)("[A] trained, experienced Federal District Court judge, as distinguished from a jury, must be presumed to have exercised the proper discretion in distinguishing between the improper and the proper evidence introduced at trial,

94

and to have based his decision only on the latter, in the absence of a clear showing to the contrary by appellant.").  In this case, the sentencing court's Order of Court in Imposition of Sentence is detailed.  (R. Vol. 2 at 272-83.)  It contains lengthy Findings of Fact based on the evidence presented at trial and at the sentencing hearing, including the Presentence Investigation Report.  The Order specifically refers to the Presentence Investigation Report as the basis, or the partial basis, for two findings:  (1) "[E]ven after a suspended sentence was imposed [for his conviction for making harassing communications], Burgess violated the conditions of his probation by assaulting Shelia Nnodimele, deceased," (*id.* at 278); and (2) Burgess "had a crack cocaine dependency at the time period in question, and . . . his drug seeking behavior might have been a motivational factor for the three killings," (*id.* at 280).  The Order does not mention the victims' family's opinions of Burgess, his crimes, or the appropriate punishment.  It discusses each statutory aggravating or mitigating factor, sets forth the evidence for each, and expressly finds the factor exists or does not exist.  It also contains a detailed discussion of the non-statutory mitigating circumstances considered by the court. Considering the jury's recommendation as a mitigating factor, the sentencing court held:

> The Court does find that the jury's recommendation is a mitigating factor and the Court has considered said mitigating factor at this sentenc[ing] hearing. However, the jury was allowed to hear testimony regarding the defendant being raised in a dysfunctional family, that he was physically abused by his uncles, that they were unkind to him and that he was borderline mentally retarded as well as suffering from a mood disorder.  Further the jury heard evidence that defendant tried to commit suicide shortly after the killings.  As stated above, the Court finds that defendant's dysfunctional family life, his mood disorder, his uncles' abuse and his attempted suicide are not mitigating factors.

(*Id*. at 282.)

The reasons for the sentencing court's decision to override the jury's recommendation are set forth clearly within the four corners of its Order. These reasons do not include the victims' family's opinions/characterization of Burgess, the crime, or the appropriate punishment that are contained in the Presentence Investigation Report. Burgess's argument that this court must assume the sentencing court considered the inadmissible statements in the Presentence Investigation Report – because it is the only variable between the evidence heard by the jury, which recommended life, and the sentencing court, which imposed a sentence of death – is rebutted explicitly by the sentencing court's Order, which explains the bases of the court's decision to override the jury's recommendation.

For the foregoing reasons, this court finds the state appellate court did not make an unreasonable factual determination when it found the sentencing court had not considered the inadmissible statements from the victims' family based on the absence of any mention of such statements in its Order. Burgess's argument to the contrary fails to overcome, by clear and convincing evidence, the presumption of correctness owed to the state court's factual determination. Therefore, this claim will be denied.

## 2. *Gardner v. Florida*, 430 U.S. 349 (1977)

Burgess argues that he "was unable to properly respond to statements made by the victims' family members," therefore, he was denied due process. (Doc. 15 at 92; *see id*. at 91-92 [quoting and citing *Gardner v. Florida*, 430 U.S. 349, 359, 362 (1977)].) The *Gardner*

96

opinion "produced a narrow holding that a death penalty procedure permitting consideration of secret information relevant to the offender's character and record – there a presentence report *not* provided to the defendant – violates the Eighth Amendment."   *O'Dell v. Netherland*, 521 U.S. 151, 152 (1997)(emphasis added).  Burgess's claim that he was denied an opportunity to properly respond to the Presentence Investigation Report is rebutted by the record, which demonstrates that Burgess had an opportunity to make comments about the Presentence Investigation Report, and that his counsel actually argued a number of items contained in the Report.  (*See* R. Vol. 19 at 3021-29.)  Nothing in the record indicates that Burgess's sentence was based on secret information or that he was not given a chance to respond to the Report.

The court finds no violation of Burgess's right to notice of the Presentence Investigation Report and his right to comment and/or respond to the Report.  The state court's decision is neither contrary to nor an unreasonable application of clearly established federal law, nor is its factual finding unreasonable based on the record evidence.  Therefore, Burgess's request for relief based on *Gardner* will be denied.

**D.    THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WHEN IT ENGAGED IN RACE-BASED GRAND JURY FOREPERSON SELECTION. Petitioner's Claim IV.D. (Doc. 15 at 95-97; doc.  29 at 32-33.)**

Burgess contends that the selection of an African-American as the grand jury foreman "violated his rights to due process and equal protection under the Fourth, Fifth, Sixth, Eighth,

and Fourteenth Amendments to the United States Constitution." (Doc. 15 at 97.) The

Amended Petition states:

> According to the Circuit Clerk of Colbert County, at the time of Mr.
> Burgess'[s] trial the procedure for selecting grand jury forepersons was to place
> the names of all of the members of the grand jury in a tumbler and draw one
> name out at random. [(R. Vol. 3, Tab R-4 at M-39.)]   In this case, that
> procedure was not followed.  Instead, the trial court directed the Clerk to place
> only one name in the tumbler, and that person obviously became the foreperson
> of the grand jury that indicted Mr. Burgess. [(*Id*. at M-40 to M-41, M-51 to M-
> 52.)]   The trial court's explanation for [its] deviation from the prescribed
> procedure was as follows:

>> After the selection of eighteen grand jurors had taken place with
>> the blind draw pursuant to law, this Court noted for the record
>> that there was one African-American on the grand jury as well as
>> only one African-American on the entire venire, which [is] a
>> random venire pull[ed] by the computer in Montgomery, and that
>> person and that person's name only was placed in the tumbler for
>> selection of a foreperson for the grand jury.  And, of course, that
>> name was drawn as foreman of the grand jury and he was the
>> foreman of the grand jury for that term.  This was done in order
>> to – well, let me put it this way, as affirmative action to prevent
>> any defects there may have been in selection of grand jury
>> forepersons during the prior years.

[(*Id*. at M-51 to M-52.)]

> This selection process was constitutionally unsound, and it defeated the
> purpose of instituting a system of random selection.  By the court's own
> admission, one of the reasons for instituting the tumbler system was that the
> prior system of appointment was made by the presiding judge after nomination
> by the district attorney.  Although a black juror was chosen to be foreperson, it
> was not done by any objective, random or systematic method; rather, it was
> done at the State's discretion, and it was done expressly on the basis of race.

> A defendant may establish a prima facie case of discrimination in the
> selection of a grand jury foreperson by showing that: 1) the group alleged to be
> discriminated against is a distinct group; 2) the degree of underrepresentation

is significant over a period of time; and 3) the selection procedure is susceptible to abuse or is not race neutral.  *Rose v. Mitchell*, 443 U.S. 545 (1979); *Lee v. State*, 631 So. 2d 1059 (Ala. Crim. App. 1993), *overruled on other grounds*, *Pace v. State*, 714 So. 2d 332 (Ala. 1997).  The trial court's selection process here was certainly not a constitutional correction of the bias that had poisoned the previous system.  Indeed, the foreperson here was selected precisely because of his race.  *See United States v. Nelson*, 68 F.3d 583 (2d Cir. 1995)(reversing conviction due in part to trial court's error in attempting to empanel racially and religiously balance jury by intentionally filling alternate space with black juror instead of white juror next in line).  "Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake.  This the Constitution forbids." *Hopwood v. Texas*, 78 F.3d 932, 940 (5th Cir. 1996), *quoting Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978)(Powell, J.).  Moreover, [t]hese equal protection maxims apply to all races." *Ibid*.

Here the trial court attempted to remedy years of discrimination by employing a method marked solely by an evaluation of race, and no other criteria.  This is constitutionally infirm, and violated Mr. Burgess'[s] rights to due process and equal protection under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The state court's disposition of this claim entailed a conclusion that was contrary to and an unreasonable application of clearly established federal authority, as well as entailed an unreasonable determination of the facts, and under 28 U.S.C. § 2254, habeas corpus relief is now warranted.

(Doc. 15 at 95-97.)  Also, Burgess argues that the Alabama Court of Criminal Appeals "unreasonably applied federal law" when it excused the trial court's discriminatory selection by "focusing on the 'ministerial' duties of" the grand jury foreman.  (Doc. 29 at 33 [quoting *Burgess*, 723 So. 2d at 751-52].)

The court notes first that Burgess's due process and equal protection rights in state court are protected by the Fourteenth Amendment.  All claims to relief under the Fourth, Fifth, Sixth, and Eighth Amendments will be denied.

Two Supreme Court cases have established the standard for determining claims regarding the discriminatory selection of a grand jury foremen – *Rose v. Mitchell*, 443 U.S. 545 (1979), which is an equal protection case, and *Hobby v. United States*, 468 U.S. 339 (1984), which is a due process case. Because the standards are significantly different, the court will discuss each claim separately.

### 1. Equal Protection Violation

The Alabama Court of Criminal Appeals rejected plaintiff's claim of an equal protection violation; it held:

> To prove a prima facie case of discrimination in the selection of a grand jury foreperson, a petitioner must show: 1) that the group alleged to be discriminated against is a distinct group, singled out for different treatment; 2) the degree of underrepresentation of the group over a significant period of time; and 3) that the selection process either is not race-neutral or is susceptible to abuse.  *Pace v. State*, 714 So.2d 320 (Ala. Cr. App.1996), *Lee v. State*, 631 So.2d 1059, 1060 (Ala. Cr. App.1993), *Locke v. State*, 631 So.2d 1062, 1063-64 (Ala. Cr. App.1993) (all citing *Johnson v. Puckett*, 929 F.2d 1067, 1071-72 (5th Cir.), *cert. denied*, 502 U.S. 898, 112 S. Ct. 274, 116 L. Ed. 2d 226 (1991)).  Burgess argues in his brief that the judge's actions discriminated against women and whites, yet there is absolutely no support in the record for this allegation; Burgess did not even attempt to establish that these groups were distinct and that they had been singled out for discrimination, or that the groups had been underrepresented over a significant period of time.  Burgess failed to establish a prima facie case of discrimination in the selection of grand jury forepersons, and his claim that whites and women were discriminated against must fail.

*Burgess*, 723 So. 2d at 750.  The state court's articulation of Burgess's burden to establish a prima facie case of discrimination is consistent with the Supreme Court's decision in *Rose*. *See Rose*, 443 U.S. at 565.  Indeed, Burgess recites the same three-part test. (*See* doc. 15 at

96.)  However, he makes no attempt to direct the court to any evidence sufficient to meet his burden of proving a violation of the Equal Protection Clause.  (*Id.* at 96-97.)

The court finds that the record is undisputed that the court selected an African-American to serve as grand jury foreman specifically because he was African-American.  However, to establish a prima facie case of an equal protection violation, Burgess was required to "show that the procedure employed resulted in a substantial underrepresentation" of whites as grand jury foremen.  *See Rose*, 443 U.S. at 565.  The undisputed evidence shows the opposite; historically, whites were overrepresented as grand jury foremen.  Burgess's claim of an equal protection violation based on the selection of an African-American as foreman of the grand jury that indicted him is without merit.

The state court's decision is neither contrary to nor an unreasonable application of Supreme Court precedent.  Therefore, this claim will be denied.

### 2.  Due Process Violation

The Alabama courts rejected Burgess's claim of a due process violation; the Court of Criminal Appeals held:

> We find additional support for our decision in a recent Alabama Supreme Court case, *Ex parte Myers*, 699 So.2d 1285 (Ala. 1997).  The Alabama Supreme Court quoted extensively from *Hobby v. United States*, 468 U.S. 339, 104 S. CT. 3093, 82 L Ed.2d 260 (1984), which analyzed a defendant's due process claim with regard to alleged discrimination in the selection of grand jury forepersons:
>
>> "'Discrimination in the selection of grand jury foremen – as distinguished from discrimination in the selection of the grand jury itself – does not in any sense threaten the interests of the

101

defendant protected by the Due Process Clause.  Unlike the grand jury itself, the office of grand jury foreman is not a creature of the Constitution; instead, the post of foreman was originally instituted by statute for the convenience of the court . . . .  Today, authority for the appointment of a grand jury foreman is found in Federal Rule of Criminal Procedure 6(c), which provides [that the responsibilities of the grand jury foreman are essentially clerical in nature.]

"'. . .

"'. . .  [T]he impact of a federal grand jury foreman upon the criminal justice system and the rights of persons charged with crime is "minimal and incidental at best."  [*United States v. Hobby*, 702 F.2d 466, 471 (4th Cir.1983).]  Given the ministerial nature of the position, discrimination in the selection of one person from among the members of a properly constituted grand jury can have little, if indeed any, appreciable effect upon the defendant's due process right to fundamental fairness.  Simply stated, the role of the foreman of a federal grand jury is not so significant to the administration of justice that discrimination in the appointment of that office impugns the fundamental fairness of the process itself so as to undermine the integrity of the indictment.

"'Nor does discrimination in the appointment of grand jury foremen impair the defendant's due process interest in assuring that the grand jury includes persons with a range of experiences and perspectives.  The due process concern that no "large and identifiable segment of the community [be] excluded from jury service," *Peters v. Kiff*, 407 U.S., [493,] 503 [92 S. CT. 2163, 2169, 33 L ED.2d 83 (1972) ], does not arise when the alleged discrimination pertains only to the selection of a foreman from among the members of a properly constituted federal grand jury.  That the grand jury in this case was so properly constituted is not questioned.  No one person can possibly represent all the "qualities of human nature and varieties of human experience," *ibid.*, that may be present in a given community.  So long as the composition of the federal grand jury *as a whole* serves the representational due process values expressed in *Peters*,

discrimination in the appointment of one member of the grand jury to serve as its foreman does not conflict with those interests.

"'The ministerial role of the office of federal grand jury foreman is not such a vital one that discrimination in the appointment of an individual to that post significantly invades the distinctive interests of the defendant protected by the Due Process Clause.  Absent an infringement of the fundamental right to fairness that violates due process, there is no basis upon which to reverse [Hobby's] conviction or dismiss the indictment.'"

*Ex parte Myers,* 699 So.2d 1285, 1296 n.4 (quoting *Hobby v. United States*, 468 U.S. at 344-46, 104 S. CT. at 3096-97)[(emphasis in *Myers*)].

The Alabama Supreme Court then stated:

"Applying the reasoning of the United States Supreme Court in *Hobby* and recognizing that a review under the plain error rule, which guarantees a defendant a fundamental right to fairness, is tantamount to a due process review, we conclude that, under the facts of this case, assuming discrimination entered into the selection of the grand jury foreperson in Morgan County, that discrimination does not warrant the reversal of the conviction against Myers under the plain error rule. *The rule of the grand jury foreperson* in Morgan County, *whose powers were primarily ministerial, Rule 12.5, Ala. R. Crim. P., was 'not so significant to the administration of justice that discrimination in the appointment of that office impugn[ed] the fundamental fairness of the process itself so as to undermine the integrity of the indictment'* against Myers.  468 U.S. [at] 345[, 104 S. CT. at 3096-97].  Furthermore, so long as the grand jury itself was properly constituted, there was no risk that the appointment of one of its members as foreman distorted "the overall composition of the array or otherwise taint[ed] the operation of the judicial process."  468 U.S. at 348[, 104 S. CT. at 3098]. In this case, nothing in the record and nothing argued to this Court indicates that the grand jury was not properly constituted.

*Ex parte Myers*, 699 So.2d 1285, 1296 n.4 (emphasis added).

As was the case in *Myers*, nothing in the record before us indicates that the grand jury was not properly constituted.  In light of the fact that in Alabama the grand jury foreperson's powers are primarily ministerial, and in the absence of evidence of any pattern of discrimination, the trial court's one-time selection of a minority foreperson for racial reasons did not "undermine the integrity of the indictment."  *Hobby*, 468 U.S. at 345, 104 S. CT. at 3097.  We do not condone the purposeful exclusion of any group from appointment as forepersons of grand juries.  The deliberate selection of a minority foreperson in this case, however, does not warrant the reversal of the conviction and the dismissal of the indictment against the appellant.

*Burgess*, 723 So. 2d 750-51.

With regard to the selection of the foreman of a federal grand jury, the Supreme Court has held, "Discrimination in the selection of grand jury foremen – as distinguished from discrimination in the selection of the grand jury itself – does not in any sense threaten the interests of the defendant protected by the Due Process Clause."  *Hobby*, 468 U.S. at 344.  The Alabama Supreme Court, based on the similarity in the selection process and the ministerial duties, has adopted the same rule.  *See Ex parte Drinkard*, 777 So. 2d 295, 304-05 (Ala. 2000); *Ex parte State* (*Pace v. State*), 714 So. 2d 332, 337-38 (Ala. 1997).  The state courts' determination of the issue of whether Burgess's right to due process was violated by the selection of an African-American as foreman of the grand jury that indicted him on the basis of his race was neither contrary to Supreme Court precedent nor an unreasonable determination of the facts.

Burgess's Amended Petition will be denied as to this claim.

**E.   PROSECUTORIAL MISCONDUCT AT BOTH PHASES OF PETITIONER'S TRIAL DEPRIVED HIM OF HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND A RELIABLE SENTENCE. Petitioner's Claim IV.E. (Doc. 15 at 97-102; doc. 29 at 33-35.)**

"Classic examples of prosecutorial misconduct are:  misstating facts; misstating a witness's testimony; suggesting that a witness made an out of court statement when there is no evidence of such a statement; assuming prejudicial facts not in evidence; bullying and arguing with witnesses; presenting perjured testimony; operating under a conflict of interest; and misstating the law." *Lee v. United States*, 2009 WL 541322, 3 (M.D. Fla. 2009)(citing *United States v. Williams*, 504 U.S. 36, 60-61 (1992)).[24]

"Prosecutorial misconduct requires a new trial only if [the court] find[s] the remarks (1) were improper and (2) prejudiced the defendant['s] substantive rights." *United States v. Delgado*, 56 F.3d 1357, 1368 (11th Cir. 1995)(citing

---

[24]Quoting *Berger v. United States*, 295 U.S. 78 (1935), the *Williams* Court noted the following examples of prosecutorial misconduct:

1. "misstating the facts in his cross-examination of witnesses;"
2. "putting into the mouths of such witnesses things which they had not said;"
3. "suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered;"
4. "pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis;"
5. "assuming prejudicial facts not in evidence;"
6. "bullying and arguing with witnesses;" and
7. "in general, of conducting himself in a thoroughly indecorous and improper manner."

*Williams*, 504 U.S. at 60-61.  Noting that the list in *Berger* was not exhaustive, the *Williams* Court added additional examples of misconduct, including "knowing use of perjured testimony," "suppression of evidence favorable to an accused person," and "misstatements of the law in argument to the jury." *Id*. at 61 (citations omitted).

105

*United States v. Cole*, 755 F.2d 748, 767 (11th Cir. 1985)). [The court] must examine the statements "in the context of the trial as a whole and assess their probable impact on the jury." *United States v. Hernandez*, 145 F.3d 1433, 1438 (11th Cir. 1998). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome [of the trial] would be different." *United States v. Wilson*, 149 F.3d 1298, 1301 (11th Cir.1998)(alteration in original)(quoting *United States v. Hall*, 47 F.3d 1091, 1098 (11th Cir. 1995)). Thus, even when error occurs, the defendant's substantial rights are not affected if the evidence sufficiently established his guilt. *United States v. Adams*, 74 F.3d 1093, 1100 (11th Cir. 1996). Nevertheless, the "cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial might be necessary." *United States v. Preciado-Cordobas*, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993).

*United States v. Frank*, 599 F.3d 1221, 1237-38 (11th Cir. 2010). Also, the court notes:

arguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence . . . and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. *See Carter v. Kentucky*, 450 U.S. 288, 302-304, and n. 20, 101 S. Ct. 1112, 1120-1121, and n. 20, 67 L. Ed. 2d 241 (1981); *Quercia v. United States*, 289 U.S. 466, 470, 53 S. Ct. 698, 699, 77 L. Ed. 1321 (1933); *Starr v. United States*, 153 U.S. 614, 626, 14 S. Ct. 919, 923, 38 L. Ed. 841 (1894). Arguments of counsel which misstate the law are subject to objection and to correction by the court. *E.g., Greer v. Miller*, 483 U.S. 756, 765-766, and n.8, 107 S. Ct. 3102, 3109, and n. 8, 97 L. Ed. 2d 618 (1987). This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made. *Greer*, *supra*, at 766, 107 S. Ct., at 3109; *Darden v. Wainwright*, 477 U.S. 168, 179, 106 S. Ct. 2464, 2470, 91 L. Ed. 2d 144 (1986); *United States v. Young*, 470 U.S. 1, 11-12, 105 S. Ct. 1038, 1044-1045, 84 L. Ed. 2d 1 (1985); see also *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S. Ct. 1868, 1873, 40 L. Ed. 2d 431 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations").

*Boyde v. California*, 494 U.S. 370, 384-85 (1990).  Thus, it follows that, for federal habeas corpus purposes, a prosecutor's interpretation of the law during argument is treated in much the same manner as any other type of statement or argument made by counsel.  In other words, a prosecutor's comment on the law is only improper if it "mislead[s] or misrepresent[s] the law to the jury."  *Spivey v. Head*, 207 F.3d 1263, 1277 (11th Cir. 2000).

### 1.    Comments During Closing Argument in the Guilt Phase

Burgess contends:

> The prosecution's misconduct so infected Mr. Burgess' trial with unfairness as to render his trial fundamentally unfair and result in a denial of due process.  The prosecutor prejudiced Mr. Burgess on several occasions during the guilt phase of trial.  The prosecutor resorted to offering his personal opinion, arguing facts not in evidence, and making improper closing arguments. This misconduct denied Mr. Burgess due process, a fair trial, and a reliable sentencing determination, and [the misconduct] requires this Court to grant habeas relief.

(Doc. 15 at 99.)  On direct appeal, the Alabama Court of Criminal Appeals stated that it had "reviewed each of Burgess's claims regarding the prosecution's arguments, and [that it had found] no error or plain error."  *Burgess*, 723 So. 2d at 753.

"The sole purpose of closing argument is to assist the jury in analyzing the evidence." *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997)(quoting *United States v. Iglesias*, 915 F.2d 1524, 1529 (11th Cir. 1990)).  "Although a prosecutor may not make an argument directed to passions or prejudices of the jurors instead of an understanding of the facts and law," *United States v. Tisdale*, 817 F.2d 1552, 1556 (11th Cir. 1987) (per curiam), there is no prohibition on 'colorful and perhaps flamboyant' remarks if they relate to the

evidence adduced at trial, *United States v. Jacoby*, 955 F.2d 1527, 1541 (11th Cir. 1992).

*Bailey*, 123 F.3d at 1400.  This court will discuss each alleged act of prosecutorial misconduct

below.

> ### a.      Improper emphasis on gruesome photographs.  (Doc. 15 at 99.)

Burgess complains, "The prosecutor repeatedly emphasized the prejudicial effect of

the photographs of the victims' bodies during his closing argument during the guilt phase."

(Doc. 15 at 99 [citing R. Vol. 17 at 2677-78].)  In his closing argument, the prosecutor had

stated:

> I have been watching you during the course of this trial, and I know you have
> been listening to every word that has come to you from the witness stand, and
> I know you have looked at every photograph, and every diagram, and you will
> have those things back there in the jury room.  And, I want to apologize to you
> also about this:  the photographs that were introduced in this case, and I held
> them away from you as long as I could.  They are some of the most disgusting
> things I have ever seen in my life.  And, let me tell you, it makes me feel
> terrible, because I have children about the age of the victims in this case, and
> it is not an easy thing to look at.  I apologize to you for having to display that
> awful disgusting mess to you, but it is important, because you have got to see
> the nature of the injuries to understand what happened in this case.  And, that
> is the only reason that we show you that stuff.  It is not because we get any
> pleasure out of it, I assure you.  But, I just want to thank you.

(R. Vol. 17 at 2677-78.)  The Alabama Court of Criminal Appeals found:

> The first instance Burgess finds objectionable arose during the prosecutor's
> guilt phase closing argument, when the prosecutor apologized to the jury for
> having to introduce into evidence photographs of the victims, and described
> these photographs as "some of the most disgusting things that I have ever seen
> in my life."  Burgess did not object to this comment at trial, but now contends
> that this comment conveyed to the jury that the prosecutor had vast experience
> and that he had never witnessed a more gruesome crime.  We disagree with
> Burgess's interpretation of the prosecutor's comments.  The prosecutor also

told the jurors that it was important that they view the photographs "because you have got to see the nature of the injuries to understand what happened in this case."  The prosecutor was simply commenting on the evidence and explaining to the jury the relevance of the photographs to the case, which he and defense counsel were both permitted to do.  The photographs are graphic and gruesome; no error occurred when the prosecutor referred to them as disgusting in his closing argument and his comments did not imply that this crime was the worst he had prosecuted.

*Burgess*, 723 So. 2d at 753-54.

Burgess contends the prosecutor's comments regarding the photographs were improper and prejudicial.  However, "Alabama courts have long recognized that photographs depicting the crime scene and the wounds of the victims are relevant and admissible." *Mitchell v. State*, No. CR-06-0827, ___ So. 3d ___, 2010 WL 3377698, *30 (Ala. Crim. App. Aug. 27, 2010)(citing *Brooks v. State*, 973 So. 2d 380, 393 (Ala. Crim. App. 2007); *Stallworth v. State*, 868 So. 2d 1128, 1151 (Ala. Crim. App. 2001); *Ward v. State*, 814 So. 2d 899, 906 (Ala. Crim. App. 2000))(other citations omitted).  In his closing, the prosecutor stated that the only reason for showing the jury the photographs was to show them "the nature of the injuries to understand what happened in this case," (R. Vol. 17 at 2678), which this court finds is a proper comment on the evidence and not misconduct.

The appellate court's factual findings – that "[t]he prosecutor was simply commenting on the evidence and explaining to the jury the relevance of the photographs to the case;" that "[t]he photographs are graphic and gruesome; that "no error occurred when the prosecutor referred to [the photographs] as disgusting; and that the prosecutor's comments "did not imply that this crime was the worst he had prosecuted" –  are entitled to deference.  Burgess's

generic assertion that the comments were improper fails to show the state court's denial of this claim is contrary to, or an unreasonable application of, clearly established federal law or unreasonable findings of fact.   The prosecutor's comments, taken in context, were not improper and Burgess suffered no prejudice because of the comments.

Therefore, the court will deny the claim.

### b.   Vouching for the strength of the case.  (Doc. 15 at 99; doc. 29 at 34)

Burgess complains the prosecutor improperly vouched "for the strength of the state's case, and offered his 'guarantees' about what had happened."  (Doc.15 at 98 [quoting R. Vol. 17 at 2684-85].)  The prosecutor's argument at issue is as follows:

> Now, they told you on the one hand that the evidence was going to show you that the Defendant wasn't in the house at the time those people were killed. You go back and examine the evidence, and let me say this at this point, if at any point during any argument that I make to you, I misstate what the facts are, and you recall the facts differently, you rely on your memory not mine.  But, you ask yourself to go back, and think about what you've heard, and you have heard a lot of testimony, but think about any evidence that you've heard in this case that put that Defendant anymore than about thirty to forty-five minutes away from that house on Brotherton Street where those people were killed. Now, there has been a lot of testimony about the Mississippi state line was just right down the road, and the Tennessee state line was just right up the road, right up the Natchez Trace.  But think, has there been any evidence that placed the Defendant anymore than about thirty to forty-five minutes away from that house at the absolute most, at the most[?]  Most of the time, he was within four or five minutes from the house, or he was right across the street.  He was in and out of that house constantly during this period of time, and ***I guarantee you***, he was in and out of that house during the period of time that those bodies were lying in there in the bedroom.

(R. Vol. 17 at 2683-84 [emphasis added].)  At this point, Burgess's counsel objected on the ground "that the District Attorney is guaranteeing something," which the trial court overruled. (*Id* at 2685.)

The Alabama Court of Criminal Appeals found, "The prosecutor's comment was based on the evidence presented at trial, which demonstrated that Burgess had made numerous trips in and out of the house during the day and night before the morning on which the bodies were discovered.  The trial court has broad discretion in its control of closing argument, *Madison v. State*, 718 So. 2d 90 (Ala. Cr. App. 1997), and we find no abuse of discretion here." *Burgess*, 723 So. 2d at 754.

Burgess makes no effort to overcome the presumption of correctness owed to the state court's findings of fact.  The record supports the state court's finding that Burgess went in and out of Shelia Nnodimele's house on a number of occasions after the victims were dead. Indeed, the evidence shows that he attempted to kill himself at Shelia Nnodimele's front door and left notes inside her house.  The gist of the prosecutor's comments was simply a comment on the evidence.  However, even were this court to find that the "guarantee" comment was somehow improper, nothing in the record suggests that it prejudiced Burgess in any way.

Therefore, Burgess is not entitled to § 2254(d) relief from the state court's determination that this comment was a reasonable inference from the evidence and did not prejudice Burgess.  This claim will be denied.

      **c.**      **Reference to facts not in evidence.  (Doc. 15 at 98; doc. 29 at 34.)**

Burgess argues that "the prosecutor . . . referred to facts that were not in evidence during the guilt phase when he argued the only reason that the youngest child survived was because of the softness of his skull."  (Doc. 15 at 99 [citing R. Vol. 17 at 2704].)  He asserts that the comment was improper because "[t]here was absolutely no testimony about this presented at trial."  (*Id*.)

The prosecutor argued:

But, hitting something on top of a globular shaped object like a skull, coming down so hard, and so forceful here on top, that the bone down here at the base of the skull breaks.  Not only in the place that was actually [struck], but far down to the base of the skull.  And, like I told you a while ago, LaRico had similar injuries, and if you believe that the Defendant intended to kill these other victims, Shelia and Latori, and Alexis, you better believe that he intended to kill LaRico too.  Probably just plain and common sense, the only thing that saved LaRico was the fact that he was just a baby.  He was just two and a half years old then.  And, you know, from your own experience, when you were real small, you could reach up here, or your parents could reach up here and touch your head, and you had a little soft spot in the top of your head.  The plates in your head wasn't set up yet.  The bone hadn't firmed up.  It was still malleable or moveable a little bit.  But see, when you grow up a little bit, your head gets a little harder.  And, it does a lot more damage when you get hit by something.  And, that is probably the only thing that saved that baby's life.  Apply your common sense in looking at things like that.

(R. Vol. 17 at 2703-04.)

On direct appeal, the Alabama Court of Criminal Appeals rejected this claim on the following grounds:

      Burgess next claims that the prosecutor argued facts not in evidence.  He claims that the prosecutor told the jury that LaRico survived the attack only because his skull was soft and he argues that this conclusion was not supported

112

by any testimony.  Burgess did not object to this argument at trial, so we must review it to determine whether plain error exists.  We have examined the complained-of comments in the context of all of the evidence and in the context of the complete closing arguments to the jury.  *See Roberts v. State*, *supra*.  The prosecutor argued to the jury his theory of the case and summarized the medical and forensic testimony regarding the head wounds all the victims suffered, noting that all of the head wounds were very similar.  He then argued inferences from the evidence, e.g., that Burgess inflicted the injuries in anger and without warning to the victims.  He argued that the jurors could rely on their common sense and experience, and suggested that LaRico probably survived only because he was a baby and his skull had soft spots.  Burgess now objects to the final comment, but we find that, in context, the remark was not outside the bounds of legitimate argument.  This brief comment was but a small portion of the entire argument, and was a permissible inference based on the prosecutor's interpretation of the evidence.  No plain error occurred.

Burgess, 723 So. 2d at 755.

"[I]t is prosecutorial misconduct to argue 'prejudicial facts not in evidence.'" *Muhammad v. McNeil*, 352 Fed. Appx. 371, 376 (11th Cir. 2009)(quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)).  However, "Prosecutorial misconduct mandates a new trial [only] if: (1) the remarks are improper, and (2) the remarks prejudiced the defendant's substantive rights." *United States v. Thomas*, 62 F.3d 1332, 1343 (11th Cir. 1995)(citing *United States v. Delgado*, 56 F.3d 1357, 1368 (11th Cir. 1995); *United States v. Cole*, 755 F.2d 748, 767 (11th Cir.1985)).  "In order to assess the prejudicial impact of a prosecutor's statements, [the court] must evaluate them in the context of the trial as a whole and assess their probable impact on the jury." *United States v. Hernandez*, 145 F.3d 1433, 1438 (11th Cir. 1998)(citing *United States v. Young*, 470 U.S. 1, 11-12 (1985); *United States v. Stefan*, 784 F.2d 1093, 1100 (11th Cir. 1986)).

The prosecutor argued that, because all the victims had similar head wounds and only LaRico survived, the jury could infer that he survived because of soft spot on his head.  The fact that young children have soft spots on the top of their heads is common knowledge.  An inference that this soft spot allowed the weapon to penetrate LaRico's head without fracturing his skull is a reasonable inference from the evidence.  Burgess has made no showing that the fact that LaRico may have survived the blows to the top of his head because of his soft skull – the alleged fact not in evidence – was in any way prejudicial to him.

The Alabama Court of Criminal Appeals held that the prosecutor's "brief comment was but a small portion of the entire argument, and [it] was a permissible inference based on the prosecutor's interpretation of the evidence." *Burgess*, 723 So. 2d at 755.  This factual finding is entitled to a presumption of correctness, and Burgess has not shown that the state court's determination was unreasonable.

For the foregoing reasons, this claim will be denied.

### d.   Victim Impact Evidence and Representing the Family.  (Doc. 15 at 101; doc. 29 at 34.)

In this sub-claim, Petitioner alleges

> The prosecutor also repeatedly injected victim impact evidence into the state's guilt phase case by describing during his closing argument how two of the victims had been model students and good girls.  (R. 2679; 2709.)[25]  He spoke at length about his role as the representative of the victims' family.  (R. 2680).   In addition, he talked about the family referring to their poor

---

[25]There is no reference to two of the victims being model students and good girls on page 2679 of the trial record.  (*See* R. Vol. 17 at 2679.)

114

background and that the adult female victim was a hard worker providing for her family.  (R. 2793).  Viewing a trial as competition between the rights of the accused and those of the victim distorts the law and subverts the prosecutor's justice-seeking function.  *Berger v. United States*, 295 U.S. 78, 88 (1935).

(Doc. 15 at 100 [footnote added].)

The prosecutor began his argument by thanking the jurors for their service "on behalf of the State of Alabama, and on behalf of [his] office, the people of Colbert County, and the entire . . . family [of the victims]," (R. Vol. 17 at 2679), and then he argued:

> I want to warn you about something before we even start talking about this case.  It will be very . . . easy with the horrible injuries, and the death of small children, like we have in this case, to get real emotional.  It is hard for me not to get emotional just talking about the facts in this case.  But, do me a favor, decide this case based on the evidence that has been presented to you.  Don't get emotional.  Don't decide it based on sympathy, because I guarantee you, I don't want you to do that, the State of Alabama does not want you to do that, if the victims' family could talk to you, they would say don't decide it based on any sympathy, or any feeling of sympathy toward the victims in this case.  If little LaRico Long could talk to you, he would probably tell you to do the same thing because you don't have to.  You don't have to do that to reach a verdict in this case.  The only thing that we, on the behalf of the State of Alabama, and the victim's family, ask you to do –

> [Burgess's attorney]:  Your Honor, I would object to references about the victims' family.  Reference to the victims' family in closing arguments are not the products of proper argument, and violate the Defendant's rights under the Sixth, Eighth, Fourteenth Amendments to the United States Constitution. . . .

> THE COURT:  Overruled.

> [Prosecutor]:  I'm imploring you to not base the case on sympathy. What I ask you to do is base it on the evidence, and if you do that, if you do that under our system of criminal justice, justice will be done.  Do it for the right reasons, and justice will be done, because that is the only thing, the only thing we ask you to do.

(*Id*. at 2679-81.)

During his closing argument the prosecutor commented that the school records of Latori and Alexis, which had been admitted into evidence, arguing that the records showed that they had been "darn good students," and "had not missed a whole day of school that entire year" until "Friday, January 29th, 1993." (*Id*.) This comment was made during a section of his argument concerning the time of death for Latori and Alexis, which the evidence showed was late January 28, 1993 or early January 29, 1993, while their mother was at work. (*Id*. at 2709-10.) He argued:

> Then you have got the records here, and I want you to look at these, the school records of Latori and Alexis. They were darn good students. They had not missed a whole day of school that entire year. And, when is the first day that they are absent? Friday, January the 29th, 1993. . . .
>
>         . . .
>
> Nobody, nobody saw any of those people alive after that time. Those bodies were found, it is undisputed, on Saturday morning, January the 30th. We don't know how long they had been laying there, but we do know the last time that anybody saw them was on that Friday morning.

(*Id*. at 2709-10.)

At the end of his closing argument, the prosecutor mentioned the economic status of the victims in the context of telling the jury that "the same [criminal justice] system" protects victims regardless of their wealth:

> I just want to close by telling you this: we live in a wonderful country, and a wonderful state that has a wonderful system of criminal justice. There is another case that is going on in this very city right now. It is in Federal Court. It's a federal racketeering case involving a very wealthy attorney from over in

Atlanta, who supposedly was involved in taking his wife's life. They are wealthy people. [That] defendant was involved in money laundering, and drug dealing. They were wealthy people. She was from a wealthy family. her father was a surgeon from Brooklyn, New York. They made good money. They had all the niceties of life. And, that family is being protected by our criminal justice system. But, you know, what is so wonderful about the system. The same system that protects the victims in that case, protects the victims in this case. These little children didn't have a lot of money. They were from a poor background. Shelia Nnodimele was a hard working woman who worked in an industrial plant. And, she earned the money she made. They weren't from a wealthy family. Her parents, you heard, they had a common background.

[Defendant's Attorney]: Your Honor, I object to any argument as previously stated that deals with victim impact at this particular stage of the case.

THE COURT: Overruled.

. . .

[Prosecutor]: Well, I'm just saying don't decide the case based on sympathy. Follow, follow the evidence. Do justice. Do justice in this case. If you do justice, you will do the right thing. And if you do the right thing, you will see that justice is done. But, you have got to demand that it be done. . . . Follow the evidence and demand that justice be done . . . .

(*Id.*, Vol. 18 at 2793-94.)

On direct appeal, the Alabama Court of Criminal Appeals rejected Burgess's claims

of prosecutorial misconduct with regards to these comments about the victims during his

closing argument; it held:

The prosecutor properly referred to the school records of the two young victims in his argument, because school officials had testified as to the records and the school records were in evidence. . . . We will not hold a prosecutor in error for making legitimate comments based on the evidence admitted at trial. Moreover, we note that Burgess [did not object] to the foregoing comment[ ] at trial; no plain error occurred.

117

Burgess argues that the court erred in overruling his objections to the prosecutor's statements that he spoke on behalf of the victims' family and that the family did not want the jury to base its decision on sympathy for the victims. We have held that it is not reversible error for a prosecutor to suggest that he is speaking on behalf of the victim's family. *See Slaton v. State*, 680 So.2d 879, 906-07 (Ala. Cr. App. 1995), *aff'd*, 680 So. 2d 909 (Ala. 1996), *cert. denied*, 519 U.S. 1079, 117 S. Ct. 742, 136 L. Ed. 2d 680 (1997).

Furthermore, we refuse to find error when a prosecutor argues to the jury that it should base its decision on the evidence and not on extraneous factors such as sympathy. The trial court did not abuse its discretion in its control of closing arguments here.

Finally, Burgess claims that the trial court erred when it overruled his objection to the prosecutor's comments that the victims came from a poor background and that Shelia was a hard worker. The State argues that the trial court did not abuse its discretion, and we agree. The objected-to comments were but a portion of the prosecutor's argument that the criminal justice system protects poor victims as well as wealthy ones, such as those involved in another case being tried in that county at the same time. After defense counsel objected, the prosecutor stated that he meant that the jury should follow the evidence and do justice. That the victims were not wealthy and that Shelia was a hard-working woman were matters in evidence and were properly the subject of comment. Moreover, the prosecutor's comment that the criminal justice system protected both the rich and the poor was in no way prejudicial. In allowing the prosecutor this latitude in his closing argument, the trial court did not commit error.

*Burgess*, 723 So.2d at 754-55.

The prosecutor's statements were not "so egregious as to create a reasonable probability that the outcome was changed." *Davis v. Zant*, 36 F.3d at 1545. The comments were not an obvious and incontrovertible attempt to infect the jury with victim impact evidence. Moreover, given that the statements were either proper comments on the evidence or, if improper, not prejudicial, the court finds no constitutional error. Burgess has not shown

118

that the state court's determination of the evidentiary facts was unreasonable.  Nor has he

explained why the state court's denial of this claim either was contrary to, or an unreasonable

application of, federal law to the particular facts before it.

Therefore, this claim will be denied.

> ### e.   Mocking and derogating defense counsel's closing argument.  (Doc. 15 at 101; doc. 29 at 34.)

Burgess alleges, "The prosecutor directly derogated defense counsel to the jurors by

dismissing their cross-examinations during the guilt phase as "nitpicking," and by mocking

the opening statement of the defense.  (Doc. 15 at 101 [citing R. Vol. 17 at 2686, 2695].)  The

prosecutor had argued:

> Mr. Benn [Burgess's trial attorney] told you in his opening statement, he
> said that he wanted you to look at a picture, and he described it like one of these
> pictures, if you look at it long enough, you see something else in it.  Do you
> remember he told you that?  Let me tell you something, don't look for an
> [illusion].  You know, you can look at something long enough, and if you really
> want to believe something, you can find an [illusion] in that.  You know you
> have heard about people going out in the desert and standing in the hot sun long
> enough, and all of a sudden, they see an oasis out there that doesn't really exist.
> Look at the whole picture.  I implore you, please look at the whole picture, but
> don't take a little portion of the picture.  If you will think about it, and the type
> cross examination that you've heard on the part of the defense in the case, it has
> been nitpicking.  You know, they are saying –
>
> . . .
>
> . . . Look at this right down here.  This doesn't add up.  Look at this
> right here.  This doesn't add up.  This may be reasonable doubt.  Look at this
> right here, this may be reasonable doubt.  That is exactly what Mr. Benn's
> approach to the whole case has been.  Look at the whole picture.  Look at
> everything, not just some little isolated portion of it.  Now, I know that a case

has to be put on a little piece at a time, but all I'm saying is, step back and look at the whole picture.

(R. Vol. 17 at 2685-87.).

He also argued:

> You know, another thing that John Benn said in his opening statement, and if this wasn't such a serious case, it would almost make me chuckle.  He told you, his solemn promise to you was that there was going to be evidence of a loving relationship between this Defendant and the children.  Where is the evidence in this case of a loving relationship?  You know, there has been plenty of evidence to the contrary.  Donna Cosby described it as an abusive relationship, as a rough relationship. . . .  And, then, what about Barbara Pride who got up here and told us about the incident back in 1991 sat Christmas time, where [Burgess] in her home, in Barbara Pride's home, he strikes the victim, and then shoves her down, and then shoves down her daughter, and Barbara Pride, and the situation was so bad, it was so bad that Shelia and the children had to stay for two or three days with Barbara Pride at her home.  Donna Cosby testified that Christmas of '92, that Shelia left her house and went to stay with her parents.  you know, don't made any mistake about it, this was Shelia's house.  Shelia's daddy had built that house for her.  It wasn't this Defendant's house.  He may have been staying there.  But, that was Shelia's house.  He ran her out of her own house.  . . .

(*Id*. at 2695-66).

The Alabama Court of Criminal Appeals addressed these comments as follows:

> Burgess argues that the prosecutor undermined his rights to counsel and to a fair trial by "pointedly attacking" defense counsel.  Burgess did not raise this objection at trial, so this issue is reviewable only for plain error.
>
> Burgess now cites as error the prosecutor's statements in his guilt-phase closing argument that defense counsel's cross-examination had been "nitpicking," and that if the case was not so serious, he would almost chuckle at defense counsel's statement in his opening argument that Burgess and the child victims had a loving relationship.  To constitute reversible error, a prosecutor's alleged improper comments must relate to the issues at trial or be the type of comment that would influence the jury's decision.  *Boyd v. State*,

715 So.2d 825 (Ala. Cr. App. 1997).   These statements would not have influenced the jury's decision.  Further, the comments were clearly made in the heat of debate and in response to defense counsel's closing argument in which he detailed every possible inconsistency and weakness in the State's case.[26]

Burgess, 723 So.2d at 755 (footnote added).

Burgess has not established he is entitled to habeas relief with regard to this claim. While the prosecutor's comments arguably were "hard blows" to defense counsel,  they were not improper.  *United States v. Young*, 470 U.S. 1, 7 (1985)("The Court made clear, however, that the adversary system permits the prosecutor to prosecute with earnestness and vigor.  In other words, while he may strike hard blows, he is not at liberty to strike foul ones."  (quoting *Berger*, 295 U.S. at 88))(internal quotations and citations omitted).  Further, as the Eleventh Circuit recently reiterated:

> Due process is denied "when there is a reasonable probability," or "a probability sufficient to undermine confidence in the outcome," that, but for the improper remarks, "the outcome of the proceeding would have been different." *United States v. Eyster*, 948 F.2d 1196, 1206-07 (11th Cir. 1991) (citations and internal punctuation omitted).  The prosecutor's comments must both (1) be improper and (2) "prejudicially affect the substantial rights of the defendant." *United States v. Thompson*, 422 F.3d 1285, 1297 (11th Cir. 2005).

*Parker*, 565 F.3d at 1273-74.  Burgess has offered no developed argument to convince this court that the state court's finding regarding the propriety of the prosecutor's comments was an  unreasonable  application  of  clearly  established  federal  law  or  an  unreasonable

---

[26]The court notes that the "nitpicking" comment was not made in response to defense counsel's closing argument; it was made before defense counsel's closing argument.  (*See* R. Vol. 17 at 2686, 2716.)

determination of the facts in light of the evidence before it.  Nothing in the record suggests

a reasonable probability that the outcome of Burgess's trial was altered by the prosecutor's

comments about defense counsel's cross-examination or his opening statement.

Therefore, based on the foregoing, this claim will be denied.

   **f.**  **Misleading the jury about the law. (Doc. 15 at 101; doc. 29 at 34.)**

    **i.**  **Burden of proof**

Burgess contends that "the prosecutor told the jury that the state had met its burden of

proof beyond a reasonable doubt if the jurors heard 'one witness that you find credible, and

that you find to be telling the truth.'"  (Doc. 15 at 101 [citing R. Vol. 18 at 2779].)  Taken in

context, what the prosecutor actually told the jury was that they could find a fact to be true

beyond a reasonable doubt if they found the witness's testimony as to that fact to be credible.

At the start of his argument in rebuttal, the prosecutor referred to defense counsel's use of

his own identity during the trial as an illustration of "reasonable doubt."  (*Id*. at 2777).  He

asked the jury to recall that defense counsel had introduced himself to the jury and to the

testifying witnesses as John Benn during the trial.  (*Id*. at 2777-78.)  He asked the jury if they

"[w]ould be more thoroughly convinced if" Benn had produced an identification card or if his

mother had testified that he was John Benn.  (*Id.* at 2778-79.)  The prosecutor then said, "All

it takes, all it takes is one witness, one witness you find credible, and that you find to be

telling the truth to meet the burden of proof.   That's all it takes." (*Id*. at 2779.)

The Alabama Court of Criminal Appeals held that the prosecutor's "legal proposition was correct," and that "[t]he prosecutor did not commit plain error." *Burgess*, 723 So. 2d at 756.

The prosecutor's statements, taken in context, were simply a means of illustrating the well-established principle that the weight of the evidence as to a fact does not necessarily depend on the number of witnesses who have testified as to that fact. *United States v. Hoskins*, 628 F.2d 295, 296 (5th Cir. 1980)("A federal conviction, however, can be based on the uncorroborated testimony of a single witness."),[27] *quoted in United States v. Knight*, 381 Fed. Appx. 942, 944 (11th Cir. 2010); *Eaton v. United States*, 408 F.2d 525, 530 and n.2 (5th Cir. 1969)(finding the following charge was a "full and fair statement of the law:" "Now, the weight of the evidence is not necessarily determined by the number of witnesses testifying on either side. You should consider all of the facts and circumstances in evidence to determine which of the witnesses are worthy of greater credence. You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side."); *City of Hartselle v. Kilpatrick*, 292 So. 2d 121, 126-27 (Ala. Civ. App. 1974)("We have reached this determination by weighing the evidence presented and being guided by the conviction produced upon the judicial mind, not by

---

[27]Decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

counting the witnesses, realizing that the witnesses' testimony must be weighed, not numbered.")(citations omitted).

Burgess has not offered any explanation as to how this prosecutor's statement that the jury could rely on just one witness was misleading, although he cites the court to *In re Winship*, 397 U.S. 358 (1970), for the proposition that the state must prove each element of the crime beyond a reasonable doubt. He appears to imply that the prosecutor told the jury that they could convict Burgess if they found one witness testified truthfully as to only one element of the crime. The court finds this interpretation of the prosecutor's statement is not supported by the context of his argument. Within the context of the prosecutor's argument as a whole and considering the court's charge, this statement did not mislead the jury as to the meaning of reasonable doubt or their duty to decide the case.

The decision of the Alabama Court of Criminal Appeals is not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in the light of the record evidence.

Therefore, this claim will be denied.

### ii.    Legal Provocation  (Doc. 15 at 101.)

Burgess contends "the prosecutor inaccurately 'corrected' defense counsel's closing argument when he stated the jury could not convict Mr. Burgess of the lesser included offense of manslaughter because 'legal provocation' was required to find someone guilty of manslaughter and none existed in this case." (Doc. 15 at 101 [quoting R. Vol. 18 at 2791-

92].)  He contends "This is inaccurate as Alabama law defines manslaughter as when one recklessly causes the death of another or in the instance of legal provocation."  (*Id*. at 101-02 [citing Ala. Code 13A-6-3].)  A review of the record shows that this claim is raised for the first time in the habeas petition.

Thus, this claim is procedurally defaulted and will be denied.

However, even if this claim was properly before this court, it would nevertheless be dismissed because the prosecutor's comment was a correct statement of Alabama law. Burgess's trial counsel had argued, "If you believe the District Attorney that the motive was rage . . . because of his situation on drugs, that takes it out of the Capital Murder case and places it in the category of manslaughter."  (R. Vol. 17 at 2768.)  In rebuttal, the prosecutor argued:

> [Burgess's trial counsel] told you, that if this was done in the heat of passion, it becomes manslaughter.  No. it doesn't.  Because, you will hear [the court] charge you that there has got to be legal provocation.  There is no legal provocation in this case.

(R. Vol. 18 at 2791-92.)

Alabama law defines manslaughter as follows:

(a)  A person commits the crime of manslaughter if:

(1)  He recklessly causes the death of another person, or

(2)  He causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death ***due to a sudden heat of passion caused by provocation recognized by law***, and before a reasonable time for the passion to cool and for reason to reassert itself.

125

Ala. Code § 13A-6-3(a)(emphasis added).

By arguing that Burgess killed the victims in a drug-induced rage, Burgess's trial counsel invoked the "heat of passion" section of the manslaughter statute, not the reckless section. Pursuant to Alabama law, "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." Ala. Code § 13A-2-2(3). This is not compatible with trial counsel's argument that Burgess killed the victims in a drug-induced rage.

Also, Alabama has recognized three situations of "sudden heat of passion caused by provocation:" "(1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative." *Rogers v. State*, 819 So. 2d 643, 662 (Ala. Crim. App. 2001). Rage based on drug seeking or using behavior is not one of the categories of legal provocation recognized in Alabama.

The court finds the prosecutor's "correction" of Burgess's counsel's statement regarding the legal provocation necessary for rage-based manslaughter was a correct statement of the law. Therefore, even if this claim was not procedurally defaulted, it would be dismissed on its merits.

126

**2. Penalty Phase Comments  (Doc. 15 at 99, 102-03.)**

Burgess contends that the prosecutor made three comments to the jury during the penalty phase that were improper and that prejudiced him at that this stage of trial.  (Doc. 15 at 98-99, 101-02.)  First, Burgess asserts, "[A]t the penalty phase, the prosecution argued without any evidence in support that Mr. Burgess had been malingering during the psychological examinations that led to diagnoses of borderline mental retardation and mood disorder."[28]  (Doc. 15 at 99 [citing R. Vol. 18 at 2944-48].)  These pages do not contain the prosecutor's argument.  Rather, these pages contain a portion of the prosecutor's cross-examination of Dr. Goff during the penalty phase of the trial:

> [Prosecutor]:  Now, let me ask you this: is it possible for a person to claim symptoms like that ?
>
> [Dr. Goff]:  He really wasn't demonstrating any symptoms except acceleration.
>
> Q.  Well. is it possible for a person to fake something like that?
>
> A.  It is possible I suppose, for someone who is sophisticated to do it.
>
> . . .

_____

[28]The Alabama Court of Criminal Appeals noted that the State had argued, "If necessary . . . the State will present the testimony of Burgess's trial counsel, who would testify that Shealy's oral report indicated that Burgess was *malingering*, *manipulative*, and *did not suffer from a severe mental disease or defect*. Trial counsel did not call Shealy to testify during the penalty-phase because they feared such unfavorable evidence might be admitted during the cross-examination." *Burgess*, 962 So. 2d at 289-90 (quoting R. Vol. 28, Tab. 65 at 5 [emphasis added].)

A. . . . I didn't get the impression [Burgess] was malingering.

Q. But, he could have been?

A. Anything is possible.

Q. Are you familiar with a study that was done by Dr. David Rosenhand at Stanford University in 1973?

. . .

Q. It was an experiment in which he got volunteers to go to various hospitals and fake symptoms of mental illness.

A. A lot of people were doing those studies at that time.

Q. As a matter of fact, this study that was done fooled a number of staff psychiatrists at various hospitals?

A. Most of them did, and had they not been able to do that, they wouldn't have been able to get them published.

Q. So, it is possible to do that?

A. It is possible to fool those guys. I'm not saying that it's easy to fool me.

Q. You have superior knowledge as to those people?

A. We all have superior knowledge to people in 1972.

(R. Vol. 18 at 2944-47.) As is clear from the quoted portion, the prosecutor did not *argue* that Burgess was malingering; he simply asked Dr. Goff, on cross examination, if it was possible. Also, Dr. Goff's testimony demonstrates that he consistently responded that Burgess was not malingering.

Next, Burgess argues that the prosecutor misled jurors about the law concerning mitigating factors by informing them that a fact could only be mitigating if "it rose to the level of an excuse for the crime." (Doc. 15 at 102 [citing R. Vol. 19 at 2974].) Also, Burgess argues that the prosecutor, without any evidence, encouraged the jury to consider the non-statutory aggravating factor of future dangerousness. (*Id*. at 102-03 [citing R. Vol. 19 at 2975].) The prosecutor had argued:

> Now, Dr. Goff told you that there is no mental condition that necessarily leads to criminal activity. And, there are many, many people functioning all over this country, and all around the world everyday, who have some forms of personality disorder, who have mental disorders, and any kind of disorder, personality or otherwise, that this Defendant might have. That's no excuse for what he did. This report indicates that he has a violent background, and has violent tendencies. And I ask you to take that into consideration.

(R. Vol. 19 at 2974-75.)

The Alabama Court of Criminal Appeals rejected the arguments on the ground that "[t]here could have been no harm, even if the argument[s] had been improper, because the jury recommended life without parole." *Burgess*, 723 So.2d at 755-756 (citation omitted). (brackets added).

As set forth above, "To find prosecutorial misconduct, a two-element test must be met: (1) the questions or comments must be improper, and (2) the questions or comments must prejudicially affect the substantial rights of the defendant." *United States v. Schmitz*, No. 09-14452, 2011 WL 754148, 14 (11th Cir. March 4, 2011)(citing *United States v. Wilson*, 149 F.3d 1298, 1301(11th Cir. 1998)).

129

[The Eleventh Circuit] has . . . given exhaustive consideration to [claims of prosecutorial misconduct during closing arguments in the sentencing phase] in its en banc opinions in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985), *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985), *Tucker (William) v. Kemp*, 762 F.2d 1480 (11th Cir. 1985) and *Tucker (Richard) v. Kemp*, 762 F.2d 1496 (11th Cir. 1985). As we pointed out, prosecutorial arguments will not warrant habeas corpus relief unless they meet two requirements. First, they must have encouraged the jury to take into account matters that are not legitimate sentencing considerations. *Brooks*, 762 F.2d at 1403. [Footnote] Second, they must have been so prejudicial, when viewed in the context of the entire sentencing proceeding, as to have rendered that proceeding "fundamentally unfair." *Id*. at 1400 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S. Ct. 1868, 1872, 40 L. Ed. 2d 431 (1974)). The test for fundamental unfairness is whether "there is a reasonable probability that [the errors] changed the outcome of a case." *Brooks*, 762 F.2d at 1402; *see also Drake*, 762 F.2d at 1460.

[Footnote]: In *Brooks* and its companion cases we identified a number of matters which have been recognized as legitimate sentencing considerations. These include the character and background of the defendant (including future dangerousness and possible rehabilitation), the circumstances of his offense, and accepted penological justifications such as deterrence and retribution. *See Brooks*, 762 F.2d at 1406-08; *Drake*, 762 F.2d at 1458.

*Johnson v. Wainwright*, 778 F.2d 623, 630 and n.8 (11th Cir. 1985)(footnotes omitted).

The court finds nothing improper in the prosecutor's questioning of Dr. Goff about whether Burgess could have been malingering. After Burgess offered Dr. Goff's testimony regarding the results of his examination of Burgess, the prosecutor was allowed to question Dr. Goff's findings and conclusions, including whether he could have been mislead by Burgess. This was proper cross examiniation. Moreover, this questioning cannot be said to have prejudiced Burgess, as Dr. Goff testified that he would not likely be fooled by Burgess and that his opinion of Burgess's mental health was valid.

130

Likewise the court finds that the prosecutor's argument that Burgess had a violent background and violent tendencies and that his mental health issues did not excuse his actions were proper comments on the evidence when taken in context.   *See Brooks*, 762 F.2d at 1406-08; *Drake*, 762 F.2d at 1458.   However, even if the statements were improper, Burgess has not shown that he was prejudiced by the statements.

> A petitioner cannot show sentencing phase prejudice when the jury recommends a sentence of life instead of death. *Routly v. Singletary*, 33 F.3d 1279, 1297 (11th Cir.1994) (per curiam). [Petitioner] cannot, therefore, demonstrate that, but for the prosecutor's death penalty argument the outcome of the sentencing phase would have been different.  The district court did not err in finding that the Alabama courts' decisions were neither contrary to nor an unreasonable application of the law, and were not based on an unreasonable determination of the facts.

*Parker*, 565 F.3d at 1275.

Burgess has not proven that the state court's decision was unreasonable.  The court will deny Burgess's request for relief based on these questions and comments by the prosecutor during the penalty phase of his trial.

### 3.  Cumulative Impact

Burgess contends that the cumulative impact of the prosecutor's errors denied him a fair trial. (Doc. 15 at 98-99).  For the foregoing reasons, this court has found that Burgess is not entitled to habeas relief with regard to any of the instances of alleged prosecutorial misconduct.   Therefore, the court rejects Burgess's request to implement a cumulative prejudice standard under the present circumstances.

Burgess's claims based on the prosecutor's comments during closing arguments of the guilt and penalty phases will be denied.

**F.     THE TRIAL COURT VIOLATED PETITIONER'S RIGHT TO DUE PROCESS AND A FAIR TRIAL WHEN IT REFUSED TO GRANT A CONTINUANCE IN RESPONSE TO THE STATE'S USE OF A NEWLY DISCOVERED WITNESS.[29]  Petitioner's Claim IV.F.  (Doc. 15 at 104-05; doc. 29 at 35-37.)**

Burgess incorporates many of the factual findings made by the Alabama Court of Criminal Appeals to explain the allegations underlying this claim.  He alleges:

> One of the witnesses in this case was Ronald Chapman, a co-worker of [Shelia] Nnodimele.  He was known to the defense as a witness but would not speak to the defense investigator.  *Burgess*, 723 So.2d at 758.  It was originally believed that Chapman's sole testimony would be about seeing Burgess at Ms. Nnodimele's place of work the night before the victim's bodies were discovered.  However, during a lunch break, Chapman informed the prosecution of information which he claimed he had never previously told any law enforcement officer before.

> This information was highly damaging, in that Chapman claimed that Mr. Burgess told him that he and [Shelia] had a fight and Mr. Burgess wanted to kill [Shelia] with a broken bottle.  *Id.*  Further, Chapman divulged that Mr. Burgess came to his house on a Friday morning, very nervous and trying to pawn items, including some hair clippers.  *Id.*  The prosecutor also informed the judge that he had given Mr. Chapman immunity in exchange for his testimony against Mr. Burgess.  *Id.*  Defense counsel asked for a mistrial or an extensive recess in order to properly investigate these new allegations.  The trial court denied both, eventually merely ordering Mr. Chapman to speak to defense counsel prior to retaking the stand.

(Doc. 29 at 35-36.)

---

[29]Burgess refers to Ronald Chapman as the state's "newly discovered witness." However, Chapman was a witness known to Burgess's trial counsel before trial.  Neither defense counsel nor the prosecutor knew the substance of Chapman's testimony before he took the stand.  (*See* R. Vol. 13 at 1776-80.)

Burgess declares that he was deprived of his right to a fair trial because the trial court did not afford him an adequate amount of time to investigate Chapman's "surprise revelations" and prepare for trial. (*Id*. at 36 [citing *Chandler v. Freitag*, 348 U.S. 3, 9-10 (1954)(finding a violation of due process where illiterate, middle-aged man was forced to immediately defend his own felony case after he requested but was refused an attorney by the trial court); *Ungar v. Sarafite*, 376 U.S. 575, 589-90 (1964)(finding no violation of due process when defendant, a lawyer, was afforded a five day continuance to obtain counsel to represent him on a civil contempt charge instituted due to his obstreperous behavior on the witness stand)].)[30]  He argues, "Allowing the State to have a witness testify about highly prejudicial matters without giving trial counsel a continuance of the trial to investigate these claims violated Mr. Burgess'[s] due process right to a fair trial."  (*Id*. at 37.)

On direct appeal, the Alabama Court of Criminal Appeals held:

> Burgess contends that the trial court erred to reversal when it refused to grant a continuance or a mistrial following the presentation of surprise testimony from a State's witness.  The State argues that the trial court did not abuse its discretion, so no reversal is due.

> State's witness, Ronald Chapman, worked with Shelia Nnodimele and was called to testify that he saw Burgess at Shelia's place of employment the night before the victims' bodies were discovered.  During a lunch break after he testified on direct examination, Chapman revealed to the prosecutor information that he had not previously disclosed to any law enforcement

---

[30]Burgess cites *Ungar* for the proposition that stressing that a "myopic insistence upon expeditiousness in the face of a justifiable request for a delay can render the right to defend with counsel an empty formality."  (Doc. 15 at 103 [citing *Ungar*, 376 U.S. at 589].)

133

officer.  The prosecutor disclosed this information to the court and to Burgess through voir dire examination of Chapman outside the presence of the jury.

Chapman testified on voir dire examination that he and Burgess "ran together" and that they had used crack cocaine before the murders.  He stated that approximately one week before the murders, while they were smoking crack, Burgess revealed to him that he and Shelia had had a fight and that he had "started to kill her" with a broken bottle.  Chapman also testified that he saw Burgess on Friday morning, the day after he last saw Shelia.  He and Burgess were at a house with a drug dealer that Friday morning, Chapman said; Burgess was nervous and shaking and when Chapman asked why he was nervous, Burgess replied that Chapman did not know what was going on.  He further testified that Burgess was trying to pawn or sell some items, including hair clippers, to the drug dealer.  According to Chapman, Burgess came to his house on the afternoon and evening of the same day.  During the afternoon visit, Burgess told Chapman that Shelia was in town.  The prosecutor stated that he had told Chapman that if he testified truthfully, he would be given immunity from prosecution for the acts about which he testified.

The prosecutor acknowledged that he intended to present this testimony to the jury, and Burgess made a motion for a mistrial arguing that the sudden disclosure was the only evidence of an admission by him of a prior threat against one of the victims.  Burgess argued that he was not adequately prepared to cross-examine Chapman about his disclosure or his criminal background and credibility.  Defense counsel stated that unless the court granted "a long recess" so he could investigate Chapman, he could not provide effective assistance of counsel.  The court denied the motion for mistrial and defense counsel's subsequent motion for a recess "of some significant duration" so he could investigate Chapman.  The court noted for the record that defense funds for an investigation for Burgess had been authorized since the case began.  In response to further questioning, Chapman acknowledged that he had been contacted by a person claiming to be an investigator for Burgess, but he declined to speak to the person.  No state agency or member of the victims' family instructed Chapman not to speak to the person, Chapman said.

The court stated that it would recess and give Burgess the option to question Chapman outside the jury's presence or to defer cross-examination of Chapman until later.  Burgess then requested, and the court ordered, Chapman to speak to defense counsel.  Later during the trial, the prosecutor questioned Chapman about the matters to which he testified on voir dire.  Burgess

134

cross-examined him extensively about the fact that he had failed to disclose the information when he spoke to investigators before trial, and he questioned Chapman about the details of his testimony.

Burgess did not renew his motion for a mistrial or for a continuance after the court announced its resolution of the surprise testimony issue. Therefore, Burgess has no adverse ruling from which to appeal, and nothing was preserved for appellate review. *Weaver v. State*, 682 So.2d 488 (Ala. Cr. App. 1996). Burgess's objection must now be reviewed pursuant to the plain error rule. Thus, the denial of a continuance or a mistrial can be reversible error here only if the error is so obvious that this court's failure to notice it would perilously affect the fairness or integrity of the proceedings. *Ex parte Taylor*, 666 So.2d 73 (Ala.1995), *cert. denied*, 516 U.S. 1120, 116 S. CT. 928, 133 L ED.2d 856 (1996). Denial of the motion for continuance or a mistrial here did not constitute plain error.

The record reflects that defense counsel knew that Ronald Chapman would be a State's witness, so defense counsel or Burgess's investigator could have investigated Chapman's background and criminal history before trial. After the new information was disclosed, defense counsel was given the unique opportunity to hear the details of Chapman's statement before Chapman testified in front of the jury. Moreover, defense counsel was permitted to cross-examine Chapman about his statement outside the jury's presence. In spite of the foregoing, Burgess argues here that a continuance was necessary because Chapman had been unavailable to him before trial. Chapman's decision not to speak to Burgess's investigator is irrelevant to this issue; even if he had been willing to speak to the investigator before trial, there is no reason to believe that he would not have revealed the information that came as a surprise to all parties on the day of trial. Instead, because Chapman disclosed new information during trial, Burgess secured an order requiring Chapman to speak to defense counsel, so counsel could interview him before he testified. Furthermore, Burgess cross-examined Chapman extensively about his new allegations.

Burgess also claims that Chapman's surprise testimony revealed information that supported a defense of intoxication, about which defense counsel had been unaware and therefore unprepared to present. This is a specious claim, at best. Burgess was certainly well aware of his own drug abuse, and other witnesses testified as to his drug abuse at trial.

135

> In summary, Burgess has failed to establish that the trial court's denial of his motion for a continuance or a mistrial constituted plain error.  When the prosecutor discovered the surprise information from Chapman and disclosed it to Burgess and the court, the court exercised its discretion and fashioned a reasonable remedy that provided a recess, allowed Burgess access to Chapman for interview purposes, and permitted Burgess to examine him outside the jury's presence so he could obtain full details and avoid further surprises.  The trial court's actions were appropriate under the circumstances.

*Burgess*, 723 So. 2d at 758-59.

Burgess does not contend that any portion of the state court's factual findings are unreasonable in light of the evidence before it.  Therefore, regardless of whether this court were to conduct a *de novo* review or § 2254(d) review of Burgess's claim, the state court's factual findings are entitled to deference.  Further, the Supreme Court cases upon which Burgess relies do not show that the state court's rejection of this claim either was contrary to or an unreasonable application of federal law.

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. *Avery v. Alabama*, 308 U.S. 444, 60 S. Ct. 321, 84 L. Ed. 377. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.  *Chandler v. Fretag*, 348 U.S. 3, 75 S. Ct. 1, 99 L. Ed. 4. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.  *Nilva v. United States,* 352 U.S. 385, 77 S. Ct. 431, 1 L. Ed. 2d 415.

*Ungar*, 376 U.S. at 589-590 (citations omitted).

136

As the state court held, counsel were well aware Chapman was going to be a witness for the State and they could have conducted a background investigation of him prior to trial for various cross-examination purposes.  Chapman's personal input as to his background was not necessary.  Moreover, Chapman did not testify to any fact that would not have been known to Burgess.  Although Chapman had refused to speak with the defense before trial, he did so after being ordered by the trial court, and counsel were able to extensively cross-examine Chapman before the jury as to his surprise revelations.

Burgess was not left to fend for himself immediately prior to trial, nor did the trial court unreasonably insist on proceeding with the trial under circumstances that rendered counsel's presence – in connection with Chapman as a witness – a mere formality.  Burgess has made no effort to describe how a continuance would have changed the outcome of the proceedings.

The court finds that the state court's decision was reasonable.  Therefore, this claim will be denied.

**G.   THE TRIAL COURT FAILED TO EXCUSE FOR CAUSE A JUROR WHO WAS UNSUITABLE FOR SERVICE. Petitioner's Claim IV.G. (Doc. 15 at 105-06; doc. 29 at 37-39.)**

Burgess complains that venireman "B.C." fell asleep twice during voir dire, and, although defense counsel challenged him for cause, the trial court "summarily denied" their challenge for cause.  (Doc. 15 at 105 [citing doc. 19, Vol. 4, Tab. 13 at 133].)  He declares the trial court abdicated its "role of ensuring a qualified jury" because it did not "inquire" into the

matter.  (Doc. 29 at 39 [citing *Rosalez-Lopez v. United States*, 451 U.S. 182, 188 (1981)(trial court must remove unqualified jurors)].)  Burgess contends that inquiry by the court might have shown that this juror was biased, missed a vital question, or had "other problems that would have prohibited him from being a fair and impartial juror."  (*Id.* at 35).  Instead, the matter was left "up to defense counsel to remove this juror through use of peremptory challenge."  (*Id.*)  Also, Burgess asserts that "the appellate court did not resolve this issue as a matter of federal constitutional law," and, therefore, he demands *de novo* review.  (*Id*. at 38.)

Prior to examination of the appellate court's findings of fact and conclusions of law, this court carefully reviewed the entire *voir dire* portion of the trial record.  (*See generally* R. Vol. 4 at 11-169; R. Vol. 5 at 170-364, 369; R. Vol. 6 at 370-475.)  *Voir dire* began with each potential juror, in alphabetical order, standing and stating their name, age, race, religion, marital status, work status, and their spouses' work status.  (R. Vol. 4 at 15-41.)  The record shows no break or disruption when B.C. stood and gave his personal information.  (*Id.* at 21-22.)  That is, the record does not indicate that B.C. had to be verbally or physically roused.  After a five-minute break, the remainder of the venire completed this task, and then the trial court asked a number of qualifying questions of the jury.  (*Id*. at 42-48.)  Counsel questioned the venire.  (*Id*. at 48-130.)  A twenty-minute break was taken during defense counsel's voir dire examination.  (*Id*. at 130.)  During this break the following colloquy occurred:

> [DEFENSE COUNSEL]:  At this time, Your Honor, we would also move to strike Juror [B.C.] from consideration.   [B.C.], let the record reflect from my observation, dozed off once or twice during the voir dire process involving [the prosecutor].

THE COURT:  Overruled.  I can observe the jury too.

(*Id*. at 133.)  Defense counsel did not request that the court conduct any further investigation into the matter.  After the break, he continued his questioning, and, in fact, he asked B.C. several questions during the second half of his voir dire of the venire.  He did not, however, ask B.C. if he had any trouble staying awake, whether he missed any questions asked by the prosecutor or defense counsel, or whether he had any problem that would have prohibited him from being a fair and impartial juror.  (*See id*. at 145-47.)  The record contains no indication that the trial court prohibited or interfered with defense counsel's questioning of the venire, in general, or B.C., specifically.  Petitioner concedes that defense counsel exercised a peremptory strike against B.C. , and B.C. was not selected as a juror.  (*See* R. Vol. 2 at 376; R. Vol. 6 at 476, 491-93.)

The Alabama Court of Criminal Appeals court held:

> "To justify a challenge for cause, there must be a proper statutory ground or some other matter that imparts absolute bias or favor and leaves nothing to the discretion of the trial court." *Ex parte Trawick*, 698 So. 2d 162 (Ala. 1997). A trial court's ruling on a challenge for cause is given great weight; it will not be reversed unless it is clearly erroneous or an abuse of discretion.  *Ex parte Windsor*, 683 So. 2d 1042 (Ala.1996), *cert. denied*, 520 U.S. 1171, 117 S. Ct. 1438, 137 L. Ed. 2d 545 (1997).

> The trial court's response to Burgess's challenge of veniremember B.C. suggests that B.C. was not sleeping.  Moreover, there is no statutory ground requiring a juror to be excused based on defense counsel's assertion that the juror dozed during voir dire, nor does dozing impart absolute bias requiring dismissal.  The trial court did not abuse its discretion when it refused to excuse veniremember B.C.

*Burgess*, 723 So. 2d at 759-60.

The grounds for disqualification under Alabama are limited –

A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also:

(1) Is a citizen of the United States, has been a resident of the county for more than 12 months and is over the age of 19 years;

(2) Is able to read, speak, understand and follow instructions given by a judge in the English language;

(3) Is capable by reason of physical and mental ability to render satisfactory jury service, and is not afflicted with any permanent disease or physical weakness whereby the juror is unfit to discharge the duties of a juror;

(4) Has not lost the right to vote by conviction for any offense involving moral turpitude.

Ala.Code § 12-16-60(a).  Sleeping during *voir dire* does not compel disqualification under Alabama law.

Burgess declares the trial judge abdicated her "role of ensuring a qualified jury" because she did not "inquire" further into the matter.  (Doc. 29 at 39 [citing *Rosalez-Lopez v. United States*, 451 U.S. 182, 188 (1981)(trial court must remove unqualified jurors)].)  To rise to the level of a constitutional violation, "the trial court's failure to ask . . . questions [regarding defense counsel's assertion that B.C. was asleep] must render the defendant's trial fundamentally unfair."  *Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991)(citing *Murphy v. Florida*, 421 U.S. 794, 799 (1975)), *quoted in Skilling v. United States*, _____ U.S. _____, 130 S. Ct. 2896, 2918 n.20 (2010).  In his Amended Petition, Burgess claims the trial court

140

"deprived [him] of due process and a fair trial." (Doc. 15 at 105-06.)  He does not elaborate beyond claiming that "the trial court avoided its duty to ensure that the juror panel contained potential jurors who were qualified to serve," and that "the trial court interfered with defense counsel's use of their peremptory challenges."  (*Id*. at 105.)

> [E]ven if a veniremember should have been struck for cause, the Supreme Court in *Ross v. Oklahoma*, 487 U.S. 81, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988), held that *there is no constitutional violation where the biased veniremember does not eventually sit on the jury*.  The Court in *Ross* held that *a habeas petitioner's constitutional rights were not violated when he was forced to waste a peremptory challenge to remove a veniremember whom the court should have removed for cause*.  Therefore, [a habeas petitioner] can raise only the trial court's denials of [his] challenges for cause of those veniremembers who eventually sat on the jury.

*Heath v. Jones*, 941 F.2d 1126, 1132-33 (11th Cir. 1991)(emphasis added); *see also Spivey v. Head*, 207 F.3d 1263, 1273 (11th Cir. 2000).  Burgess has not alleged that any "member of the jury as finally composed was removable for cause;" therefore, the court finds "no violation of [his] Sixth Amendment right to an impartial jury or his Fourteenth Amendment right to due process." *Rivera v. Illinois*, 129 S. Ct. 1446, 1454 (2009)(citing *Ross*, 487 U.S. at 86-91).  The fact that Burgess's counsel had to exercise one of his peremptory strikes to remove B.C. is of no constitutional consequence.

For all of the foregoing reasons, this court finds that Burgess has failed to demonstrate that he suffered "actual prejudice" as a result of the trial court's failure to question B.C. and its denial of Burgess's challenge for cause.   The decision of the state court on these issues was neither contrary to, nor an unreasonable application of, clearly established federal law.

Moreover, the rulings were not an unreasonable determination of the facts in light of the record evidence. Therefore, this claim will be denied.

**H.    PETITIONER'S ABSENCE FROM SEVERAL STAGES OF HIS CAPITAL PROCEEDINGS VIOLATED HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. Petitioner's Claim IV.H. (Doc. 15 at 106-07; doc. 29 at 40-41.)**

Burgess contends that the state court fundamentally erred when it "reli[ed] on Alabama law concerning the presence of the defendant" to reject his claim that his absence from several proceedings violated his constitutional rights, thus rendering a decision that was contrary to clearly established United States Supreme Court precedent. (Doc. 29 at 40-41 [citing *Illinois v. Allen*, 397 U.S. 337, 338 (1970) and quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)].) He argues that "the United States Supreme Court has defined a critical stage in the proceedings to include all hearings that are an essential part of trial - *i.e.*, to all proceedings at which the defendant's presence has a relation, reasonably substantial, to the fullness of his opportunity to defendant against the charge." (*Id*. at 41 [quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)(emphasis deleted; internal quotations omitted)].) He alleges that he was absent from four critical stages:

> [1.] Mr. Burgess was not present at a motion hearing at which the district attorney stated in open court that he would drop the charge for murder of a child under fourteen, and during which discovery was discussed. (M. 5-7) [2.] Mr. Burgess was absent from a hearing in which he was ordered to produce handwriting samples. (M. 161-164). [3.] Mr. Burgess was again absent from portion of the voir dire, when the trial court held an in-chambers discussion with counsel on both sides, and the victims' family members. (R. 368-69). [4.] He was absent when the court heard argument and subsequently ordered Mr. Burgess to refrain from using the jail telephone. (R. 1187-92 ).

142

(Doc. 15 at 106-07.)  Without explanation, Burgess contends that these "absences directly affected [his] ability to present his case, as he was unable to have any input into the critical decisions that were made by the court," and "seriously jeopardized" his right to confrontation, due process and a fair trial.  (*Id*. at 107.)

The court finds the allegations in Burgess's Amended Petition, (doc. 15 at 106-07), fail to meet the "heightened pleading requirements" of Rules Governing § 2254 Cases, Rule 2(c), and, therefore, this claim is due to be dismissed.  *See McFarland*, 512 U.S. at 856. Alternatively, the court finds that this claim is without merit.

The Alabama Court of Criminal Appeals found no reversible error created by Burgess's absence from these four proceedings; it held:

> Burgess next argues that he was absent from several proceedings, and that his absence requires reversal of his conviction and sentence.  The State notes that Burgess did not raise this objection in the court below; it argues that no error occurred or, if error occurred, it was invited.

> Rule. 9.1, Ala. R. Crim. P., provides that a defendant has a right to be present at every stage of trial, and that a defendant charged with a capital offense may not waive the right to be present.  Alabama courts have held, however, that if a capital defendant is absent from noncritical stages of trial and if his presence would not have benefitted his defense, no error occurs.  *See Harris v. State*, 632 So. 2d 503, 510-12 (Ala. Cr. App. 1992), *aff'd*, 632 So. 2d 543 (Ala. 1993), *aff'd*, 513 U.S. 504, 115 S. Ct. 1031, 130 L. Ed. 2d 1004 (1995).

> Burgess contends that he was absent from two pretrial motion hearings, an in-chambers discussion with counsel for both parties and the victims' family members during voir dire proceedings, and an in-chambers discussion with counsel for both parties about suspending Burgess's telephone privileges until a certain witness testified.  Burgess's absence was not objected to, and, in fact, his attorneys stated on the record at the pretrial hearings that his presence was

143

waived.  Furthermore, Burgess was absent from only the beginning of the August 3, 1993, pretrial motion hearing when the court and counsel discussed primarily what motions had been filed and when they would be heard. When Burgess arrived in court, the judge noted for the record that defense counsel had agreed that the "housekeeping matters" could be conducted in Burgess's absence.

Burgess has not demonstrated that he suffered any prejudice as a result of his absence from the pretrial hearings.  It is obvious that defense counsel believed that Burgess's presence would not be helpful to his defense, because counsel attempted to waive his presence. The Alabama Supreme Court recently observed, "This Court has not held, however, that a defendant has the right to be present at all pretrial proceedings without regard to whether the defendant's absence will prejudice the defendant." *Ex parte Trawick*, 698 So. 2d at 177. No plain error occurred as a result of Burgess's absence from one pretrial hearing and a portion of a second hearing.

We have reviewed the portions of the record relating to the in-chambers discussion following defense counsel's motion that the victims' family be removed from courtroom during voir dire proceedings and the in-chambers discussion regarding the brief suspension of Burgess's telephone privileges. We note that the record does not clearly indicate that Burgess was, in fact, absent from the discussion regarding the victims' family.  Further, we hold that no plain error occurred as a result of Burgess's absence at either in-chambers discussion.  The discussions related to minor procedural matters and motions unrelated to Burgess's guilt or innocence, and Burgess's presence would not have benefitted his defense. Burgess has not demonstrated any possibility of prejudice that resulted from his absence.  *Harris v. State*, *supra*, 632 So. 2d at 510-12.

*Burgess*, 723 So. 2d at 760-61.

Burgess argues that the state appellate court's opinion violates clearly-established

constitutional right because "the appropriate constitutional inquiry is whether [Burgess's]

presence would contribute to fairness," and not – as the Alabama Court of Criminal Appeals

found – whether he had "the ability to assist."  (Doc. 29 at 41-42.)

144

The Supreme Court has held –

> The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, *e.g.*, *Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970), but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him.  In *Snyder v. Massachusetts*, 291 U.S. 97, 54 S. Ct. 330, 78 L. Ed. 674 (1934), the Court explained that a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge . . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."  *Id.*, at 105-106, 108, 54 S. Ct., at 332, 333; *see also Faretta v. California*, 422 U.S. 806, 819, n.15, 95 S. Ct. 2525, 2533, n.15, 45 L. Ed. 2d 562 (1975).  The Court also cautioned in *Snyder* that the exclusion of a defendant from a trial proceeding should be considered in light of the whole record.  291 U.S., at 115, 54 S. Ct., at 335.

*United States v. Gagnon*, 470 U.S. 522, 526-27 (1985).  The Court held that consideration of whether a defendant "could have done [anything] had [he] been at the conference, [or whether he] would . . . have gained anything by attending" is relevant to determining whether his absence "thwarted" a "fair and just hearing."  *Id.* at 527, *quoted in Stincer*, 482 U.S. at 747.  Such consideration would necessarily include whether a defendant's presence would assist his defense.  Therefore, the court finds that the Alabama Court of Criminal Appeals did not err in considering Burgess's ability to assist his attorneys.

Burgess contends that he was absent from "a motion hearing at which the district attorney stated in open court that he would drop the charge for murder of a child under fourteen, and during which discovery was discussed."  (Doc. 15 at 106 [citing R. Vol. 3, Tab. M-5 to M-7].)  This hearing occurred April 3, 1993.  (*See* R. Vol. 3, Tab. at M-4.)  The court

notes that the pages cited by Burgess do not contain any discussion of discovery issues.  (*See id*. at M-5 to M-7.)  Without Burgess present, the prosecutor stated that he was going to dismiss "the capital count dealing with the minor victim."  (*Id*. at M-5, M-7.)  Burgess's counsel then raised an issue regarding discovery requests for hair and blood samples obtained before petitioner was reindicted; he indicated that he would "be raising the issue . . . [o]ver the fact that [the samples were obtained pursuant to] a prior discovery request [in a] case [that had] been disposed of at this moment."  (*Id*. at M-9 to M-10.)  The trial court refused to rule on this issue because it was "not before [the court]."  (*Id*. at M-10.)  Counsel and the court then proceeded to discuss which of the pending motions were to be heard at the hearing and which would be set for a later date.  (*See id*. at M-11 to M-22.)  At this time, the proceedings were stopped until Burgess arrived in the courtroom.  (*Id*. at M-22.)  When Burgess arrived, the court stated, "Let the record show that this is CC93-142, State of Alabama v. Alonzo Lydell Burgess and now he's present and it is on the record, the housekeeping matters that we did and that was with your agreement that we did that even though he was not present, right . . . ?  (*Id*.)  To which defense counsel responded, "Yes, Your Honor."  (*Id*.)

No testimony was given at the hearing; therefore, Burgess's rights under the Confrontation Clause were not violated by his absence.  Also, nothing related to the merits of the charges against him was discussed or ruled upon in his absence.  Therefore, his presence at this hearing had no relation to his opportunity to defend against the charges against him.

146

Burgess's absence from the first part of the August 3, 1993, hearing did not violate his constitutional rights.  Thus, the decision of the state court was neither contrary to nor an unreasonable application of federal law.

Next, Burgess contends that his constitutional rights were violated when he was "absent from a hearing in which he was ordered to produce handwriting samples."  (Doc. 15 at 107 [citing R. Vol. 4, Tab 11 at M-161 to M-164].)  This hearing occurred on February 17, 1994, after the Alabama Supreme Court had ordered the trial court to grant the State's motion for samples of Burgess's handwriting.  (*Id*. at M-158, M-163.)  At the hearing, the following occurred:

> THE COURT:  Let the record show that the Defendant is not present and I want to know if you insist on him being present for this motion?
>
> [DEFENSE COUNSEL]:   No, under the circumstances that have transpired as reflected on the record today as counsel I'll take that responsibility that this proceeding[ ] is taking place without his being present and that I will make sure that he is fully advised [of] it.
>
> Also, for purposes of the record, we have been down this particular road previously under the original indictment so it's not something that we are crossing for the first time.
>
> THE COURT:  Okay.  And it's my understanding that I'm under a Supreme Court order to grant that motion and I'm granting it due to the fact that I do not want to be in contempt of the Supreme Court's order.
>
> So he's ordered to provide those handwriting samples.

(*Id*. at M-162 to M-163.)

Clearly, the decision to grant the State's motion for a handwriting sample was made by the Alabama Supreme Court before the hearing; the trial court merely announced the decision.  Burgess's presence at this hearing would have been "useless."  *See Snyder*, 291 U.S. at 106, *quoted in Stincer*, 482 U.S. at 745.  Burgess's absence from this February 17, 1994, hearing did not violate his constitutional rights. Thus, the decision of the state court was neither contrary to nor an unreasonable application of federal law.

Burgess contends his absence "from [a] portion of the voir dire, when the trial court held an in-chambers discussion with counsel on both sides, and the victims' family members" violated his constitutional rights.  (Doc. 15 at 107 [citing R. Vol. 5 at 368-69].)  The record shows that Burgess was present during this discussion.  (*See* R. Vol. 5 at 364-65 [court reporter's note in the transcript immediately preceding the discussion of victims' family members in the courtroom states:  "Let the record show that this is outside the presence and hearing of the jury in chambers with Defendant present."].)  Nothing in the record at the pages cited by Burgess shows he was absent at this time.[31]  Because Burgess cannot show he was absent, he cannot show any violation of his constitutional rights arising from his absence.  Thus, the decision of the state court was neither contrary to nor an unreasonable application of federal law.

---

[31]Defense counsel stated that his oral motion during voir dire was a renewal of a previously-filed motion that had been discussed outside Burgess's presence.  (R. Vol. 5 at 365.)

148

Finally, Burgess argues that his constitutional rights were violated when he "was absent when the court heard argument and subsequently ordered [him] to refrain from using the jail telephone." (Doc. 15 at 107 [citing R. Vol. 10 at 1187-92].)  The record shows that the court entered an Order, in open court after the lunch break and before 1:39 p.m., when Burgess returned to the courtroom, stating that Burgess was "not allowed to make any telephone calls from the Jefferson County Jail until Mr. Howard Burgess [had] testified." (R. Vol. 2 at 271; R. Vol. 10 at 1186-92.)  The Order was cancelled at 3:15 p.m.; Howard Burgess began testifying a little after 5:00 p.m.  (R. Vol. 2 at 271; R. Vol. 11 at 1385-86.)  The State had requested that Burgess, who had been taken back to the Jefferson County Jail for the lunch break, not be allowed to use the telephone for fear that he would warn Howard Burgess that the State had secured a writ of attachment to compel his appearance and testimony at trial. The record does not reflect how long Burgess remained at the Jail after the Order was entered, whether he attempted to make a telephone call after the Order was entered, and how he was prejudiced in his defense by his absence from this hearing and/or his inability to make a telephone call from the Jefferson County Jail after the Order was entered.

No testimony was given during this hearing and nothing related to the merits of the charges against him was discussed or ruled upon in his absence.  His presence at this hearing had no relation to his opportunity to defend against the charge against him.  Burgess has not shown any violation of his constitutional rights arising from his absence.  Thus, the decision of the state court was neither contrary to nor an unreasonable application of federal law.

For the foregoing reasons, this claim will be dismissed as insufficiently pled, and, alternatively, without merit.

## I. THE STATE COURT'S DECISION THAT THE TRIAL COURT SUFFICIENTLY CONSIDERED MITIGATION EVIDENCE IS AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT THAT DENIED PETITIONER HIS EIGHTH AMENDMENT RIGHT TO A RELIABLE SENTENCING PROCEEDING. Petitioner's Claim IV.I.  (Doc. 15 at 106-10; doc. 29 at 42-45.)

Burgess alleges, "The trial court's determination that Mr. Burgess'[s] 'dysfunctional family life, his mood disorder, his uncle's abuse, and his attempted suicide" were not mitigating factors, along with the court's failure to even mention Mr. Burgess' drug addiction, mental illness, or mental retardation as potential non-statutory mitigating factors, notwithstanding the state's failure to rebut any of this evidence, flies in the face of extensive federal court precedent." (Doc. 15 at 109-10.) He contends that this evidence was "inherently mitigating," but "rather than consider the weight of this evidence in determining whether [he] should live or die, the trial court found that these facts were not mitigating factors." (*Id.* at 109 [citing R. 3094-95].)  Burgess alleges the state appellate court's affirmation of the trial court's error is contrary to and unreasonable application of clearly established federal law because

> Sentencing in a capital case must be individualized both in consideration of the offense and the "character and record of the particular offender." *Woodson v. North Carolina*, 428 U.S. 380, 204 (1976).  Every mitigating circumstance presented by the defense must be considered in a capital case. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  A sentencer in a capital case may not refuse to consider as a matter of law, any mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982).

(Doc. 29 at 43.)

On direct appeal, the Alabama Court of Criminal Appeals made the following findings

of fact and conclusions of law:

> Burgess argues that the trial court refused to consider nonstatutory
> mitigating circumstances – his alleged mood disorder, the fact that his mother
> was mentally ill, his low intelligence, his allegedly dysfunctional home during
> his childhood, his drug dependence, and the fact that violence had always been
> in his life.  The State argues that the sentencing order demonstrates that the
> court considered the evidence but that it did not find it to be mitigating.  We
> agree with the State.

> In the sentencing order, the trial court discussed evidence regarding
> Burgess's crack cocaine use and his mother's mental illness, but did not find
> them to be mitigating.  The court also noted evidence of Burgess's mood
> disorder, his low intelligence, his dysfunctional home life, and the fact that
> violence had always existed in Burgess's life.  The trial court found Burgess's
> remorse and the jury's recommended sentence of life imprisonment without
> parole to be nonstatutory mitigating circumstances.  It is clear that the trial court
> considered the nonstatutory mitigation presented by Burgess, but found most
> of the evidence not to be mitigating.

*Burgess*, 723 So. 2d at 767-68.

Burgess cannot show that the trial court's findings in the sentencing order regarding

some of the mitigating evidence presented during the penalty phase of trial amounted to a

decision that was either contrary to, or an unreasonable application of, clearly established

Supreme Court precedent, because the Constitution requires only that the sentencing court

consider evidence offered in mitigation by a capital defendant; it does not require the court

to accept that evidence.  The verb "consider" is not synonymous with "accept."  There are

important legal distinctions between "consideration" of evidence offered as a basis for a

sentence less than death, and "acceptance" of that evidence – a term here used in the sense of finding that the evidence proffered in mitigation of sentence establishes or proves the "existence of" the factual proposition for which it is offered. ***Acceptance*** "is not constitutionally required; the Constitution only requires that the sentencer ***consider*** the factors." *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) (emphasis in original).[32]

Indeed, the Supreme Court's seminal decision in *Lockett v. Ohio*, 438 U.S. 586 (1978), and its progeny, requires only that sentencing authorities not be precluded by law from "considering" a broad range of evidence offered by a defendant as a basis for a sentence less than death. *See id*. at 604 ("[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from **considering**, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.")(italics in original, bold emphasis added, footnotes omitted); *see also*, *e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (reiterating that *Lockett* held only that "the sentencer in capital cases

---

[32]The Eleventh Circuit held:

> Although [petitioner] argues that the trial judge did not ***consider*** non-statutory factors, it is more correct to say that the trial judge did not accept – that is, give much weight to – [petitioner's] nonstatutory mitigating factors. Acceptance of nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer ***consider*** the factors.

*Atkins*, 965 F.2d at 962 (citing *Blystone v. Pennsylvania*, 494 U.S. 299, 308 (1990))(emphasis in *Atkins*).

must be permitted to *consider* any relevant mitigating factor")(emphasis added).  However, neither *Lockett* nor its progeny say anything about "acceptance" of evidence offered in mitigation of the sentence to be imposed, in the sense of finding that the evidence establishes, or proves the existence of, the factual proposition for which it is offered.  *See*, *e.g.*, *Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006) ("The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight.").

All that the Constitution requires is "a full hearing" at which "defense counsel is given a fair opportunity to present mitigating evidence;" and, when that is done, federal habeas review "becomes highly deferential."  *Atkins*, 965 F.2d at 962 (citing *Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir. 1984)).  In other words, the state trial judge's "findings on mitigating factors are presumed to be correct, and will be upheld if they are supported by the record."  *Id*. (citing 28 U.S.C. § 2254(d), and *Magwood v. Smith*, 791 F.2d 1438, 1450 (11th Cir. 1986)).

This court has examined the trial court's sentencing opinion order in full, and is satisfied that the trial court judge ***considered*** evidence presented by Burgess of statutory and non-statutory mitigating circumstances.  The fact that it did not ***accept*** the evidence in mitigation or find that the mitigating factors outweighed the aggravating factors was not unreasonable under the circumstances.  When "a full hearing has been held in which the

defense counsel is given a fair opportunity to present mitigating evidence, [federal habeas]

review becomes highly deferential." *Atkins*, 965 F.2d at 962 (citing *Palmes*, 725 F.2d at

1523). The Eleventh Circuit's decision in *Schwab*, has made that point clear:

> [W]hile sentencing courts may not refuse to consider evidence offered in mitigation, they need not decide that the facts established by that evidence have mitigating force in the context of the case. The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; ***it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight***.

451 F.3d at 1329 (emphasis supplied); s*ee also Harich v. Wainwright*, 813 F.2d 1082, 1101

(11th Cir. 1987) (observing that the Supreme Court's decisions in *Skipper v. South Carolina*,

476 U.S. 1 (1986), *Eddings*, and, *Lockett* require ***only*** "that the defendant be allowed to

***present*** all relevant mitigating evidence to the sentencing jury or court . . . . These cases do

not require that the sentencing body ***accept*** the conclusion that the evidence constitutes a

mitigating circumstance or that the mitigating circumstances outweigh the aggravating

circumstances.")(emphasis in *Harich*), *adopted in relevant part sub nom*. *Harich v. Dugger*,

844 F.2d 1464, 1468-69 (1988) (*en banc*), *partially abrogated on other grounds by Davis v.*

*Singletary*, 119 F.3d 1471, 1481-82 (11th Cir. 1997).

For the foregoing reasons, Burgess cannot show that he is entitled to habeas relief from

the state court's rejection of this claim on the merits. Therefore, this claim will be denied.

J.     **BECAUSE ALABAMA'S CAPITAL SENTENCING SCHEME IS UNCONSTITUTIONAL AS WRITTEN AND AS APPLIED TO PETITIONER, HIS RESULTING DEATH SENTENCE VIOLATES HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEEN AMENDMENTS TO THE UNITED STATES CONSTITUTION.  Petitioner's Claim IV.J.  (Doc. 15 at 111-17; doc. 29 at  45-46.)**

Burgess argues that Alabama's sentencing scheme violates the United States Supreme Court's decisions in *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  (Doc. 15 at 112-13; Doc. 29 at 45).  Burgess did not raise this claim either at trial or on direct appeal.  Allen argues that Burgess's failure to raise this claim in state court on direct review renders the claim procedurally defaulted.  (Doc. 21 at 35).

The *Apprendi* Court held that "the Sixth Amendment prohibits imposition of a sentence greater than 'the maximum [a criminal] would receive if punished according to the facts reflected in the jury verdict alone.'" *See United States v. Julian*,  No. 09-13673, 2011 WL 590007, *5 (11th Cir. Feb. 22, 2011)(quoting *Apprendi*, 530 U.S. at 483) The *Ring* Court held that "[c]apital crimes are no different." *See id*. (citing *Ring*, 536 U.S. at 589).  The Supreme Court has held that the *Ring* decision announced a new procedural rule of Constitutional law; therefore, it applies only to cases on direct review at the time the decision was decided. *Schiro v. Summerlin*, 542 U.S. 348, 358 (2004)("*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review.").[33]  As *Ring* was an

---

[33]According to well-established Supreme Court precedent,

Under *Teague* [*v. Lane*, 489 U.S. 288 (1989)], the determination whether a constitutional rule of criminal procedure applies to a case on collateral review

application of *Apprendi* to capital cases, this court finds that *Schiro*, by implication, applies

to make the rule announced in *Apprendi* prospective only.[34]

---

involves a three-step process. First, the court must determine when the defendant's conviction became final.  Second, it must ascertain the legal landscape as it then existed,, and ask whether the Constitution, as interpreted by the precedent then existing, compels the rule.  That is, the court must decide whether the rule is actually "new."  Finally, if the rule is new, the court must consider whether it falls within either of the two exceptions to nonretroactivity. [Footnote]

> [Footnote].  Rules that fall within what we have referred to as *Teague*'s first exception are more accurately characterized as substantive rules not subject to *Teague*'s bar.

. . .

> *Teague*'s bar on retroactive application of new rules of constitutional criminal procedure has two exceptions.  First, the bar does not apply to rules forbidding punishment of certain primary conduct or to rules prohibiting a certain category of punishment for a class of defendants because of their status or offense. [Footnote]  . . .  The second exception is for watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.

> > [Footnote].  As noted above, these rules are more properly viewed as substantive and therefore not subject to *Teague*'s bar.

*Beard v. Banks*, 542 U.S. 406, 411, 416-417 (2004)(internal citations and quotations omitted).

[34]Burgess declares that in the event this court determines his claim is procedurally defaulted, then *Walton v. Arizona*, 497 U.S. 639 (1990), should be applied.  (Doc. 29 at 46.) However, Burgess's argument in support of this assertion is nonsensical.

Burgess's conviction and sentence became final on direct review on April 5, 1999. *See Burgess v. Alabama*, 526 U.S. 1052 (1999). Therefore, the rules announced in *Apprendi* and *Ring* do not apply retroactively. Burgess's claims are procedurally defaulted.

Nevertheless, the court notes that, under *Apprendi*, aggravating factors based on recidivism are excepted from those additional facts that must be presented to the jury. *Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.") The aggravating factors found by the sentencing court were (1) Burgess was under a sentence of imprisonment at the time he murdered the victims, and (2) Burgess was previously convicted of two counts of felony kidnapping, which the court found were felonies involving the use or threat of violence to the person. (R. Vol. 2 at 276.) These aggravating factors would not have to be "submitted to a jury, and proved beyond a reasonable doubt" under *Ring* and *Apprendi*. *See Apprendi*, 530 U.S. at 490.

Therefore, even if the new rules announced in *Ring* and *Apprendi* applied retroactively to Burgess's sentence, he would not be entitled to relief because his prior convictions were not facts that had to be found by a jury before the sentence of death could be imposed.

Based on the foregoing, this claim will be denied.

157

**K.   THE IMPOSITION OF THE DEATH SENTENCE AFTER THE JURY RETURNED A VERDICT OF LIFE WITHOUT PAROLE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND THE ALABAMA CONSTITUTION. Petitioner's Claim IV.K.  (Doc. 15 at 117-19; doc. 29 at 48-49.)**

Burgess protests the trial court's "summary dismissal" of the  jury's 8-4 recommendation of life without parole recommendation, and argues that the "trial court's override in this case, without any standards to guide its discretion, was clearly in violation of" his Eighth Amendment constitutional rights.  (Doc. 15 at 117-18 [citing *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) ("[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.")].)  Burgess contends the sentencing court's decision  –

> was not predicated on any statutory or constitutional standard.  The trial court ignored the evidence that was presented in mitigation, including the evidence that Mr. Burgess is mentally retarded and improperly relied on victim impact statements that the jury never considered. (R. 3095).  Moreover, the trial court articulated no reason for her rejection of the jury's verdict.

(*Id*. at 118-19.)

The court finds, for the reasons set forth above, that Burgess is not mentally retarded. The court also finds that the sentencing court did not ignore mitigation evidence or rely upon improper victim impact evidence or argument in its decision to override the jury's recommendation that he be sentenced to life in prison without parole.  The sentencing court explicitly articulated its reasons for overriding the jury's verdict.  It held that the jury had

heard evidence that was sympathetic to Burgess – his dysfunctional family, his abuse as a child, his mood disorder and borderline intellectual functioning, and his attempted suicide. (R. Vol. 2 at 282.)   However, the court explained that these factors were not mitigating factors.  (*Id*. at 279-81, 282.)

When the Alabama Court of Criminal Appeals examined this claim on direct review, it made the following findings of fact and conclusions of law:

> Burgess next argues that Alabama's capital murder statute is unconstitutional on its face and as applied to him because it permits judicial override of a jury's advisory verdict of life imprisonment without parole.  Burgess claims that § 13A-5-47, Ala. Code 1975, permits standardless overrides, disregards juries' roles in sentencing, and permits the arbitrary imposition of the death sentence.  Burgess did not object to the override provision at trial.
>
> Burgess's claims have been rejected by the United States Supreme Court.  *Harris v. Alabama*, 513 U.S. 504, 115 S. Ct. 1031, 130 L. Ed.2d 1004 (1995).  *See also*, *Madison v. State*, 718 So.2d 90 (Ala. Cr. App.1997); *Scott v. State*, [Ms. CR-94-763, Jan. 17, 1997] — So.2d — (Ala. Cr. App.1997) (both citing *Harris* and rejecting claims regarding judicial override).   Therefore, Burgess's arguments regarding the unconstitutionality of the statute are without support in the law.

*Burgess*, 723 So. 2d at 769.  The court went on to hold:

> In accordance with the requirements of § 13A-5-53, Ala.Code 1975, we have reviewed the record of proceedings for any error that adversely affects Burgess's rights, and we have found none.  We have also determined that the trial court properly found two aggravating circumstances:  (1) that the capital offense was committed while Burgess was under a sentence of imprisonment; and (2) that Burgess had previously been convicted of a felony involving the use or threat of violence.  The trial court found that the appellant's age was a statutory mitigating circumstance.   The trial court found the jury's recommended sentence of life imprisonment without parole and Burgess's remorse to be nonstatutory mitigating circumstances.  The court found no other

mitigating circumstances to exist.  The evidence supports the trial court's findings with regard to the aggravating and mitigating circumstances.

In accordance with § 13A-5-53(b), we have reviewed the propriety of the death sentence.  The trial court found that the aggravating factors outweighed the mitigating factors and wrote, "Killing three human beings, two of whom were children, intentionally and deliberately, when taken together with defendant's previous conviction of a felony involving threats of violence to at least one child under 14 years of age, evidences a total and complete disregard for the value of human life."  There is no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.  Our independent weighing of the aggravating and mitigating circumstances leads us to conclude that the trial court's sentence of death was the appropriate sentence in this case.  We also find that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.  *Williams v. State*, 710 So. 2d 1276 (Ala. Cr. App. 1996).

*Id* at 769-70.

In his reply brief, Burgess admits "that *Harris* held that a trial judge acting alone can impose a capital sentence, and . . . that the Constitution is not violated when the State trusts the judge to put the appropriate weight on the jury's verdict." (Doc. 29 at 48).  However, he asserts, "What *Harris* did ***not*** hold is that a judge can arbitrarily impose a death sentence." (*Id*. at 49 [emphasis in original].)  Burgess argues the imposition of death in his case was arbitrary because "there is no evidence that the trial court conducted an individualized decision." (*Id*.)

Our capital punishment doctrine is rooted in the principle that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be wantonly and freakishly imposed.  Accordingly, where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should

160

be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

This principle requires a State to channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death.

*Lewis v. Jeffers*, 497 U.S. 764, 774 (1990)(internal quotations and citations omitted).

The United States Supreme Court in *Harris* determined that Alabama's sentencing scheme – its procedural mechanism – adequately channeled the sentencer's discretion. It went on to hold:

"Our responsibility, however, is not to second-guess the deference accorded the jury's recommendation in a particular case, but to ensure that the result of the process is not arbitrary or discriminatory." [*Spaziano v. Florida* 468 U.S. 447,] 465 [(1984)]. We thus made clear that . . . the hallmark of the analysis is not the particular weight a State chooses to place upon the jury's advice, but whether the scheme adequately channels the sentencer's discretion so as to prevent arbitrary results.

*Harris*, 513 U.S. at 511. Nothing in *Harris* requires an Alabama trial court to state its reasons for rejecting a jury's sentencing recommendation. However, in this case, the sentencing court stated the weight it gave the jury's recommendation and why it did not consider that recommendation to be dispositive.

The sentencing scheme under which Burgess was sentenced is constitutionally sound. Moreover, as already set out in this Memorandum Opinion, the trial court properly utilized Alabama's sentencing scheme and clearly explained the sentencing decision, including the reasons for not following the jury's recommendation. Burgess's claim that the sentencing court acted arbitrarily is not supported by the record.

Also Burgess contends that Alabama's sentencing statute "violates equal protection because it allowed race and gender factors to play a part in the judges' sentencing decision while at the same time placing those factors beyond the reach of meaningful review." (Doc. 15 at 117.)  This claim was not raised in state court and, thus, is procedurally defaulted.  The court finds that, even if this claim was not defaulted, it would be dismissed because it is too vague, general and conclusory to satisfy the specificity requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts*.

For these reasons, the court will deny this claim for relief.

## L.   THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS TO DUE PROCESS AND EQUAL PROTECTION BY FAILING TO CONDUCT A HEARING PURSUANT TO *BATSON v. KENTUCKY*. Petitioner's Claim IV.L. (Doc. 15 at 119-22; doc. 29 at 49-51.)

There is no need to the recite the allegations underlying this habeas claim because they are adequately described in the Alabama Court of Criminal Appeals' rejection of it on the merits:

> Burgess argues that the trial court erred when it failed to conduct a hearing pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).   He argues that he established a prima facie case of discrimination and that the State should have been required to proffer the reasons for its peremptory challenges of blacks.
>
> After the parties struck the jury, defense counsel objected to the State's exercising 5 of its 19 strikes against black veniremembers.  After listing the black veniremembers struck by the State, defense counsel stated, "[W]e would like to pose an objection to the State striking those because we feel the State does not have a race neutral reason for striking those jurors."  The prosecutor responded that defense counsel failed to make out a prima facie case of racial discrimination, and the trial court agreed.  Defense counsel reiterated that it

appeared to him that the strikes were based solely on race.  After noting that 60% of the original panel was comprised of black veniremembers and that the jury had 1 white juror and 11 black jurors, the trial court again overruled the motion.

> "In *Batson v. Kentucky*, 476 U.S. 79, 106 S. CT. 1712, 90 L ED.2d 69 (1986), the United States Supreme Court set out the components of a prima facie case of racial discrimination in jury selection. In addition to showing that the State used peremptory challenges to remove members of a cognizable group to which he belongs and relying upon the fact that peremptory strikes permit discrimination, a claimant also must show that these facts and any other relevant facts raise an inference that the prosecutor used his strikes in a discriminatory manner.  In *Ex parte Branch*, 526 So.2d 609, 622- 623 (Ala. 1987), the Alabama Supreme Court explained that relevant factors could include, but were not limited to, the following: evidence that the jurors shared only the characteristic of their group membership and were heterogeneous in all other respects; a pattern of strikes against black jurors; past conduct of the prosecutor; type and manner of the prosecutor's questions during voir dire, including desultory voir dire; type and manner of questions to the challenged juror, including a lack of questions or meaningful questions; disparate treatment of veniremembers with the same characteristics or type of responses; disparate examination of members of the venire; circumstantial evidence of intent due to the use of most challenges to strike blacks; and the use of peremptory challenges to dismiss all or most black jurors."

*Madison v. State*, 718 So.2d 90, 101- 02 (Ala. Cr. App. 1997).

Burgess offered no evidence to show that the struck jurors shared only the characteristic of race or that the prosecutor exercised his strikes in a discriminatory manner, "particularly in light of the increased percentage of blacks who served on the jury relative to ... the initial panel...."  *Madison, supra*.

Burgess has not offered evidence to show that there was a lack of meaningful voir dire directed at black veniremembers, or that black and white veniremembers were treated differently.  Nor did Burgess offer evidence that

the prosecutor had a history of using peremptory challenges in a manner that discriminated against black veniremembers. Burgess noted only that the State used several of its strikes to remove blacks from the venire. "Without more, we do not find that the number of strikes this prosecutor used to remove [blacks] from the venire is sufficient to establish a prima facie case of racial discrimination." *Ex parte Trawick*, 698 So.2d at 168. "We will not reverse a trial court's *Batson* ruling unless it is clearly erroneous. Great deference should be accorded to a trial court's *Batson* ruling." *Davis v. State*, 718 So.2d 1148, 1158 (Ala. Cr .App. 1997) (citations omitted). The trial court's denial of Burgess's *Batson* motion was not clearly erroneous.

*Burgess*, 723 So. 2d at 762-63.

Burgess contends that the state appellate court's rejection of this claim is contrary to and an unreasonable application of clearly established federal law and an unreasonable determination of the facts in light of the evidence before it. (Doc. 15 at 122.) His argument is twofold. Initially, he asserts that "defense counsel had established a prima facie case showing that African-Americans had been struck from the jury, and that those strikes were unsupported by any possible reason other than race."[35] (*Id.* at 120.) However, Burgess makes

---

[35] At trial, the following occurred regarding defendant's *Batson* motion:

[Defense Counsel]: . . . At this time, the Defense would like to pose an objection against the State citing the Batson case as precedent, and we would like to object to the State striking . . . No. 114, a black female; also . . . a black female, No. 183; and No. 206, . . . a black female; and . . . No. 19, a black female; and . . .No. 330 – well, I don't know, he is an alternate juror so I guess for the purposes of Batson, we still need to challenge him – No. 330, . . . a black male[. W]e would like to pose an objection to the State striking those because we feel the State does not have a race neutral reason for striking those jurors.

THE COURT: Anything else? You want to respond?

[Prosecutor]:  I just want to say something.  He has failed to establish a prima facie case, grossly failed to show one.

THE COURT:  That is sustained.

[Defense Counsel]:  Can I have an opportunity before you rule?

THE COURT:  Sure.

[Defense Counsel]:  If I may begin with . . . No. [114].  Your Honor, [based on] the notes I have from [No. 114], I did not see a reason, any reason, why the State would not have chosen her as a juror in this case . . . except for race.  I don't know of any responses that this juror made that would pose a reason, and I'm looking at my detailed notes.  She was very vocal through the trial, but I don't see any reasons why they would have stricken her other than because of race.  . . .

. . .

[Defense Counsel]:  Judge, also on Juror No. 183 . . . there are no reasons that I can see besides a race strike by the State that is listed in here.  I would cite also with Juror . . . 206, she spoke very little during voir dire and gave no reasons why she could not be a fair and impartial juror in the case and [Juror No.] 19, also gave no criteria reason to be stricken, other than for a race strike, and then, of course. [Juror No.] 330.  [Juror No. 330] also gave no reason that the State would have to strike that juror except . . . based upon his race.  And . . . we have shown to the Court that there are no . . . reasons why the State should have stricken these [jurors] except for on the basis of race.

THE COURT:  I believe we have a jury with eleven blacks on it and one white.

[Defense Counsel]:  That is correct.

THE COURT:  And sixty percent of the jury panel was black.

[Prosecutor]:  And that is over ninety percent.

no effort to point out with any factual detail **why** the strikes were unsupportable by any reason other than race; he simply argues that they were.  (*See* doc. 29 at 121.)   Also, Burgess complains that the "[t]he trial court declined to find a prima facie case of discrimination, and erroneously denied the defense request for a hearing on the issue, relying on the jury composition and fact that the jury panel was '60% African-American.'" (Doc. 15 at 120 [quoting R. Vol. 6 at 486-90].)  He believes this is an unreasonable application of *Batson* because the state court "place[d] particular emphasis on the fact that the jury was comprised of eleven black jurors and one white juror" when "[t]he United States Supreme Court has made it clear that the ultimate makeup of the jury is irrelevant to the question of whether a violation under *Batson* has occurred."   (Doc. 29 at 50-51.)   He contends the state court erroneously "presume[d] that the racial makeup of a jury is relevant to the question of whether to hold a *Batson* hearing[,]" when "[i]t is not."  (*Id.* at 51.)  However, contrary to Burgess's assertion, the racial composition of the jury is relevant to the establishment of a prima case of discrimination.

The Supreme Court has held "that a prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'"  *Johnson v. California*, 545 U.S. 162, 169-70 (2005); *see also Batson*, 476 U.S. at 96.  That "discriminatory purpose" is "to exclude the

_____

THE COURT:  Yeah, I'm going to overrule the motion.

(R. Vol. 6 at 486-90.)

veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96.  The Eleventh

Circuit has held:

> In order to determine whether a *Batson* objector . . . has established a prima facie case of discrimination, courts must consider ***all*** relevant circumstances.  This Court has cautioned that the mere fact of striking a juror or a set of jurors of a particular race does not necessarily create an inference of racial discrimination.  While statistical evidence may support an inference of discrimination, it can do so only when placed in context.  For example, the number of persons struck takes on meaning only when coupled with other information such as the ***racial composition of the venire***, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck.

> In determining whether the totality of the circumstances shows a "pattern" that creates an inference of discrimination, this Court has considered a number of factors.  First, ***whether members of the relevant racial or ethnic group served unchallenged on the jury***.

> Similarly, we have considered whether the striker struck all of the relevant racial or ethnic group from the venire, or at least as many as the striker had strikes.

> Second, we have considered ***whether there is a substantial disparity between the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire***.  For example, in [*Central Alabama Fair Housing Center v.*] *Lowder*[, 236 F.3d 629, 637 (11th Cir. 2000)], we concluded that there was no prima facie case of discrimination where the plaintiffs used both of their peremptory strikes against white jurors.  In so holding, we stated that there was no significant disparity between the plaintiffs' 100% rate of challenging white jurors and the 80% representation of white jurors on the venire.  On the other hand, in [*United States v.*] *Stewart*[, 65 F.3d 918, 925 (11th Cir. 1995)], we upheld a finding of a prima facie case based in part on the fact that, in exercising three peremptory challenges against black jurors, the defense struck 75% of black venire members.

> Third, this Court has considered ***whether there is a substantial disparity between the percentage of jurors of one race or ethnicity struck and the percentage of their representation on the jury***.

*United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044 (11th Cir. 2005)(emphasis in original, internal citations, quotations, and footnote omitted; emphasis added).

In this case, the percentage of African-Americans sitting on the jury – over 90% – was substantially greater than the percentage of African-Americans in the panel – 60%. The State used seven of its nineteen peremptory strikes against African-Americans – using its first eight strikes against white venire persons before using its ninth strike against an African-American. Clearly, these facts do not support an inference of discrimination against African-Americans. The trial court's consideration of the racial composition of the jury to determine if defendant established a prima facie *Batson* violation, under these circumstances, is neither contrary to nor an unreasonable application of Supreme Court precedent.

At trial, Burgess's counsel complained that he could not determine any race-neutral reason for the State's striking five African-Americans. However, defense counsel's inability to determine why the State struck a juror does not demonstrate a prima facie case of discrimination. Indeed, the Eleventh Circuit has held that "the fact that the [stricken] jurors did not (from the perspective of the defendants) say anything during voir dire that would justify striking them hardly establishes a *prima facie* case." *Central Alabama Fair Housing Center, Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 638 (11th Cir. 2000).

Burgess has not demonstrated that the state court's resolution of his *Batson* challenge was either contrary to, or an unreasonable application of, clearly established federal law, nor

has he shown that the state court's decision was an unreasonable determination of the facts in light of the evidence before it.

Based on the foregoing, this claim is due to be denied.

## VI. **CONCLUSION**

All claims in Burgess's Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody under Death Sentence, (doc. 15), are due to be denied.  An Order consistent with this Memorandum Opinion, dismissing Burgess's Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody under Death Sentence, (doc. 15), will be entered contemporaneously herewith.

**DONE**, this 31st day of March, 2011.


*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE